Pages 1 - 72

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

YOUNG AMERICA'S FOUNDATION, a )
Tennessee nonprofit )
corporation; and BERKELEY )
COLLEGE REPUBLICANS, a student )
organization at the University )
of California, Berkeley, )
 )
        Plaintiffs, )
 )
  VS. )     **NO. C 17-02255 MMC**
 )
JANET NAPOLITANO in her )
official capacity as President )
of the University of )
California; et al., )
 )
        Defendants. )
_____)

              San Francisco, California
              Friday, September 29, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:
              DHILLON LAW GROUP LLP
              177 Post Street - Suite 700
              San Francisco, California  94108
      **BY:  HARMEET K. DHILLON, ATTORNEY AT LAW**
           **GREGORY MICHAEL, ATTORNEY AT LAW**


     **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For the Defendants:
                             MUNGER, TOLLES & OLSON LLP
3                            560 Mission Street - 27th Floor
                             San Francisco, California  94105
4                   BY:  **BRYAN H. HECKENLIVELY, ATTORNEY AT LAW**
                         **JESLYN A. EVERITT, ATTORNEY AT LAW**
5                        **ELIZABETH A. KIM, ATTORNEY AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Friday - September 29, 2017**</u>                              <u>**10:53 a.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling Civil Case Number 17-2255, Young
America's Foundation versus Janet Napolitano.

Will counsel please step forward and state your
appearances for the record.

**MS. DHILLON:**  Good morning, Your Honor.  Harmeet
Dhillon representing the plaintiffs Young America's Foundation
and Berkeley College Republicans.

**THE COURT:**  Thank you.

**MR. MICHAEL:**  Gregg Michael for the plaintiffs.

**THE COURT:**  Mr. Michael.  Thank you.

**MR. HECKENLIVELY:**  Good morning, Your Honor.
Bryan Heckenlively from Munger, Tolles & Olson for defendants.

**THE COURT:**  Good morning.

**MS. EVERITT:**  Good morning, Your Honor.  Jeslyn
Everitt with Munger, Tolles & Olson for the defendants.

**THE COURT:**  Okay.  Good morning.

**MS. KIM:**  Good morning, Your Honor.  Liz Kim from
Munger, Tolles & Olson for the defendants.

**THE COURT:**  Thank you.

Well, okay.  All right.  I have the defendants' motion to
dismiss, and even if you weren't last on the calendar, I
probably would have saved you till last because there are a

1   number of things to talk about here.  And I actually didn't

2   think the Karuk Tribe was going to take quite as long as it did

3   but, in any event.

4        All right.  I'm not quite sure where to start.  I guess I

5   would say that an important starting point would be a

6   resolution of what kind of a forum we're dealing with here.

7        The motion is primarily dependent on the Court finding

8   this to be a particular type of forum.  And I almost hesitate

9   to use the words "limited public forum" because it sounds like,

10  as I've been reading the cases on the subject, that the term

11  has been used in different ways over the course of the time

12  that these First Amendment cases have been decided, and I think

13  that can cause some confusion.

14       I want to get our terminology straight, and then we can

15  talk about your respective positions concerning the type of

16  forum we have.  I also want to make sure that everybody's in

17  accord that if it's one kind of forum, then a particular

18  showing has to be made; if it's another kind of forum, a

19  different showing has to be made, just so that we can get a

20  little bit of a framework.  I may not be able to decide those

21  issues right here with you or I may not do it, I'm not sure,

22  but at least we get an idea of where this discussion can go

23  framed up by what kind of forum we're dealing with.

24       There are a number of other issues that include things

25  like mootness and I guess other points that are raised,

1  although some of them, such as equal protection, I think are

2  just joined at the hip, essentially, with First Amendment as an

3  analysis.

4      So let's get our terminology straight.  All right.  The

5  plaintiff is asking the Court to find that we are dealing with

6  a designated public forum; is that correct, Ms. Dhillon?

7          **MS. DHILLON:**  Yes, Your Honor, that's correct.

8          **THE COURT:**  Very good.

9      And from the defendants' standpoint, what is -- how do you

10 want to characterize by a title the forum that you say we're

11 dealing with here?

12         **MR. HECKENLIVELY:**  It's a limited public forum,

13 Your Honor.

14         **THE COURT:**  Limited public forum.

15     Now, I see just a little bit of a problem with some of the

16 authority that was given.  I read so many Supreme Court cases,

17 and really at a certain point I decided you couldn't reconcile

18 them.  Then I thought about maybe you can if you start looking

19 at the terminology that the courts use to describe various

20 situations that were raised in those cases.

21     For example, in *Perry*, which is a case that, without

22 putting a label on it other than a third category, determined

23 that, for example, a school could exclude certain categories of

24 people or content and, thus, limit themselves in a certain way

25 so that you would be applying a different test than if they

1    were just a public forum, either traditional or designated.

2        In that case -- and I think it's *Perry*.  I want to

3    double-check.  After awhile they all start blurring -- a

4    plaintiff had argued that this should be considered a limited

5    public forum.  And I looked and I said "Wait a minute," because

6    they were using acronyms.  And I said, "Wait.  Which acronym?

7    Is this the defendant?"  No, it was the plaintiff.  And the

8    Court said, "Oh, no, this is not a limited public forum."  In a

9    sense they were saying it's nonpublic.

10       Other courts, then, have used the term "limited public

11   forum" and it's not always clear what they mean it to be.  So,

12   for example, the defendant has relied on -- or the defendants

13   have relied on various footnotes in cases.  I found one case

14   with a footnote that simply cited to another footnote; and by

15   the time I got through with all that and what they meant by

16   their parentheticals in various footnotes, I wasn't sure that

17   when some of those courts were calling *Widmar*, for example, a

18   limited public forum case, that they really meant it in the

19   sense that the defendants are using it now as opposed to how

20   the plaintiffs used it in *Perry*.

21       Okay.  Also, we have a case that makes a very clear

22   statement -- again all Supreme Court.  I'll just get that for a

23   minute in front of me -- *Arkansas*, a very clear case for

24   putting *Widmar*, which arguably is similar to what the plaintiff

25   is saying our case is, whether they proved that enough -- or

1  pled it enough in their complaint, we can talk about, but it's

2  plaintiffs' theory this is *Widmar*.

3      Okay.  And this is what the Supreme Court said in *Arkansas*

4  *Educational Television Commission*.  Okay.  And let's see, I'll

5  give you a hint as to where I am.  679 but getting close to

6  680.  Okay, quote (reading):

7          "On one hand, the Government creates a designated

8      public forum when it makes its property generally

9      available to a certain class of speakers, as the

10     University made its facilities generally available to

11     students in *Widmar*."

12     That is a pretty strong statement that *Widmar* is a

13 designated public forum case.  When some courts have used the

14 phrase "limited public forum" to describe *Widmar*, I'm not so

15 sure they aren't using it in the way that the plaintiffs tried

16 to use it in *Perry*; but I couldn't really and, frankly, I

17 didn't have quite enough time to try and trace the chronology

18 in that way, but *Arkansas* is making a very definite statement

19 here.

20     So if the defendants' position is that if you keep some

21 groups out and let other groups in, that you're always going to

22 have a limited public forum, I'm not sure that that quite works

23 in light of *Widmar* and in light of how *Arkansas* has

24 characterized *Widmar*, but I'm happy to hear from you about

25 that.

I tried to pull all those cases you cited, even the Fifth Circuit case that had their one-liner.  Most of the time it was a parenthetical "limited public forum" in parentheses after "*Widmar*," but we'll talk about that.

So I'm thinking in the first instance if the plaintiff could show that this is the kind of situation where one class of people -- I guess, students in this instance; however, registered student organizations are given free reign, essentially, on content -- whether, then, at least as to that class, they are a designated public forum.  We can talk about that.

I've looked over the regulations that have been attached that set forth the rules for using facilities if you are a registered campus organization or whether you're just kind of an invitee of a campus organization.  There are distinctions in that respect.

Can you have -- you've got two different plaintiffs here.  One is registered campus, the other is not.  Could the same action be taken by the University as to one of those plaintiffs in the capacity of a limited public forum and then the other as a designated?

You don't need your first plaintiff, the noncampus group, really but you have them.  If they were the only plaintiff and you looked at the regulations about how that particular class of organizations is treated, there are all kinds of statements

1   in the regulations about whether you're going to get to be

2   approved for a facility, including, I think, just kind of an

3   overarching statement about being the kind of organization they

4   like, but I have to look at it for a minute to see.  Let me see

5   if I can find those.

6        We don't have that as a case at the moment purely set out,

7   but -- and nobody's distinguishing between your two plaintiffs.

8   So we have, quote/unquote, "recognized campus organizations"

9   and then we have -- wait a minute -- the other group, which is,

10  quote, "non-University organizations upon invitation," close

11  quote.  And it says that they can use the facilities -- I'm

12  going to quote this, just a couple of these provisos --

13  "provided, one, the use must confer a benefit to the

14  University."  That seems pretty judgmental and selective.

15  Let's see, that may be the one that is arguably the least

16  ministerial.

17       Okay.  If you just have a bunch of distinguishing

18  features, like "Be sure you make a reservation, nobody's

19  conflicting with the room," those kinds of things might be put

20  in a ministerial box and they may not count to make you

21  selective.

22       Okay.  But for one of the plaintiffs, they may be -- if

23  they tried alone, somebody could argue, "Hey, as far as you're

24  concerned, we're designated.  We are very selective about

25  people like you."

1      Now, I'm not sure you can have it for two different

2   purposes; but, anyway, I just thought I'd bring that up so

3   everybody could think about it even though it isn't part of our

4   case exactly at the moment because nobody's distinguishing

5   between the two plaintiffs and saying, "Okay.  You can have

6   this claim but not you."  So that was one of the questions, can

7   the same forum have different character depending on who wants

8   to come speak there.

9      And, let's see, I might just ask sort of an easy question

10  just to start, then we can get into the forum idea.  One of

11  the -- and I am jumping around, but one of the arguments being

12  made -- well, maybe we should do mootness.  Do you want to do

13  mootness first, or do you want to do the substance of the

14  claims under the various tests first?  Which do you want to do?

15  I give you the burden -- the benefit rather.

16      **MR. HECKENLIVELY:**  The defendants will defer to your

17  preference on that, Your Honor, but we're prepared to address

18  the mootness first, and that could make sense logically at the

19  same time if you ask some questions about the merits, then I'm

20  also happy to address those.

21      **THE COURT:**  I just jumped around a bit but, you know,

22  you had to wait so I'll say whichever one you want to do first

23  if you had a consensus on it.

24      On mootness, I was reasonably persuaded by the state of

25  affairs that currently exists.  They apparently can't put a

1    permanent policy into place at the moment until -- what? --

2    they go through some kind of procedural steps, but they really

3    seem to be trying to get away from whatever the complaint was

4    about the initial policy, which there's no question whether

5    they had a policy.

6        Okay.  There's kind of a one-liner, you know, in the

7    motion that they don't concede they had a policy; and then they

8    say, "But if we did, we don't have it anymore because we have

9    this new policy."

10       The plaintiff can only plead a little bit as to the policy

11   because they don't have a lot of information about it.  So

12   it's, like, described as when the policy was apparently

13   enacted, I think was a phrase used in the complaint, or adopted

14   apparently.

15       Anyway, if it's simply an argument that they haven't

16   cleaned it up enough, I would say that it's enough different

17   that I would want a different, you know, amended complaint,

18   another shot at it separate from the arguments that are being

19   made about the unwritten one.

20       If the argument is they really haven't changed their

21   stripes and they're just going to go back and do it as soon as

22   nobody's looking at them, I don't know, it seemed like they've

23   gone quite a ways to try and avoid the problem.

24       It's certainly very detailed compared to whatever you know

25   about the other one, and they're trying to take content out and

1    not charge the groups themselves.  They'll decide how much, you

2    know, this is going to cost but they won't do it based on

3    content.

4        I don't know.  Feel free to address it, but I'm reasonably

5    persuaded that it's new.  Whether it's good enough and you want

6    to argue that it's still bad, I would want to see a new

7    complaint that says, "Here's the policy.  Here's what's wrong

8    with that one."

9        Okay.

10       **MS. DHILLON:**  If I may, Your Honor, I'll address that

11   issue of mootness, and thank you for giving us some guidance on

12   your thinking here.

13       It is the plaintiffs' position that this policy is not

14   changed.  It is effectively the same policy with a couple of

15   tweaks to make it look more attractive to the Court and to the

16   media, frankly, which was the first target for this policy.

17       And what we've since learned since filing this complaint

18   is that we have learned more details about the unwritten

19   high-profile speakers policy.  Chancellor Christ has actually

20   said two weeks ago to the *L.A. Times* that the University has

21   been imposing this unwritten policy for two decades plus on

22   speakers who they don't like.  They ask them to go speak on the

23   edge of campus.  I have an *L.A. Times* article on that, so --

24       **THE COURT:**  Well, I don't know.  That, I don't know

25   that I can consider as a fact.  I mean, you might be able to be

1   able to plead something --

2          **MS. DHILLON:**  It's some color, Your Honor.

3          **THE COURT:**  -- as something out of the newspaper; but

4   I would just be shocked if anybody in a position from

5   Mr. Mogelof, who is on TV all the time, all the way up the

6   chain were to actually tell anybody that they were, in fact,

7   discriminating based on who they don't like.

8          **MS. DHILLON:**  And yet she did that, so I have it in

9   writing; and if we are required to amend the complaint, it's

10  going to be referenced in the complaint.

11         **THE COURT:**  Good.  That would be very interesting.  I

12  would like to see that.

13         **MS. DHILLON:**  It was shocking to me, but that is what

14  the University is now saying.  And they're also saying their

15  lawyers are telling them that's illegal, so there are a number

16  of admissions that have come out since the beginning of this

17  case.

18     But with regard to the changes in the policy, we have a

19  current policy and the current policy is actually the second

20  version.  So there was an interim policy referenced in

21  Mr. Heckenlively's declaration and then there has been a

22  subsequent one issued, and the subsequent one is as defective

23  as the unwritten high-profile speakers policy.

24     I will say there is one improvement between the two.

25  Let's say there's 10 or 12 defects in it.  The current policy

1   no longer imposes an unconstitutional curfew on speech based on

2   its content.   Okay.   So I will concede that there's no longer a

3   3:00 p.m. or a 3:30 p.m. curfew for conservative speech in this

4   policy.   However, this policy actually decreases the clarity in

5   some ways.   This interim policy originally excluded --

6   included, let's say, professors or departmental users who

7   invited speakers.   They were covered by the interim policy that

8   was referenced by the defendants.

9        The current version of the policy excludes invitees who

10   are professors or other departmental users.   So it's only

11   student groups who are subject to the current policy.   That's

12   one change that's happened over the summer.

13        The University reserves huge discretion that violates

14   constitutional norms with respect to classification of whether

15   a speaker is a high-profile -- is a major event or not.   So in

16   our view, and we argued in our brief, it's, you know, putting

17   lipstick on a pig to change the policy from being high-profile

18   speaker to major event, which is in the sole discretion of the

19   University based on seven factors that are extremely vague.

20        And I will add that the University keeps changing its

21   policy.   Just last night one of my student clients texted me a

22   new pronouncement from Chancellor Christ, which said, "In the

23   light of all the troubling incidents that we've had and speech

24   issues, we are going to constitute a commission of

25   stakeholders.   The stakeholders will exchange views.   There

1   will be notice and comment, and then there will be a new

2   policy."

3       And it can't be the law that the University of California

4   Berkeley can keep moving the goalposts and thereby evade

5   constitutional review of its unconstitutional policy.

6       **THE COURT:**  Okay.  Let me ask you just a preliminary

7   question.  That's all very interesting.

8       Is the policy that you were just describing something that

9   happened after whatever I was given?  In other words, I've got

10  a policy that's exhibit -- was it A?  Hang on.  I was sort of

11  keeping these together.  I guess Ellen Topp has a declaration

12  and there's a policy that's attached to that.

13      **MR. HECKENLIVELY:**  I can speak to that, Your Honor,

14  and I am sure Ms. Dhillon will correct me if I'm mistaken what

15  she's intended to say.

16      There was an interim policy -- a version of the interim

17  policy that was released for public comment by Berkeley College

18  Republicans and other groups in July.  That's the version

19  that's attached to Ms. Dhillon's declaration.

20      As a result of that one-month public comment period, an

21  updated version of the policy was released in August, and

22  that's the version that was adopted as the interim policy.

23  That's the version that's attached to Ellen Topp's declaration.

24          **THE COURT:**  Okay.  That's the most recent written one?

25          **MR. HECKENLIVELY:**  Yes, Your Honor.

1      **THE COURT:**  Okay.  You know, one of the things you

2  said, Ms. Dhillon, is kind of interesting to me trying to read

3  these cases.  If you start out as a -- let's just say -- this

4  is hypothetical.  It's not Berkeley *per se* in any way.  Let's

5  just say you've got a public forum and along the way you say,

6  "You know, I'd just like to restrict that."

7      Let's just go off the record for a minute.

8                    (Discussion held off the record.)

9      **THE COURT:**  Back on the record.

10     Anyhow, so, okay, so let's just say you've got a public

11  forum and you say, "You know, I think I'd like to sort of make

12  it more exclusive, and let's just have a policy that says, you

13  know, you can talk about this and you can talk about that, but

14  you can't talk about such and such."  Okay.  Can you do that at

15  some point?  You know, just change your mind.

16     **MS. DHILLON:**  I suppose the University could, and then

17  we'd have to litigate that and whether that was retaliation

18  under the First Amendment for a particular speaker's type of

19  speech; but that's not this case, so --

20     **THE COURT:**  Well, I'm just wondering because they

21  start out and, let's say, arguably they're open -- you know,

22  just from your argument's sake, okay? -- they're open.  It's --

23  well, I don't want to use that term.  There's also "limited

24  open."  We don't want to get into establishment clause,

25  anti-whatever act.  Anyway, okay.

1       Okay.  So let's say you have just a public forum and then
2    you decide here that things didn't go too well with
3    Mr. Yiannopoulos, so maybe we ought to have a policy and let's
4    say you spell it out quite well.  And you say, "We're going to
5    have a policy that if you are someone who is likely to attract
6    heavy media attention" -- maybe I shouldn't even do that
7    because then we'll have to talk about whether you can do that
8    at all.

9       Well, let's just do that.  Okay.  "So we're going to have
10   a policy if you're likely to attract heavy media attention,
11   because you have in the past, we're going to have certain rules
12   about when you can speak and where."

13      Okay.  Can you do something like that?

14          MS. DHILLON:  That is their policy and I believe it's
15   unconstitutional.

16          THE COURT:  Just no matter when they did it?

17          MS. DHILLON:  Well, I mean, that's their current
18   policy, and their policy is clearly in the context of this
19   lawsuit and it clearly is in response to conservative speakers
20   speaking on campus and Antifa creating violent conditions on
21   the campus.

22          THE COURT:  Well, then we get into another thing
23   because we don't have a test at the moment.  Well, we have a
24   little bit of a test case from the old policy because you have
25   it enacted at some point earlier in the month than the former

1  President from Mexico spoke and the Obama cabinet member, and

2  they apparently, according to what you pleaded, didn't have any

3  restrictions; correct?

4          **MS. DHILLON:**  Correct.

5          **THE COURT:**  So if that's true, there's a little bit of

6  a test of what the high-profile meant.  "High-profile" is

7  actually a defined word in the dictionary.  It isn't like you

8  couldn't get a definition.  It essentially means attracting

9  media attention, you know.  So you have a high-profile person,

10  anybody who's been in the news a lot.

11      But if they're going to say "high-profile" means

12  attracting attention of an undesirable sort, then you get your

13  heckler's veto and things like that.  I was trying to come up

14  with something else.

15      You know, *Widmar* -- there's so many cases involving

16  religion, which gets on such a touchy subject, that every time

17  somebody says you can't talk about religion or you have to talk

18  about religion, or whatever, something goes -- you know, they

19  then segue into establishment clause, and the whole thing gets

20  confused in terms of a nice, clean discussion.

21      Can we think of a topic that isn't so loaded just for an

22  example?  Can you come up with something?  I don't know.  Maybe

23  you say you can talk about anything except travel.  Okay.  "We

24  don't want anybody coming in here talking about travel and

25  promoting certain kinds of trips, and things like that."  Okay.

1   Maybe nobody will complain.  I don't know.

2       All right.  So then you say that, and up to that point you

3   had no restrictions content based about anybody talking about

4   anything.  All of a sudden you say, "You know, it didn't work

5   out too well.  What happens is they come in and they sort of

6   turn into little travel agents and it's not working.  Even when

7   they purport not to be formal travel agents, they're really

8   looking to drum up people to come with them and they're going

9   to charge them.  We don't want to have people do that."

10      Could you suddenly pick some kind of topic and start

11  making yourself limited?

12       **MS. DHILLON:**  I mean, I suppose you could in some

13  circumstances.  I believe you referenced, Your Honor, the *Perry*

14  case, and the *Perry* case is one where the court -- even though

15  there's some *dicta* that you quoted, actually the conclusion is

16  that it's a nonpublic forum and in that nonpublic forum, even

17  though it's at an institution where a number of people are

18  allowed to use it, only the union, the approved union, was

19  allowed to communicate through that forum and other people

20  weren't.  So if the other union wanted to talk about different

21  terms and conditions of employment, they were barred from doing

22  that through that forum.

23       **THE COURT:**  Now, we know that you can't just do it on

24  a spur of the moment; in other words, you can't turn yourself

25  into a limited forum of the current definition by just saying,

 1   "All right.  We're not letting you speak and now we're

 2   limited."  You have to have done it somewhere in advance in

 3   some fashion so that you've got that as an in place.

 4        And then if you weren't one of the excluded groups, I

 5   don't know if they can exclude you.  It sounded like what I was

 6   reading in the cases is you say who can speak; and if you're

 7   part of that, you can't suddenly -- if you haven't been

 8   excluded, you can't, at least under that policy, start

 9   excluding somebody now.  Then how do you get the policy if you

10   want to exclude this extra category?

11        And that's what I was just wondering.  And as you say,

12   you've got this kind of moving target here.

13             MS. DHILLON:  That's right.

14             THE COURT:  And I was just wondering.  I wasn't

15   thinking about it in terms so much of what you've described on

16   the mootness issue, but just more all of a sudden they came up

17   with a policy and all of a sudden they're enforcing it, could

18   you do that and in effect convert yourself into a limited

19   public forum?  But then as you say, it's kind of mushy and they

20   weren't letting -- they weren't restricting these other

21   speakers who came out after that policy.  Okay.

22             MS. DHILLON:  So if I may, Your Honor, address that.

23   To be fair to the University, they have repeatedly, including

24   last night's statement from Chancellor Christ, taken the

25   position that they do not intend to shut off the University

1    from any particular viewpoint or speaker, category, and they

2    want -- in fact, they spent, I think, a huge amount of money

3    and effort, from what I can tell, in public relations to try to

4    manage the disaster that occurred after this lawsuit.

5           **THE COURT:**  No content-based discrimination or if you

6    want to make it less pejorative, selection.

7           **MS. DHILLON:**  Yes.  I believe they've actually used

8    the term in yesterday's comment "viewpoint-based

9    discrimination."  So these terms have been used

10   interchangeably, which is part of the confusion.

11          **THE COURT:**  That's another problem.

12          **MS. DHILLON:**  It is, Your Honor.

13          **THE COURT:**  Because in the current, I guess,

14   terminology "viewpoint discrimination" is "We don't want you to

15   speak because we disagree with what you're talking about."

16   Okay.  "We disagree with your position."

17          So then -- and it's all part of content, but it's

18   extra-bad content.  So you could have somebody where you say,

19   "Okay.  We're not going to let people talk about politics."

20   Maybe you can do that.  But if you say, "We're not going to let

21   you talk about politics because we don't agree with your

22   particular political position," then you'd be in viewpoint.

23   However, under a public forum, you can't even say "We won't let

24   you talk about politics."

25          **MS. DHILLON:**  Correct.

1        **THE COURT:**  So if you get into limited public forum,

2    you can say "I don't want you to talk about politics," but you

3    have to say it early enough, I guess, so that it's your policy.

4        **MS. DHILLON:**  You could say that, but the University

5    isn't saying that right now.  And, in fact, to contribute to

6    the confusion, the papers of the University's counsel, very

7    able counsel, argue for the more limited characterization of

8    the space, but the University's own policies repeatedly

9    throughout the summer and throughout the course of this dispute

10   used the terms "time, place, and manner restriction" --

11   "reasonable time, place, and manner restriction," which is the

12   hallmark of a designated public forum or a public forum.

13       So, you know, that terminology belongs in one camp.  A

14   subset of that is viewpoint.  My position before this Court

15   today is whether it's viewpoint or whether it is the

16   traditional *Widmar* designated public forum; or even more

17   liberal analysis than that, if you look at the steps of Sproul,

18   which is even more open to the public, we win in terms of this

19   motion because it is clear that we have pled that there's

20   viewpoint discrimination, as well as content discrimination, as

21   well as unreasonable time, place, and manner restrictions.

22       **THE COURT:**  Okay.  Well, let's go back for a moment

23   then.

24       The first diversion, if you will, when you're talking

25   about designating public and limited public, would be that if

1    you are in designated public, you can't discriminate on

2    content, right, and you definitely can't discriminate on

3    viewpoint.

4        The plaintiff actually doesn't seem to be arguing -- well,

5    I don't know.  Are you arguing that they are discriminating on

6    content here or just viewpoint?

7            MS. DHILLON:  Well, I think it's both.  The content if

8    you -- and the cases are, to use your term, "mushy," they're

9    all over the place; but it is a series of conservative

10   speakers, including Ben Shapiro, who's been treated differently

11   than liberal speakers in the same time at the campus.

12           THE COURT:  That would be viewpoint in a way.

13           MS. DHILLON:  It's also viewpoint.  I think there's

14   the conservative politics and then there's some conservative

15   speakers are better than others.  There's that too.

16           THE COURT:  Yeah, well, you may be right.  Though, I

17   mean, for viewpoint, true viewpoint, you've got to show they

18   disagree with the message.

19       Okay.  For content, you do have this idea that you have a

20   kind of hybrid.  If you want to look at security for more

21   conservative speakers, you have both noncontent and content

22   kind of joined, and then you -- I'm not -- I'm not really too

23   much persuaded that you've shown that they are, as sort of a

24   personal matter, not letting either Ann Coulter or Mr. Horowitz

25   speak in the same way as they've let other people speak because

1  they personally don't hold those conservative views.

2      If that were the case, they would have never started with

3  Mr. -- can you pronounce his name once for me?  Is it

4  Yiannopoulos?  Is it --

5          **MS. DHILLON:**  I believe it's Yiannopoulos, Your Honor.

6          **THE COURT:**  Yiannopoulos.  Okay.

7      Mr. Yiannopoulos was given a great venue and a great time;

8  and before he could get to avail himself of either of those

9  benefits, they had the major riots.  But I think the fact that

10  they offered him those cuts against the argument that they

11  disagree with the speaker and, therefore, won't let them speak

12  because he was certainly very conservative and provocative and

13  they gave him full reign, and then everything went downhill and

14  we now get into this security idea.

15      But you have the heckler's veto point, and then I'm not

16  quite sure where this all comes in with the juxtaposition of

17  security.  I'm not even sure what the obligations are of the

18  University to provide security.  In other words, what's their

19  obligation to the campus?  What's their obligation to speakers?

20  They obviously feel they have one.

21      Are we just getting down to the idea of whether they were

22  too heavy-handed in their choice of a space and a choice of a

23  time and perhaps the fee, which you have also as a question,

24  which then gets down to more what other options did they have

25  which perhaps could easily be pleaded in some way if you felt

1    it was more that they were just totally out of line to do this?

2       Because I don't think anybody wants to be put at risk

3    themselves; in other words, let's say Ms. Coulter.  She

4    obviously didn't want to get attacked, so she's going to want

5    to be able to speak in a way that's reasonably safe and would

6    perhaps want the University to provide some kind of space and

7    security.

8       But what she can demand of them is an interesting question

9    and what you could perhaps plead, if you haven't already, to

10   show that no matter what kind of forum this was, this was just

11   too much.  It just wasn't reasonable under the circumstances;

12   or if you've got public forum and you're looking at strict

13   scrutiny and it wasn't narrow enough, I think you can say

14   there's a -- you know, you have a public interest here of some

15   concern -- safety -- that's probably going to get in the box of

16   okay there.

17      But, yeah, so, anyway.

18      **MS. DHILLON:**  Your Honor, *Terminiello* requires that

19   safety be provided to the extent that the University is

20   providing a forum at all.  And perhaps it is possible -- it's

21   not a question in this case yet -- perhaps it's possible for

22   the University to take a position that they don't want to

23   invite or allow outside speakers at all.

24      And I'm not taking the position in this case that

25   Ann Coulter has any standing before this court.  That's not the

1  theory of our case.  The theory of our case is that these two

2  organizations --

3      And, Your Honor, to address one comment you made earlier,

4  you made the comment that we don't really need the Young

5  America's Foundation here.  There's no circumstance under which

6  most of these events would have occurred without the funding

7  and support of that organization.  So it is necessary.

8  Frankly, this lawsuit is, you know, made possible by the fact

9  that an organization that's not limited by students graduating,

10  or what have you, is standing behind this principle, so they

11  have rights.

12      **THE COURT:**  But as a practical matter.  As a practical

13  matter but not as a legal matter because your strongest

14  argument is on behalf of the registered campus organization.

15      **MS. DHILLON:**  But they both have rights.

16      **THE COURT:**  They do but they may be more limited for

17  the other plaintiff who falls under a different category.  If

18  they were the only one bringing in the speaker, you've got

19  different regulations that apply to them that at least have

20  this kind of judgmental quality that doesn't seem to be quite

21  in line with what the rules are for registered groups.

22      But I really -- no matter what we do here, I might want

23  things cleaned up a little bit --

24      **MS. DHILLON:**  Okay.

25      **THE COURT:**  -- but I know -- I'm pretty sure you could

1    do it even if I said that.

2          But let's go back for a second to mootness.

3          **MS. DHILLON:**  Okay.

4          **THE COURT:**  Okay.  Your argument is this is still no

5    good, but it is very different -- well, you argue it's not, but

6    I think it's very different than what you had before, and

7    whether or not it's good enough isn't the issue for mootness.

8          What we have now is just whether we still have a case

9    where you want to enjoin them enforcing the unwritten policy

10   that doesn't go anywhere if they're not going to use it.  You

11   don't really, then, have, you know, a case of controversy as to

12   that policy.

13         You have a damages claim.  I want to ask you about that.

14   The damages seem to be pled primarily as a concern for chilled

15   speech in the future.  Are there any past damages here?

16         **MS. DHILLON:**  Yes.  There will be damages related to

17   the preparations that were taken for the events that were

18   canceled because of the unconstitutional application of this

19   unconstitutional policy.

20         **THE COURT:**  Because I can accept an argument that for

21   injunctive relief, if you no longer -- if the University is no

22   longer operating under the original policy that brought this

23   lawsuit, that I could see that that claim is mooted out; but

24   for damages, damages are -- they've occurred.

25         There is a case that, I think it's Fourth Circuit, that

1   the defendants may be relying on but the circumstances were

2   different there.  The only damages that were alleged in that

3   case were forward-looking damages, chilled speech in the

4   future.  That is, perhaps, a damage that's claimed here and not

5   some of the other things you've just described, but those could

6   be pleaded.

7        Just to take a real clean example, let's say someone had a

8   case where they said they challenged and sought injunctive

9   relief on a Police Department thought policy to sic dogs on

10  people for minor crimes.  Okay.  And so then they get the idea

11  maybe this is a bad policy and they change it.

12       The injunctive relief would be gone at that point; but if

13  the plaintiff says, "Hey, what about my leg?  I got permanent

14  nerve damage from the dog biting me.  That didn't go away just

15  because somebody changed the policy in the future."

16       So if we have a case where you're saying, "Okay.  Even if

17  you find that they're not going to do it anymore under the old

18  policy and even though we don't like the new one, okay, we'll

19  file our complaint about the new one, we'll amend; but how

20  about the fact we laid out all this money to get geared up and

21  then we weren't able to go forward?  That's damage that we've

22  already sustained."  But it's not pled yet, but you could plead

23  it.

24       Okay.  But I had to look at it because they did cite a

25  case and it looked kind of persuasive at first, but it

countered what I was thinking would be logical, and then I
figured out why that case was different.

       **MS. DHILLON:**  Your Honor, we haven't pled the damages
yet with specificity.  I can.  I was retained on a Thursday and
this was filed on a Monday, so it was a pretty --

       **THE COURT:**  I'm not complaining about it.

       **MS. DHILLON:**  We could.  We could fix that.

       **THE COURT:**  No, no.  I wanted to ask you whether you
had actual because if you don't have past damage, then your
damage claim would be mooted if it was only looking to say,
"Look, now in the future we're afraid to do anything.  We
can't -- there's no point in our trying to get a speaker.
You're not going to let them talk and it's going to cost too
much, and then they'll be in a bad room at a bad time."

       **MS. DHILLON:**  Your Honor, if I may address the
mootness burden with regard to injunctive and declaratory
relief.  The United States Supreme Court has characterized it
as a heavy burden, and the burden is of establishing that it
is, quote, "absolutely clear that the allegedly wrongful
behavior could not reasonably be expected to recur."

    Now, we have an example already of unconstitutional
conduct in the Ben Shapiro case that occurred after this policy
was promulgated.  He was limited in the number of people he was
allowed to have in the forum, which was arbitrary and at the
last minute and not -- importantly not consistent with the new

```
 1    policy.  The timing of the denial of half of the space, the
 2    arbitrary changing of the amount of fees being charged to the
 3    students for the event, none of that comports with this new
 4    policy.
 5          So it's our position --
 6          THE COURT:  Is that in any of our papers, though?
 7          MS. DHILLON:  Well, it just happened, so --
 8          THE COURT:  I know.  And so -- I thought actually --
 9    so he wasn't happy with how things went?  I thought he was
10    okay.
11          MS. DHILLON:  Well, he's not a lawyer arguing this
12    case regarding the constitutionality.  He was happy that he was
13    allowed to speak at all, that's fair.  Okay.  But --
14          THE COURT:  I thought he was happy.  Okay.
15          MS. DHILLON:  But was he treated the same?  He was
16    not.
17          THE COURT:  Well, it may be that even so, it's under
18    the new policy; right?
19          MS. DHILLON:  No.  We believe that the new policy is
20    the old policy with some better window dressing on it.  It has
21    numerous unconstitutional vague concepts.
22          THE COURT:  Yes, this is different.
23          Okay.  All right.  Well, that's the mootness idea.  I'm
24    trying to think if you -- if you -- the only thing we don't
25    have really nailed down, which would be nice, on the nature of
```

1   the forum, if you're going to argue that the court should test

2   what they did under the standards applicable to public fora,

3   it's not totally clear to me, even with the attachment of the

4   regulations, that whatever restrictions are placed on

5   registered groups are wholly ministerial.

6        You can argue there's kind of an inference of that from

7   the distinction in how they're treated in the regulations off

8   the non-University and the University registered, but there's

9   even another step in getting registered and that, when you look

10  at it, seems like there are some selections that are made but

11  it's unclear what they are.

12       You know, there's *Christian Legal* and *Hastings*, that case,

13  where they were -- the group wasn't registered at all and it

14  turned out that their rules incorporated -- or their policy

15  incorporated the school's regulations and rules, and one of

16  those regulations was that you couldn't discriminate based on

17  religion.

18       It looks almost like that's the same test that Berkeley

19  might be using themselves for getting groups approved.  I don't

20  know if they have that or don't have that in their own rules,

21  but then this isn't a religious speaker so it may not go

22  anywhere anyway.

23       But I'm just curious how far one can go back in looking at

24  where the selection occurs, and then moving forward how that

25  plays out.  We may just get to the same point in all of this no

1    matter where we go.

2          MS. DHILLON:  Well, you raise an interesting point,

3    Your Honor.  I don't think anybody is arguing yet that by the

4    process that the University recognizes organizations is flawed

5    yet, but Chancellor Christ has made statements in the media --

6    again, I hate to keep referring to that -- but she's recently

7    said they're looking at that, reexamining whether that's valid

8    in light of the most recent Milo Yiannopoulos drama that

9    occurred on the campus.

10         THE COURT:  Okay, yes.  He was not happy with the fact

11   that, I guess, I don't know, the line to come in got hung up.

12   I don't know if it was because somebody brought in nonbrass

13   knuckles and they started searching people or whatever; but

14   only a few people were able to get in to hear him, and I can

15   understand why he wasn't happy about that.

16         MS. DHILLON:  Yeah, and I'm not representing him or

17   that organization here.

18         THE COURT:  I understand.  Okay.

19      All right.  So let's get back then.  If -- and obviously

20   I've got to hear from the University.  Why don't we see what

21   they have to say for a minute, and I'll try and stay on topic.

22         MS. DHILLON:  Absolutely.

23         THE COURT:  But there's just so many different things

24   that this case prompted, that every two minutes I'm thinking of

25   something else and then I have to go back and look at it.  And

1    so, sorry.

2        Okay.  Hi.

3            **MR. HECKENLIVELY:**  Thank you, Your Honor.

4            **THE COURT:**  Just when you come up, be sure to state

5    your appearance once just for the assistance of the reporter.

6            **MR. HECKENLIVELY:**  Sure.  And I'm Bryan Heckenlively

7    for the defendants.

8        I'd like to try and address the issues that Your Honor

9    raised, and I may forget one or two so I hope you will ask me

10   the same questions you asked Ms. Dhillon when necessary.

11       But I want to pick up on the point that we were just

12   discussing, which is the difference between the two

13   organizations.  The University has treated this as an event

14   that was organized by the Berkeley College Republicans, which

15   is a registered student organization.  There's no dispute about

16   that whatever the standards are, and I'll represent to the

17   Court that they're content and viewpoint neutral standards.

18       There's Supreme Court case law -- including the *Hastings*

19   case that you mentioned, Your Honor -- holding that student

20   organization funds are themselves limited public forum, which

21   has a whole other layer of complication that I don't think we

22   need to get into.

23       But that's not an issue here.  There's no dispute that

24   whatever the chancellor said, that Berkeley College Republicans

25   are a registered student organization and this was their event.

1          **THE COURT:**  No.  That, I understand.

2          **MR. HECKENLIVELY:**  If this event had been organized by

3     the Young America's Foundation, the other plaintiff, without

4     the College Republicans, then a different set of standards

5     would apply and then we'd have a different case that we're

6     dealing with.

7          **THE COURT:**  Okay.

8          **MR. HECKENLIVELY:**  But the University's position has

9     been this is a College Republicans event.

10         **THE COURT:**  All right.

11         **MR. HECKENLIVELY:**  But just for the record,

12    Your Honor, the University's position is that the standards

13    distinguishing when groups, other than registered student

14    organizations, such as YAF, are permitted to use campus venues

15    are viewpoint neutral, as they should be in a limited public

16    forum, even if there is some judgment based on content.  A

17    content-based judgment is whether someone is a registered

18    student organization or not, so we're not disputing that at

19    all.

20         So let me step back, then, to mootness, and I want to get

21    back to the forum analysis after that.

22         The University's position, as I think is clear from our

23    papers, is that there's no allegation of any unconstitutional

24    conduct here by any University actor but that it's not

25    necessary for the Court to reach that issue in order to grant

1   the motion.  And that's because, as Your Honor noted, the

2   injunctive and declaratory relief claims are -- we argue that

3   they're moot because the policy is -- there's a new policy in

4   place and the complaint should be amended to challenge that

5   policy if that's, in fact, what plaintiffs want to do.

6        The retrospective declaratory relief claim is also barred

7   by the Eleventh Amendment as we say in our papers, and I think

8   that's pretty clear.

9            **THE COURT:**  The what?

10           **MR. HECKENLIVELY:**  The Eleventh Amendment -- excuse

11   me -- the declaratory relief claim goes only to retrospective

12   relief, and the Eleventh Amendment makes -- the case law

13   interpreting the Eleventh Amendment makes clear that there's no

14   claim permitted against a state actor seeking only

15   retrospective declaratory relief.  So that's an alternative

16   grounds in addition to mootness for finding that the

17   declaratory relief claim should be dismissed at this stage.

18   It's laid out in our papers.

19           **THE COURT:**  Okay.

20           **MR. HECKENLIVELY:**  And then finally on damages, which

21   I think with -- which is not covered by the mootness argument,

22   I think the University's position on that is that even if there

23   were unconstitutional conduct, which we don't think there were,

24   it's privilege by qualified immunity.

25        For reasons laid out in our papers and in the

1    Supreme Court's case law, qualified immunity protects

2    government actors who are acting in any way other than

3    incompetently or in knowing disregard of clearly established

4    law.  And there's no allegation, nor could be, that the

5    University officials were doing that here.

6         THE COURT:  Well, there's an allegation that they're

7    violating the Constitution, and there's certainly a raft of

8    case law on when people can speak and when they can't.  It

9    isn't like it's a whole new field.

10        So, I mean, you can have a qualified immunity finding

11   without finding somebody has, in fact, violated the

12   Constitution.  You could say, "Look, let's just get past

13   whether they did or they didn't.  The main thing is nobody ever

14   said this was a problem before, and so okay."

15        But ordinarily you only get to qualified immunity if

16   there's been a violation, and your argument is there's no

17   violation.  Okay.

18        MR. HECKENLIVELY:  That's certainly our argument,

19   Your Honor.

20        THE COURT:  All right.

21        MR. HECKENLIVELY:  And I just want to point out for

22   the Court that the other alternative route of finding that

23   qualified immunity applies before reaching whether there's a

24   violation is exactly the route that Justice Ginsburg took in

25   the unanimous opinion before the Court in *Wood versus Moss*, the

1    Secret Service case.  I think the facts here are pretty

2    similar.  When you're making determinations about whether

3    someone should be a block away from where the President is or

4    two blocks away compared to whether an event should end at

5    3:30 or 3:00 o'clock or 4:00 o'clock, those are the sort of

6    security-based determinations that are privileged by qualified

7    immunity.

8           **THE COURT:**  Yeah.  Well, that's -- we have a question

9    here about whether or not certain things have been pleaded

10   enough, and I'm pretty sure if I were to say certain things

11   need to be pleaded, that Ms. Dhillon is going to plead them.

12   But I don't think we're at -- I'm not going to get hung up on

13   qualified immunity at the moment.

14       The question here really in the first instance is whether

15   they can distinguish at all on these grounds that they were.

16   There's a question about a fuzzy policy and whether that

17   violates the First Amendment.

18       And, you know, rarely you're going to have a case that's

19   exactly on point on all fours; but if there's a body of law

20   that generally somebody could follow and arrive at a conclusion

21   pretty easily, then qualified immunity wouldn't apply, but I

22   really don't want to get into that right now.

23       And also if that were true and that protects the

24   individuals who are sued in their individual capacities, does

25   qualify immunity apply to, like, the University?

1            **MR. HECKENLIVELY:**  No, it wouldn't, Your Honor, but

2    the only damages claims are the claims against the individuals

3    in their individual capacities.

4            **THE COURT:**  Oh, is that right?  There's no damage

5    claim against anybody in their official capacity?

6            **MR. HECKENLIVELY:**  There couldn't be under the

7    Eleventh Amendment.

8            **THE COURT:**  Okay.  So it's -- yeah.  So it's only

9    against the individual defendants.

10        You know, the point you're making as to whether they would

11   know that they picked this room versus that room, or something

12   like that, it's not ordinarily where you get to in qualified

13   immunity.  It's something usually a little broader than that;

14   whether or not you can have a hot chase in a crowded area to

15   try and catch a suspect, not how fast can you go, could you

16   turn left when the guy went right.

17        So I'd have to think about it a little bit, but I think

18   that for our purposes right now, we don't have to get to

19   qualified immunity at least in this first part of our

20   discussion.  Let's keep going.

21           **MR. HECKENLIVELY:**  So let me dive into the merits of

22   the First Amendment claim then, Your Honor.

23           **THE COURT:**  Okay.

24           **MR. HECKENLIVELY:**  And, you know, the University's

25   position, as you asked me earlier, is that the venues at issue

 1   here are limited public forums.  I want to talk about the

 2   University's policy and I also want to talk about the case law,

 3   which I agree requires some weaving in order to figure out

 4   exactly what forum is which and which case is saying what.

 5       The University's policy carefully distinguishes between

 6   two different types of venues.  This is laid out in the campus

 7   regulations that are attached to my declaration that Your Honor

 8   was referencing earlier.

 9       There's the outdoor space of Sproul Plaza, the steps

10   adjacent to Sproul Plaza, and lower Sproul Plaza.  Those are

11   treated under the regulations -- and I can give you a more

12   specific cite if that's useful to you.

13       THE COURT:  That's all right.  I'm just getting it

14   here.  That's okay.  Keep going.

15       MR. HECKENLIVELY:  Those are treated as designated

16   public forums where speech can occur without a reservation.

17   Now, there are some time, place, and manner restrictions, such

18   as it's closed, you know, from midnight to 5:00 a.m.  I'm

19   messing up the exact times.  You need a reservation if you want

20   to have amplified sound.  But anyone can go to Sproul Plaza and

21   speak at any time during those hours.

22       The regulation treats differently the indoor spaces, such

23   as classrooms and lecture halls, and the like, that are at

24   issue here.  Those are treated as parts of the campus that need

25   to be reserved and can only be reserved if you follow the

```
 1    procedures that are laid out in the old policy and in the new

 2    policy.

 3             THE COURT:   Okay.   Now let me stop you for a minute.

 4        Are you arguing that just because you have to make a

 5    reservation, that makes it a limited public space -- forum?

 6             MR. HECKENLIVELY:   I think that's one -- that's one

 7    factor.   Another --

 8             THE COURT:   Just a reservation.   Okay?   Here's the

 9    rule.   Anybody can speak.   Just call and make sure that the

10    room's available.

11             MR. HECKENLIVELY:   Yes, that would be -- that would be

12    a limited forum.

13             THE COURT:   You think that's going to make it a

14    limited public forum?

15             MR. HECKENLIVELY:   Yes, Your Honor.

16             THE COURT:   Okay.   I would probably disagree with

17    that.

18             MR. HECKENLIVELY:   Well, I'm lucky that's not our case

19    then, Your Honor, but the Supreme Court --

20             THE COURT:   No, it was close because we have case law

21    that says that the distinctions or selections can't just be on

22    a ministerial level.   So if all you have to do is call up and

23    say, "Hey, do you have a table?   I want to, you know, eat

24    dinner at your restaurant," is that going to make it some kind

25    of limited public forum?
```

1      I'm just saying if all you have to do is call and up make

2  a reservation, I don't think that's enough.  Now, there is a

3  provision here that says reservation of facilities or requests

4  for services by recognized campus organizations must be made

5  within and approved by the Center for Student Leadership.

6      So I look at who are the Center -- what is the Center for

7  Student Leadership?  Are those students or is that something

8  that the University itself controls?  What are they?

9      **MR. HECKENLIVELY:**  The Center for Student Leadership,

10  which is now referred to as the LEAD -- all caps L-E-A-D --

11  Center is an organization that's part of the University that

12  provides services to student organizations to help them.  So

13  it's staffed by University employees.

14      **THE COURT:**  Employees?

15      **MR. HECKENLIVELY:**  Yes.  They're not -- I'm sure some

16  students work there, but it's primarily staffed by University

17  employees and they assist the student groups, like the College

18  Republicans, in organizing their events and making sure that

19  they are following campus policies and things like that.

20      **THE COURT:**  Okay.  Well, we don't know what at the

21  moment is necessary to get their approval.  Okay?  And it's

22  possible that the plaintiff could plead what that is and say

23  it's just ministerial.  You said to call up and make sure that,

24  you know, there's a space available.

25      If it was more along the lines of somebody making a

 1   selection based on conferring a benefit to the University,

 2   which is one of the restrictions on non-University groups, then

 3   maybe you could say, "Well, they're selective.  It isn't

 4   conferring a benefit when we have to spend $800,000 to make

 5   sure that you're not going to be beat up or that people don't

 6   break windows or trash businesses in the area."

 7        But, in any event, it may not be pled yet, but I have a

 8   feeling they're going to say it's not a big deal to get a

 9   reservation, you know.

10            MR. HECKENLIVELY:  May I address that, Your Honor?

11            THE COURT:  Yes.

12            MR. HECKENLIVELY:  And I think that the complaint and

13   the record shows that it's not just ministerial, that these

14   reservations -- that these venues are made available for

15   reservations when, A, the ministerial element is satisfied that

16   literally there's not someone else using the venue at that

17   time; and, B, in the judgment of the Police Department, the

18   venue is securable.  I mean, that's what's alleged in the

19   complaint, is that the University would not make space

20   available to the Berkeley College Republicans based on the

21   determination that security couldn't be provided for that venue

22   at that time.

23        And I want to be clear that I'm not saying that the

24   University decided "We don't want to spend $800,000."  They're

25   saying that "Even if we did spend $800,000, we couldn't provide

1   security for that venue in a way that made us feel comfortable

2   that the students and the campus community would be safe."

3        **THE COURT:**  Okay.  However, however, there's not an

4   allegation that that was the policy in place as part of the

5   judgment that ordinarily would be used in deciding whether a

6   group could speak.

7        Now, let's just take the question of whether there ever

8   was a policy that did get enacted or adopted.  But originally

9   if you just look at these regs, we don't know what the student

10  leadership council looked at.  Maybe they did look, even at the

11  beginning, of whether something could be secured properly.  I

12  don't know and it's not pled, but I -- and I might require

13  someone to plead that.

14       But just like you can't say, "Yes, we've now decided out

15  of the blue that religious groups can't speak here," or "We've

16  now decided out of the blue political groups can't speak here,"

17  or "We've now decided out of the blue that people who present a

18  problem for security can't speak here," and then they raise

19  heckler's veto.

20       So I don't know where --

21       **MR. HECKENLIVELY:**  May I address that, Your Honor?

22       Okay.  My first point is going back before you asked your

23  question.  The original regulations actually do set out health

24  and safety and security -- health/safety standards.

25       **THE COURT:**  Okay.  Where is that?

1      **MR. HECKENLIVELY:**  This is on item 226 of those

2  regulations.  It's --

3      **THE COURT:**  Okay.  Did you cite that in your papers?

4  Because I didn't --

5      **MR. HECKENLIVELY:**  I'm sure that I did not --

6      **THE COURT:**  You did not.  Okay.  Thank you.

7      **MR. HECKENLIVELY:**  -- but this is part of our request

8  for judicial notice.

9      **THE COURT:**  All right.  Just a minute.

10      **MR. HECKENLIVELY:**  On page 34.

11      **THE COURT:**  Okay.  That's interesting.  Let me just

12  highlight that a little bit so I have it.

13      Okay.  226 of the regulations states (reading):

14          "All campus health and safety standards must be met

15      and special security provisions may be required depending

16      upon the nature of the proposed use."

17      Hmm.  Okay.  That's kind of interesting.

18      So then comes a question that I'll now pose to you -- and

19  you can think about this too, Ms. Dhillon -- is the only way

20  that you can create a limited public forum by content

21  selection?

22      **MR. HECKENLIVELY:**  The case law, Your Honor, says that

23  you can define something -- and, again, the case law is clear

24  that the way that a forum is defined is based on the intent of

25  the government actor.  So it's really up to the University to

decide what it wants the forum to look like, and there are two

ways that I can think of and that are clear in the case law

that you can narrow a limited public forum such that it's

limited.   Number one is to restrict the use of it to a specific

class of people.

THE COURT:   Okay.

MR. HECKENLIVELY:   And then number two is to restrict

the use of it to a certain -- to certain topics of content.

That's what your example about no discussion of travel

implicates.   That would be a content-based restriction.

THE COURT:   Okay.   So where does campus safety fit in?

MR. HECKENLIVELY:   Campus safety, Your Honor, is

content neutral, and the Ninth Circuit made clear in the

*Menotti* case, which is the case we cite in our papers involving

the WTO protest in the City of Seattle in the '90s, that

justifying restrictions -- and there those were city streets.

It was a public forum so the terminology is slightly different.

But they said even there when you're applying time, place, and

manner restrictions, they're content neutral when they're based

on the risk of security, and there it was violence.

THE COURT:   That's after you've already figured out

what the forum is.   I'm just saying that you've just said there

are two ways you can create a limited public forum.   One is by

choosing what groups can use it --

MR. HECKENLIVELY:   Yes.

1     **THE COURT:**  -- then we have *Widmar*, even if you've

2  chosen the group what happens when you leave it as open to

3  them -- okay -- and the other is content.

4     And so if you are trying to say that this is a limited

5  public forum because you have to pass health and safety

6  standards, I was just asking where that fit in.  Which of those

7  two categories does it fall under?

8     **MR. HECKENLIVELY:**  I think that would -- that would

9  fall into -- that's a good question, Your Honor.  It does raise

10  a question about the case law.  So maybe there's a third

11  category.

12     But I want to be clear that there's no -- the forum wasn't

13  denied.  There's no forum that was denied to these groups.  I

14  think that's why I'm having trouble with the question.

15     **THE COURT:**  There was no what?

16     **MR. HECKENLIVELY:**  There was no denial of a forum to

17  these groups.  The University didn't say --

18     **THE COURT:**  Well, that's a different question, but --

19     **MR. HECKENLIVELY:**  Well, but I want -- I think -- I'm

20  sorry to interrupt, Your Honor, but I think it shows the

21  tension that we're having in my trying to answer this question,

22  is that there was no decision made by the University that the

23  College Republicans aren't allowed to use the limited public

24  forums on campus even if events do raise security concerns.

25     The University said, "You can use our venues, but we don't

1   think we can secure it on this particular date."  So it doesn't

2   go to what the nature of the forum is.  It goes to the issue in

3   *Menotti*, which is:  Is the restriction constitutional in that

4   particular instance?

5           **THE COURT:**  Okay.  226 is an interesting provision,

6   which I hadn't looked at before.

7       Okay.  Anyway, I think the distinction that I'm trying to

8   get to here is:  If you have a public forum, the restrictions

9   that you placed on this particular speaker then have to meet a

10  little bit higher standard than if you are a limited public

11  forum.  You have to show more than it's just kind of

12  reasonable, and so that was one of the concerns that I had.

13      I'm not prepared to find that the plaintiff has pleaded,

14  for example, viewpoint discrimination of the sort where the

15  University just simply says "We're not going to let

16  conservative speakers, you know, speak here because we disagree

17  with them," or any of the individual people who made the

18  decision, like, "You know, I am a staunch Democrat.  I'm not

19  letting these people speak and make these comments.  I totally

20  disagree with them."  I don't think anybody's doing that, and I

21  think that the whole pleading showing the chronology events,

22  without anything to show it's pretextual, at the moment at

23  least, supports only an inference that they were acting on

24  security grounds.

25      Now, whether what they did meets whatever standard one

1    applies may depend partly on how strict that standard is and

2    that may be dependent, then, on the nature of the forum.

3        We may not have a clear pleading sufficient on the factual

4    allegations to show that this is what the plaintiff is alleging

5    it to be; but even if the plaintiff were to say, "Look, even if

6    you call it a limited public forum, they had all these other

7    choices.  This just isn't reasonable."  If they wanted to plead

8    that, they could; or they may not be able to plead that.  They

9    may only be able to plead choices that would take you out of

10   the picture and show a violation if it's a public forum.

11       But I'm kind of interested about the health and safety.  I

12   don't know if that changes the nature of the forum or not, but

13   it's an interesting question because then it's not what comes

14   up in the cases, you know.

15       Did you say you thought *Menotti* was the closest to this

16   situation?

17       **MR. HECKENLIVELY:**  Well, let me talk about a couple of

18   forum cases, Your Honor.

19       *Menotti* is, I think, the case that clearly says that

20   regulations based on security restrictions are not content

21   based and that there are other cases that say that, but I think

22   *Menotti* is a good example.

23       **THE COURT:**  Well, when they are concerned about

24   security, though, what -- just tell me quickly, again, just to

25   remind me.  I want to make sure I've got the right case.  Who

1    was trying to do what in *Menotti*?

2         **MR. HECKENLIVELY:**  *Menotti* involved a group of, I

3    think, almost exclusively, if not exclusively, anti-World Trade

4    Organization protestors who were trying to protest on the

5    sidewalk in front of or across the street from the conference.

6         **THE COURT:**  They were protestors.  That's right, they

7    wanted -- oh.  They wanted to be able to have their

8    demonstration and ultimately the case said you could go do it

9    somewhere else and it's almost as good.

10         **MR. HECKENLIVELY:**  Right.  And that's content neutral,

11   yeah.

12         **THE COURT:**  Okay.  But in that instance, I'm not

13   sure -- I'm pretty sure that there are cases that have said

14   that you get kind of a hybrid of content and security when your

15   security concerns are based on content.

16      So if you're not going to -- in this instance, given the

17   nature of the Cal campus, you know, we're never going to get a

18   clear test case on security needs for somebody who is not a

19   very staunch right-leaning speaker.

20      So, anyway.  All right.  But let's get into where we are

21   at this point.

22      I'm probably going to find -- and I'll do whatever I'm

23   going to find most likely today so you know where we're going

24   and we don't belabor this too much -- but I'm probably going to

25   find that there needs to be some more pleading as to the

1   screening process for getting facilities to show that whatever

2   they require is simply not the kind of requirements that take

3   you out of the designated public forum box to see if the

4   plaintiff can do that.  All right.  Because I'm -- certainly if

5   I dismiss, I'm not going to say that's the end of the case.  I

6   would give them leave to amend.

7           MR. HECKENLIVELY:  Sure.

8           THE COURT:  So this is just a way station where we're

9   talking about what the next step is going to be.  So that's

10  only if I were to find it isn't enough, and they have some

11  interesting points that show inferentially that there are

12  distinctions between how non-University and University groups

13  are treated.

14       Then there's at least some selection process with the

15  non-University groups who sponsor.  That's laid out in the

16  regulations.  There's less going on here but it isn't

17  necessarily foreclosed, but it is not spelled out.

18          MR. HECKENLIVELY:  Right.

19          THE COURT:  Okay.

20          MR. HECKENLIVELY:  But that's a content-neutral

21  criteria because the action happens and in determining who's an

22  RSO, a registered student organization, not who can speak.

23          THE COURT:  Is that -- I'm looking at reservations of

24  facilities.

25          MR. HECKENLIVELY:  Right.  And it presupposes that

some process has already happened, as Your Honor said earlier,
to determine who's going to be a registered organization.

      **THE COURT:**  Okay.  All right.  And if that process
involves some prescreening so that certain groups were never
allowed to be registered, for example, then you could take this
whole analysis back to that step, but I don't know if that's
happened here.

      But it could be pled one way or the other maybe a little
cleaner than we have right now, now that we know what
everybody's positions are, which weren't known fully at the
time the complaint was filed.

      Okay.  So at some point, though, there's going to have to
be -- after all, you can always defend any way you want once
they get a complaint on file if they can.  It isn't the end of
the case.

      But if they make certain allegations, even if you think
they're not true, if they've made them and supported them with
some kind of a factual showing, then that might be enough and
probably would be enough -- okay -- if they can do it.

      So we've got questions about whether or not they've have
actually pled a forum sufficiently for the Court to make a
determination.  Then we have a question about even if -- well,
the next step is:  Once you get the forum, what kinds of
actions are going to be okay under the Constitution and what
aren't?  And that may depend on how much -- what kind of forum

1   we have.

2       But once we have that forum, then the plaintiff would need

3   to plead, I think, here some facts to show that you had

4   options, and then whether or not those options do foreclose

5   what you did or not depends in part on what kind of forum you

6   have.  Okay?  So that's one of the things I'm thinking.

7       On mootness, don't keep arguing it.  I think that you have

8   done enough to show mootness and it doesn't foreclose them from

9   coming back.  I would just like to see a pleading addressing

10  that policy instead of the one that no longer exists, but they

11  still have a First Amendment claim and tied to it an equal

12  protection claim that's challenging the vagueness of the

13  unstated policy that -- or, I'm sorry, the orally stated policy

14  that you say didn't exist as a policy anyway, but that we have

15  to get to later.

16      So right now they haven't pled past damage, but they could

17  have an opportunity to do that too.  So what would be left if I

18  find that the complaint needs some additional factual

19  allegations to show that the action you took was not reasonable

20  even though not viewpoint prompted?  What else do we have in

21  the complaint?

22      I can look and see right now.

23          MR. HECKENLIVELY:  And, Your Honor, I assume that

24  you're assuming in that analysis that you haven't decided what

25  the nature of the forum is and would leave that for the next

1   round of briefing.

2        THE COURT:  Right.  I can't -- I don't have to

3   actually decide what the forum is, but I have to have a

4   pleading that --

5        MR. HECKENLIVELY:  Yeah.

6        THE COURT:  Before I could decide it, I would have to

7   have a pleading that supports one forum or another.  Now, it's

8   possible that the plaintiff could not -- would not be able to

9   show at this time that it's public but could still say, "Even

10  if it's -- even if it's limited" --

11       MR. HECKENLIVELY:  Right.

12       THE COURT:  -- "this just isn't good enough.  Look at

13  all the other things they could have done.  They didn't have to

14  send us off campus to, you know, their own sports track

15  facility," whatever it was.  You know, that they go -- "You

16  know, we could have had a better place.  And why 3:00 o'clock?

17  Why did they pick 3:00 o'clock?  They didn't have to pick

18  3:00 o'clock."

19       Now, if they make any kind of a showing along those lines

20  that gets them just moving, then they may get their complaint

21  on file, and then we'll look at what the University has to say

22  in response.

23       MR. HECKENLIVELY:  Right.

24       THE COURT:  We do -- I don't think that -- I would say

25  that there really isn't a claim here that's been pled for

1  punitive damages at the moment either.  I want to talk a little

2  bit about it just because when we get back to -- if we're going

3  to have a new complaint, let's try and avoid some of whatever,

4  you know, the Court thinks might need work by just fixing it up

5  in advance.

6      The citation to Judge Koh's case about all you have to say

7  is you're bad people really isn't quite -- I think it's based

8  on some case that I think was badly reasoned, and that there's

9  generally authority, particularly under *Iqbal* and *Twombly* now,

10  that you need some facts.  You don't have to even use the words

11  "oppression, fraud, or malice," but the behavior has to be at

12  least arguably within that.

13      Clearly if someone was doing viewpoint discrimination,

14  that gets you into punitive damages; but if they just did a

15  kind of a poor job in restricting somebody, I'm not sure that

16  that would.  So I would just leave you to rely on whatever you

17  think the behavior is and then if that meets the legal test,

18  that's fine.

19      We had a little bit of a question of how far up the chain

20  you can go if somebody didn't take the action personally with

21  the OSU Student Alliance group.  At the moment I don't think

22  there's a showing that anybody acted with real discriminatory

23  intent.

24      An interesting discussion about First Amendment claims

25  don't require specific intent, but then we do have these cases

1    about limited public forum law and viewpoint discrimination.

2         I still think -- just, again, kind of segueing for a

3    minute -- when I was reading the limited public forum cases, it

4    looks like if you make the cut that -- you know, that you're in

5    a group that's okay, that you can't keep the person out based

6    on their content once you've said the content's all right.

7         And so if this idea of you're likely to produce a problem,

8    you know, with security, if that does get into the content box

9    because you're likely -- not because you're out here just

10   demonstrating but you're taking a particular position, then we

11   might have a little question about that too.

12        **MR. HECKENLIVELY:**  If I can just address that briefly,

13   Your Honor.

14        **THE COURT:**  Yes.  And I'm happy to have you do it.  I

15   mean, I spent so much time reading these cases, and now I'm up

16   here and it doesn't sound like I'm really very clear on what

17   they hold, and maybe I'm not because --

18        **MR. HECKENLIVELY:**  I don't think that's the issue,

19   Your Honor.  I think we can take the issue up to

20   Washington, D. C.

21        **THE COURT:**  Too much said in all these cases about the

22   same subject and not always kind of meeting at the right place.

23   Okay.

24        **MR. HECKENLIVELY:**  The point I wanted to make is in

25   response to your last point.  In the *Seattle Mideast* case that

1   we cite in our papers, the Ninth Circuit clearly said that

2   there's no -- the Heckler's Veto Doctrine does not apply in a

3   limited public forum unless you can show that the exercise of

4   the restrictions is a pretext viewpoint discrimination, which

5   is not alleged.  But that, again, gets to your point that the

6   forum is important.

7          THE COURT:  It's pretty important.

8          MR. HECKENLIVELY:  Yeah.  And I, you know, contend,

9   again, that *Widmar* is a limited public forum case just as this

10  is a limited public forum case.

11      The Delaware *Forbes* cases are distinguishing between

12  whether something is a nonpublic forum versus any type of

13  public forum.  They don't have to draw the fine distinction

14  between different types of public fora.

15      I'd also --

16         THE COURT:  I'm not sure I got that argument.

17         MR. HECKENLIVELY:  Well, in the *Forbes* case, which

18  involved the Presidential debates that plaintiffs cite in their

19  papers, the Court isn't engaging in sort of a granular

20  determination about whether something is a designated public

21  forum versus a limited public forum.  They're deciding whether

22  something is a nonpublic forum versus some type of public

23  forum, and that's not the analysis that we have at issue here.

24      *Widmar* was decided before the limited public forum existed

25  as a category.  The Supreme Court in the *Hastings* case that

1  we've talked about clearly categorizes *Widmar* as a limited

2  public forum case and says that the issue in that case is that

3  there was viewpoint discrimination.  That's -- in the *Hastings*

4  case, that's clearly the way it treats it.

5         **THE COURT:**  I'm not sure it was quite that clear.

6  What do you want to do with *Arkansas*?

7         **MR. HECKENLIVELY:**  Well, that -- and, Your Honor,

8  respectfully, that language that you quoted was from the

9  dissent in the *Arkansas* case.

10        **THE COURT:**  Is that from the dissent?  Was I reading

11  the dissents at that point?  I didn't think I was.  Maybe I

12  did.  Let's go back.

13     Here's the opinion.  Justice Kennedy, Justice Kennedy,

14  Justice Kennedy.

15                   (Pause in proceedings.)

16        **MR. HECKENLIVELY:**  It's 679 to 680.

17        **THE COURT:**  That was not in the dissent.

18        **MR. HECKENLIVELY:**  Oh.  I'm sorry, Your Honor.  Then I

19  must have been relying on the pin cite that you gave for 679 to

20  680.

21        **THE COURT:**  Well, I did, but this is not in the

22  dissent that I'm aware of.  Let's just make sure.  I've got the

23  dissent is Justice Stevens, Souter, and Ginsburg, and there

24  they start at 683.

25        **MR. HECKENLIVELY:**  Right.  Well, I apologize if I had

1   that wrong, Your Honor.

2           **THE COURT:**  You scared me for a minute.

3           **MR. HECKENLIVELY:**  I apologize for that.  I'm sorry I

4   didn't have the case in front of me.

5           **THE COURT:**  Yeah.  I mean -- okay.

6       I mean, this case, when I read it, just seemed so strongly

7   to talk about *Widmar* being a designated public forum because

8   they use this phrase "generally available."  Okay, "generally

9   available to a group."

10          **MR. HECKENLIVELY:**  Right.

11          **THE COURT:**  All right.  So if you make it generally --

12  now, *Widmar* we have no idea how you got to be a registered

13  student group.  We have no idea about what it took that group

14  to get a forum.  All that the court seemed to think is all you

15  had to do is be a registered group and there you were.

16          **MR. HECKENLIVELY:**  Right.

17          **THE COURT:**  And that may be different than what you

18  have here.  I don't know.

19          **MR. HECKENLIVELY:**  Yeah.  And I --

20          **THE COURT:**  What were you citing?  *Christian Legal*?

21          **MR. HECKENLIVELY:**  *Christian Legal* and then I'll also

22  cite you to *Santa Fe Independent School District*.

23          **THE COURT:**  Yeah, I have that, but let me look at

24  *Christian Legal*.

25      Where are you on *Christian Legal*?

1    **MR. HECKENLIVELY:**  On *Christian Legal*, I am at -- let

2    me find it.

3         **THE COURT:**  Oh, here is where they were citing.

4         **MR. HECKENLIVELY:**  And this is on page 2987 to 2988.

5                   (Pause in proceedings.)

6         **THE COURT:**  Well, let's see here.  Are they talking

7    about *Widmar* here?

8        There's a paragraph, "We later relied on *Healy* and

9    *Widmar*."  Okay.  That's at 2987.  And they go on to describe

10   what happened, and they say (reading):

11             "But because" -- okay, quote -- "But because the

12        University singled out religious organizations for

13        disadvantageous treatment, we subjected the University's

14        regulation to strict scrutiny."

15       **MR. HECKENLIVELY:**  Right.  There was no question there

16   that they said religious organizations are not okay.  And then

17   in the next sentence the Court says (reading):

18             "The school's interest," in *Widmar*, "in maintaining

19        strict separation of church and State we held was not

20        sufficient to" -- "sufficiently compelling to justify

21        viewpoint discrimination against religious speech."

22       And by putting that phrase "viewpoint" in there, they're

23   saying that it's a limited public forum case, otherwise you

24   wouldn't need that.

25        **THE COURT:**  Well, they put "viewpoint" in brackets.

1        **MR. HECKENLIVELY:**  Right.  And then -- so then let me

2   direct you -- and that shows they were intentional about this.

3   They were trying to characterize it in a way that the *Widmar*

4   case hadn't been able to because that doctrine didn't exist

5   yet.

6        **THE COURT:**  I don't know.  When they said "viewpoint,"

7   I still -- this case, you know, I still think you have to look

8   at how each of the cases has referred to *Widmar*.  I'm not sure

9   half the time whether they're talking about the establishment

10  clause part or they're talking about the First Amendment part.

11    Okay.

12        **MR. HECKENLIVELY:**  It was important in *Widmar*.

13        **THE COURT:**  Where was *Santa Fe*?

14        **MR. HECKENLIVELY:**  And then one more thing on

15  *Christian Legal Society*, Your Honor, on the same page that we

16  were on --

17        **THE COURT:**  I have to go back just a minute.

18        **MR. HECKENLIVELY:**  I'm sorry.

19        **THE COURT:**  All right.  Just a minute.

20                    (Pause in proceedings.)

21        **THE COURT:**  Can I get out of this case by saying I

22  went to Cal?  No.  How about I went to Boalt?

23        **MS. DHILLON:**  Too late, Your Honor.

24        **THE COURT:**  It was so long ago, it was like a

25  different world, different school, different experience.

1        Okay.  Where do you want me to go?

2            MR. HECKENLIVELY:  On 2988, the paragraph beginning

3    with the bracketed 6 it says (reading):

4            "In all three cases" -- that's referring to *Healy*,

5        *Widmar*, and *Rosenberger* -- "we ruled that student groups

6        had been unconstitutionally singled out because of their

7        points of view.  'Once it has opened a limited public

8        forum,' we emphasized, 'the State must respect the lawful

9        boundaries itself set.'"

10   So it's characterizing *Widmar* as a limited public forum

11   case where viewpoint neutrality is the only thing that's

12   required, and I'll submit that that's the situation here and

13   the regulations are undisputedly viewpoint in nature.  Not

14   undisputedly.  I'll take that back.

15           THE COURT:  The problem is that their quote, "'Once it

16   had opened a limited public forum,'" that's the quote, they

17   say, "we emphasized," quote, "'the State must respect the

18   lawful boundaries it has itself set,'" quoting and citing

19   *Rosenberger*, not *Widmar*.

20           MR. HECKENLIVELY:  Yeah.  I agree with that.

21           THE COURT:  Okay.  So I don't know what to tell you.

22   If the plaintiff -- if I dismiss with leave to amend to fix up

23   A, B, and C and the plaintiff then files an amended complaint

24   and you want to argue that based on that pleading, they have

25   pled a limited public forum, because we're only dealing --

1    we're not dealing with actuality here --

2            **MR. HECKENLIVELY:**  Right.

3            **THE COURT:**  -- we're dealing with --

4            **MR. HECKENLIVELY:**  I understand.

5            **THE COURT:**  -- what is alleged, which can be

6    challenged but what's alleged, then everybody get ready to

7    reconcile these cases.  That's all I can say because I'm not

8    sure they can be.  And if it were a different court, you know,

9    if these were different circuits or different panels in a

10   single circuit, but this is supposed to be consistent

11   Supreme Court law and I'm beginning to think it's not

12   consistent.  I just have a problem.

13       Do you -- let me ask you a question.  Do you disagree with

14   the following:  If you open up a forum to a class of people

15   without restriction on content, for that class of people it is

16   a designated public forum?

17           **MR. HECKENLIVELY:**  I think that would be a loaded

18   characterization, Your Honor.  I think it's a limited public

19   forum still, just it's a limited public forum in the way that

20   the University has defined it.

21           **THE COURT:**  No, I'm not talking about the University.

22   I don't want to talk about the University.

23           **MR. HECKENLIVELY:**  The actor then.

24           **THE COURT:**  Just in the abstract.  You had said that

25   there's two ways you can create a limited public forum, one is

by people -- right? -- and one is by content.

All right.  So if you start by limiting people in a certain way but just in terms of these kind of broad characterizations, students/nonstudents -- okay -- and for that class of people that you allow, they can talk about anything they want, they can basically have unrestricted access, just make a reservation.

Okay.  And this is hypothetical.

**MR. HECKENLIVELY:**  Yeah, I understand.  I understand that.

**THE COURT:**  I don't want to get into our case.

For that class of people, is it designated or limited?

**MR. HECKENLIVELY:**  I will answer the question this way, Your Honor:  The Ninth Circuit has never differentiated between those two concepts.  Under Ninth Circuit law, once something is a limited public forum, it remains a limited public forum.

**THE COURT:**  Well, you've called it limited then.  In other words, you have said that if you select out some groups from who can speak, no matter how broad that selection sort of process is, that you will always be a limited public forum; right?

**MR. HECKENLIVELY:**  Yes.

**THE COURT:**  Okay.  And that's what I understood your position to be, and I just -- I can't say that you're wrong,

1   but I don't know that you're right.  Okay.

2        **MR. HECKENLIVELY:**  All right.  Well, as long as I

3   don't get an opinion saying I'm wrong, I can live with that for

4   today, Your Honor.

5        **THE COURT:**  For the moment because, you know, I just

6   keep getting back to *Widmar*.  Ordinarily the sort of buzzwords

7   here for designated are "generally open."  That's the words --

8   terms, "generally open."

9        **MR. HECKENLIVELY:**  Right.

10       **THE COURT:**  And that's what they used in *Widmar* and,

11   yes, it's for a limited group because, you know, it's a school.

12   So schools are always going to have students and nonstudents.

13     I'm just wondering if they really -- under those

14   circumstances, when you're dealing with schools, don't really

15   think that the distinction between students and nonstudents

16   counts, you know.  I'm just wondering.

17       **MR. HECKENLIVELY:**  Your Honor, I'll just leave it at

18   this, and I will be pleased to take this up with briefing on

19   the next complaint.

20       **THE COURT:**  All right.  You're happy enough that I'm

21   not making a final decision on it.  Okay.  All right.

22     So, okay.  Well, then, I think it's your motion, so I

23   guess technically you would have the last word, but I'll just

24   see if Ms. Dhillon wants to add anything.

25       **MR. HECKENLIVELY:**  And there's one case management

1    point I wanted to raise, which I'm happy to raise after

2    Ms. Dhillon.

3         **THE COURT:**  What is that?

4         **MR. HECKENLIVELY:**  We're set for case management

5    conference on the 27th of October, which makes our initial

6    disclosures due a week from today.  I just ask that in light of

7    Your Honor's tentative ruling, that you continue those dates

8    after -- until -- so we can look at the actual operative

9    complaint when we're doing our discovery.

10        **THE COURT:**  I'd rather wait on the case management

11   until we've got a pleading on file if I am going to grant your

12   motion in some fashion --

13        **MR. HECKENLIVELY:**  Sure.

14        **THE COURT:**  -- but I want to give Ms. Dhillon one

15   further shot at this.

16        **MR. HECKENLIVELY:**  Thank you, Your Honor.

17        **THE COURT:**  Thank you.

18        **MS. DHILLON:**  Your Honor, I'm just going to make a

19   couple of points.  I see the time and where the Court's going

20   here, but we do believe that *Widmar* is the case that's closest

21   in terms of the facts; and in *Widmar* the United States

22   Supreme Court said that strict scrutiny was the appropriate

23   test to apply, and they're treating it more in the parlance of

24   what we're calling a designated public forum today and not a

25   limited purpose public forum.

1          **THE COURT:**  Where in *Widmar* did they actually say

2     "strict scrutiny" as opposed to "constitutional" something or

3     other?

4          **MS. DHILLON:**  Let me get the case.

5          **THE COURT:**  Because they may have used that.

6          **MS. DHILLON:**  Let's see...

7               (Pause in proceedings.)

8          **THE COURT:**  You know, at one point they use the phrase

9     "content of their speech."  They don't say "viewpoint."  Then

10    some other court calls it "viewpoint."

11               (Pause in proceedings.)

12         **MS. DHILLON:**  Well, I would -- to me, it looks like at

13    page 454 U.S. page 276, the court says that (reading):

14          "Respondents' First Amendment rights are entitled to

15          special constitutional solicitude.  Our cases have

16          required the most exacting scrutiny in cases in which a

17          state undertakes to regulate speech on the basis of its

18          content."

19         **THE COURT:**  Now, where are we?  You said it's at what

20    page again?

21         **MS. DHILLON:**  It's on page 276, Your Honor.

22         **THE COURT:**  I'm looking.  Okay.  *Widmar*, I'm looking

23    at it.  Let's see...  Oh, yes.  I'm sorry.

24       All right.  Quote (reading):

25          "Our cases have required the most exacting scrutiny

1      in cases in which a state undertakes to regulate speech on

2      the basis of its content."

3  Then they go on, they say (reading):

4      "On the one hand" -- okay -- "On the one hand

5      Respondents' First Amendment rights are entitled to

6      special constitutional solicitude," et cetera, as just

7      quoted.

8  And then they say (reading):

9      "On the other hand, the state interest in achieving

10     greater separation of church and State is limited by the

11     free exercise clause and the free speech clause."

12  You know, they're looking at compelling state interests --

13          **MS. DHILLON:**  That's the test.

14          **THE COURT:**  -- which is strict scrutiny.

15          **MS. DHILLON:**  That's the test, and it clearly doesn't

16  even mention viewpoint.  It's content and content is -- you

17  know, we believe -- we believe our complaint survives in either

18  concept, but we do believe *Widmar* is the correct ruling and it

19  applies a correct level of scrutiny, and we believe we have

20  those facts here.

21      The only other point I'll make, Your Honor, is, you know,

22  it's clear that you would like us to replead.  Repleading isn't

23  really going to help the University, frankly, because there are

24  so many more facts that have come out in admissions that the

25  University has made that we'll have a stronger complaint when

 1   it's repled.

 2        So at some point we're going to have to face these issues

 3   and deal with them because we believe we have ongoing

 4   constitutional violations of our clients' civil rights,

 5   particularly the Berkeley College Republicans.

 6        In four attempted events so far this year, they've only

 7   been able to hold one with less than half the number of people

 8   they were originally promised; and they have several other

 9   speakers they'd like to bring this semester, so we are

10   concerned that the continued imposition of unconstitutionally

11   vague standards to them is going to impact their ability to

12   enjoy their free speech rights.  And so, you know, we may be

13   seeing an injunction situation coming up, so I'd like to

14   probably move this case along at this point.

15        THE COURT:  Right.  Well, all right.  Why don't I just

16   rule and that way you won't be delaying too much.

17        Having reviewed the complaint and without making any

18   specific finding as to the forum that we're dealing with here,

19   I would find that the plaintiff has not pled facts at the

20   moment sufficient to support a finding of a public forum,

21   designated public forum.  They haven't foreclosed that, but

22   that there are not facts sufficient at this point.

23        But in either respect, whether it is public or limited

24   public, either way, the plaintiff at the moment has not pled

25   facts to show what other options the University had; in other

1   words, to show that the restrictions that they placed on the

2   particular speakers did not meet the standard that they would

3   need to meet in order to place those restrictions on those

4   speakers.

5       And there are different standards depending on whether

6   it's a limited public forum or designated public forum, but in

7   either case, there just isn't at the moment any pleading as to

8   what other options and choices the University would have.

9       I also find that the plaintiff has not pled facts that

10  give rise to an inference that the University was operating on

11  viewpoint discrimination -- specifically that they disagreed

12  with the particular speaker's point of view and, therefore, did

13  not allow it -- for all the reasons I said earlier, the

14  original allowing Mr. Yiannopoulos to speak in a very good

15  forum or a location at a very good time, the chronology of

16  events of what happened in connection with his speaking

17  engagement, and the statement over and over that security was a

18  concern and that concern appearing not pretextual from the

19  facts that were set forth in the complaint.

20      I am going to find that as presently pleaded, that the

21  injunctive relief claims are moot because of the new policy,

22  but I certainly don't foreclose the plaintiff from amending to

23  challenge the new policy.

24      The damages claims are mooted until the plaintiff pleads

25  some past damage, which again the plaintiff will have leave to

do.

Likewise, punitive damages I find are not supported; but, again, if I find that a First Amendment or equal protection claim hasn't been fully pleaded yet, then all of these are really just pieces of that claim and if there's no claim there, then those particular pieces don't have to be broken out.

How much time do you want?  I'll give you whatever reasonable amount of time you want to try and put together a new complaint.

MS. DHILLON:  Your Honor, I'd like to reserve 30 days.

THE COURT:  That's all right.

MS. DHILLON:  I might try to do it sooner because of the urgency that I mentioned.

THE COURT:  Well, 30 days is okay.  You don't object to that, do you?

MR. HECKENLIVELY:  No, I don't object to 30 days, and I'm sure we can work together on that for a briefing schedule.

THE COURT:  Right.  Okay.  So why don't I just take a quick look at the calendar.  So today is the 29th.  So I guess just the 27th of October, does that make --

MS. DHILLON:  Sure, Your Honor.

THE COURT:  I guess.  That's 30 days.

All right.  So I will grant the motion with leave to amend for the reasons stated, and plaintiffs' first amended complaint would be due on or before October 27.  If you run into some

1    problem, Ms. Dhillon, speak to opposing counsel.  If you feel

2    that you need more time for some reason, if you can't agree,

3    then ask the Court.  I'd like to give you as much time as you

4    need to get whatever facts you think would support this.  Some

5    of these facts may be in more control of the University.  I

6    don't know, you know, how easily they're available.

7         Okay.  I will continue the case management conference.

8    What was the date again, Counsel, that that's currently set

9    for?

10        **MR. HECKENLIVELY:**  I believe it was October 27th.

11        **THE COURT:**  The very date that --

12        **MR. HECKENLIVELY:**  I think so.

13        **THE COURT:**  Okay.  So I'll just put that over.  Why

14   don't we say -- let's see, if the complaint is filed in 30 days

15   and then you answer or move --

16        **MR. HECKENLIVELY:**  Can I make a suggestion,

17   Your Honor?

18        **THE COURT:**  Yeah.

19        **MR. HECKENLIVELY:**  Subject to Ms. Dhillon's agreement,

20   since we haven't worked out a briefing schedule yet and we

21   don't know when the complaint will be filed, maybe we can just

22   continue it and set a new date at the hearing date on the

23   motion.

24        **THE COURT:**  I don't know.  I could do that.  Maybe

25   what I'll do is I'll just pick a date arbitrarily now, and then

1  that date can be either advanced or moved at the next calling

2  just like you're doing now.  That way I won't feel like I

3  forgot about it or that I'm going to lose track of you.

4      So just looking at this...  Oh, I'll just pick a date

5  here.  January 13.  No, make it the 20th with a statement by

6  the 13th.

7          THE CLERK:  It would be the 19th, Your Honor.

8          THE COURT:  Oh.  I'm in the wrong year.  Sorry.  Let

9  me go back.

10     January 19 with a statement by the 12th.  That just gives

11  lots of time for you to do all kinds of things, but we may move

12  it up.  I just want something in place.  Okay.  All right.

13     All right.  Anything from the plaintiffs' standpoint?

14         MS. DHILLON:  No, Your Honor.  Thank you.

15         THE COURT:  Anything else, defendants?

16         MR. HECKENLIVELY:  No, Your Honor.

17         THE COURT:  Okay.  That wasn't as organized as I would

18  have liked; nonetheless, we are in recess.  Thank you.

19         MS. DHILLON:  Thank you.

20         MR. HECKENLIVELY:  Thank you, Your Honor.

21             (Proceedings adjourned at 12:35 p.m.)

22                      ---oOo---

23

24

25

1

2

3                   <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Wednesday, October 4, 2017

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25