HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiffs Young America's Foundation
and Berkeley College Republicans

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| **YOUNG AMERICA'S FOUNDATION,** a Tennessee nonprofit corporation; and **BERKELEY COLLEGE REPUBLICANS**, a student organization at the University of California, Berkeley,<br><br>            Plaintiffs,<br><br>            v.<br><br>**JANET NAPOLITANO,** in her official capacity as President of the University of California; **NICHOLAS B. DIRKS**, individually as former Chancellor of University of California, Berkeley; **CAROL T. CHRIST**, individually and in her official capacity as Chancellor of University of California, Berkeley; **STEPHEN C. SUTTON**, individually and in his official capacity as Interim Vice Chancellor of the Student Affairs Division of University of California, Berkeley; **JOSEPH D. GREENWELL**, individually and in his official capacity as Associate Vice Chancellor and Dean of Students of University of California, Berkeley; **MARGO BENNETT**, in her official capacity as Chief of Police of University of California Police Department, at Berkeley; **ALEX YAO**, individually and in his official capacity as Operations Division Captain of University of California Police Department, at Berkeley; and **LEROY M. HARRIS**, individually and in his official capacity as Patrol Lieutenant of University of California Police Department, at Berkeley,<br><br>            Defendants. | Case Number: 3:17-cv-02255-MMC<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, and MONETARY RELIEF;**<br><br>**1. 42 U.S.C. § 1983 (Free Speech)**<br>**2. 42 U.S.C. § 1983 (Retaliation for Exercising Free Speech)**<br>**3. 42 U.S.C. § 1983 (Due Process)**<br>**4. 42 U.S.C. § 1983 (Equal Protection)**<br><br>**JURY TRIAL DEMANDED** |



First Amended Complaint                                      Case No. 3:17-cv-02255-MMC

Plaintiffs Young America's Foundation ("YAF") and Berkeley College Republicans ("BCR") (collectively, "Plaintiffs"), bring this action against University of California, Berkeley ("UC Berkeley" or the "University") officials Janet Napolitano, Nicholas B. Dirks, Carol T. Christ[1], Stephen C. Sutton, and Joseph D. Greenwell, and University of California Police Department ("UCPD") officials Margo Bennett, Alex Yao, and Leroy M. Harris (collectively, "Defendants"), for damages, declaratory judgment, and injunctive relief following Defendants' adoption and discriminatory application of policies to restrict conservative speech on the UC Berkeley campus, which policies are vague and overbroad, in violation YAF and BCR's constitutional rights to free speech, due process, and equal protection under the law.

## INTRODUCTION

1.     This case arises from efforts by California's leading public university, UC Berkeley – once known as the "birthplace of the Free Speech Movement" – to restrict and stifle the speech of conservative students whose expression of ideas challenges campus political orthodoxy. Though UC Berkeley promises its students an environment that promotes free debate and the free exchange of ideas, it had breached this promise through the repressive actions of University administrators and campus police, who have systematically and intentionally suppressed constitutionally-protected expression by Plaintiffs (and the many UC Berkeley students whose public policy viewpoints align with Plaintiffs), simply because that expression may anger or offend students, UC Berkeley administrators, and/or community members who do not share Plaintiffs' viewpoints.

2.     In or around March 2017, Defendants adopted an unwritten and unpublished policy that vests in University officials the unfettered discretion to unreasonably restrict the time, place and manner of any campus event involving "high-profile speakers" – a term that is wholly undefined, and that has enabled Defendants to apply this policy in a content- and viewpoint-discriminatory fashion, resulting in the marginalization of the expression of conservative viewpoints on campus by any notable conservative speaker. Defendants freely admit that they have

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), on or around June 1, 2017, UC Berkeley Chancellor Carol T. Christ was automatically substituted as Defendant to all official capacity claims previously asserted against former UC Berkeley Chancellor Nicholas B. Dirks. Plaintiffs also assert individual capacity claims against both Christ and Dirks.



First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

1  permitted the demands of a faceless, rabid, off-campus mob to dictate which speech is permitted at

2  the center of campus during prime time, and which speech may be marginalized, burdened, and

3  regulated out of its very existence by this unlawful heckler's veto.

4        3.     Defendants' discriminatory imposition of this policy's curfew and venue restrictions

5  resulted in the cancellation of two speaking engagements featuring prominent conservative

6  speakers in the month of April, 2017. First, YAF and BCR were forced to cancel a scheduled April

7  12, 2017 speaking engagement by David Horowitz, a widely acclaimed conservative writer, after

8  the University first demanded that Horowitz speak before 3 p.m. in the afternoon, at a time when

9  students are in class and most are unable to attend, and then demanded that the speech take place in

10  a room on a separate campus that is more than one mile from the main campus center (so far away,

11  in fact, that it even has its own track facilities). Then, less than two weeks later, after weeks of

12  discussion, the University unilaterally canceled a speaking engagement by Ann Coulter, a

13  nationally renowned New York Times bestselling author and conservative political commentator,

14  which was previously scheduled to take place on campus on April 27, 2017.

15        4.     In the ensuing national firestorm of criticism, the University partially retracted its

16  cancellation of the Coulter event, offering to allow Ms. Coulter to speak the following week, on

17  May 2, 2017 – during a period referred to by the University as a "dead week," in which no classes

18  are held, and far fewer students are on campus due to final exams the week following – but still

19  insisted that the event would be subject to a 3:00 p.m. curfew and unspecified venue restrictions.

20  Meanwhile, Defendants freely permitted the expression of non-conservative viewpoints by notable,

21  liberal speakers addressing the same contentious topic Ms. Coulter planned to address – illegal

22  immigration – during the same month, including Vincente Fox Quesada, the former President of

23  Mexico, and Maria Echaveste, a former presidential advisor and White House Deputy Chief of

24  Staff to President Bill Clinton.

25        5.     On or around July 14, 2017, following YAF and BCR's filing of the initial complaint

26  in this action, UC Berkeley adopted and released an interim written events policy for "Major

27  Events Hosted by Non-Departmental Users" ("Major Events Policy"), which was later revised and

28  reissued on or around August 14, 2017.

First Amended Complaint                                Case No. 3:17-cv-02255-MMC

1        6.      The Major Events Policy sets forth the outer boundaries of the unwritten policy

2 Defendants had applied in the spring semester of 2017. The Major Events Policy applies only to

3 "non-departmental users" (including YAF and BCR); vaguely defines what constitutes a "Major

4 Event" (in a way equally as unclear as the vague "high-profile" designation that Defendants had

5 applied to earlier events); allows for the implementation of "security measures," such as curfew

6 and venue restrictions; and imposes various timing and notification requirements on the event host,

7 including that all advertisements, social media or otherwise, be pre-approved by the UC Berkeley

8 LEAD Center at least two weeks prior to the event.

9        7.      All requirements that were imposed under the unwritten policy can, and are likely to

10 be, imposed under the written Major Events Policy. In addition, the Major Events Policy allows for

11 imposition of other unreasonable speech restrictions deemed by campus officials to be appropriate

12 "security measures," such as the imposition of irrational ticket-sales and seating restrictions, and

13 the collection of discretionary, unreasonable security fees.

14       8.      By imposing an unconstitutionally vague and overbroad policy, or set of policies,

15 concerning so-called "high-profile speakers" and "Major Events," and selectively applying the

16 impermissibly vague and overbroad policy, or set of policies, to burden or ban speaking

17 engagements involving the expression of conservative viewpoints, Defendants have deprived YAF

18 and BCR of their constitutional rights to free speech, due process, and equal protection.

19       9.      Accordingly, YAF and BCR seek temporary and permanent injunctive relief to

20 prevent Defendants from continuing to muzzle Plaintiffs' constitutionally-protected speech, and to

21 enjoin the Defendants' transparent attempts to stifle political discourse at UC Berkeley. Plaintiffs

22 also seek monetary damages from each Defendant sued in his or her individual capacity for all

23 harm suffered as a result of Defendants' actions.

**JURISDICTION AND VENUE**

25       10.     This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of

26 YAF and BCR's free speech, due process, and equal protection rights under the First and Fourteenth

27 Amendments to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under

28 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under

First Amended Complaint                    Case No. 3:17-cv-02255-MMC

1  28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and

2  attorneys' fees and costs under 42 U.S.C. § 1988.

3      11.     Venue is proper in this judicial district under 28 U.S.C. § 1391, because a substantial

4  part of the acts or omissions giving rise to the claims for relief occurred in or were directed toward this

5  District, and each of the Defendants is subject to the personal jurisdiction of this Court.

6      12.     This Court has personal jurisdiction over each of the Defendants, because each of the

7  Defendants is domiciled in the State of California, has sufficient minimum contacts with California,

8  and/or otherwise has intentionally availed himself or herself of significant benefits provided by the

9  State of California, rendering the exercise of jurisdiction by this Court permissible under traditional

10  notions of fair play and substantial justice.

11                          **INTRADISTRICT ASSIGNMENT**

12      13.     This Action is properly assigned to the San Francisco Division of the Court, as the

13  conduct giving rise to this dispute occurred in Alameda County, California.

14                                  **PARTIES**

15      14.     Plaintiff Young America's Foundation is a Tennessee nonprofit corporation whose

16  mission is to educate the public on the ideas of individual freedom, a strong national defense, free

17  enterprise, and traditional values – hallmarks of conservative values. YAF has sponsored students

18  and student groups on the UC Berkeley campus over the course of several years, including BCR,

19  by providing these students and groups with the funding and logistical support needed to host

20  prominent conservative speakers on campus. YAF has sponsored many speaking events at UC

21  Berkeley in past years, including one such event in 2016 featuring renowned conservative political

22  commentator and author Ben Shapiro, and its efforts have brought numerous other notable

23  conservatives to share their viewpoints with students and the public at UC Berkeley and other UC

24  campuses.

25      15.     Plaintiff Berkeley College Republicans is a Registered Student Organization at the

26  University of California, Berkeley, in operation for several decades. According to an email sent by

27  UC Berkeley Vice Chancellor Stephen C. Sutton to BCR member Naweed Tahmas, copying Joseph

28  Greenwell and UCPD Captain Yao, on or around April 19, 2017, BCR is "independent from the

First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

**DLG**
DHILLON LAW GROUP INC.

1  University, and [has] the right to invite whoever they'd like to speak [on campus] . . . ." A true and

2  correct copy of this email, with personal contact information redacted, is attached hereto as

3  **Exhibit A**.

4  　　　16.　Defendant Janet Napolitano ("Napolitano") is the President of the University of

5  California. According to UC Board of Regents Standing Order 100, "[t]he President shall be the

6  executive head of the University and shall have full authority and responsibility over the

7  administration of all affairs and operations of the University . . . ." Napolitano ultimately is

8  responsible for all policies enacted and enforced at UC Berkeley, including the policies challenged

9  herein. She acted under color of state law, and is sued in her official capacity.

10  　　　17.　Prior to June 1, 2017, Defendant Nicholas B. Dirks ("Dirks") was the Chancellor of UC

11  Berkeley, and was UC Berkeley's chief executive officer, responsible for UC Berkeley's

12  administration and policy-making, and had ultimate authority to approve the unwritten policies and

13  procedures challenged herein that were applied to deprive BCR and YAF of their constitutional rights.

14  On or around June 1, 2017, Defendant Carol T. Christ ("Christ") replaced Dirks as Chancellor of UC

15  Berkeley, and pursuant to Federal Rule of Civil Procedure 25(d) was automatically substituted as

16  defendant in connection with all official capacity claims asserted against Dirks. Accordingly, in this

17  First Amended Complaint, Plaintiffs assert claims against Dirks in his individual capacity only. Dirks

18  acted under color of state law.

19  　　　18.　On or around June 1, 2017, prior to the September 14, 2017 event featuring Ben

20  Shapiro discussed below, Defendant Christ became Chancellor of UC Berkeley, and as such, is UC

21  Berkeley's chief executive officer, responsible for UC Berkeley's administration and policy-making,

22  and has ultimate authority to approve the policies and procedures challenged herein that were and will

23  be applied to deprive BCR and YAF of their constitutional rights. Christ acted under color of state

24  law, and is sued in her individual and official capacities.

25  　　　19.　Defendant Stephen C. Sutton ("Sutton") is the Interim Vice Chancellor of the Student

26  Affairs Division, at UC Berkeley. Sutton acted under color of state law, and is sued in his official and

27  individual capacities.

28  　　　20.　Defendant Joseph D. Greenwell ("Greenwell") is the Associate Vice Chancellor for

First Amended Complaint　　　　　　　　　　　　　　　　Case No. 3:17-cv-02255-MMC

1  Student Affairs and the Dean of Students, at UC Berkeley. Sutton acted under color of state law, and
2  is sued in his official and individual capacities.

3       21.    Defendant Margo Bennett ("Bennett") is the Chief of Police for the UCPD, at the UC
4  Berkeley campus. Bennett acts as the ultimate authority for the UCPD at the UC Berkeley campus and
5  is responsible for UCPD's administration and policy-making, and has ultimate authority to approve
6  the policies and procedures challenged herein that were applied to deprive BCR and YAF of their
7  constitutional rights. Bennett acted under color of state law, and is sued in her official capacity.

8       22.    Defendant Alex Yao ("Yao") is the Operations Division Captain for the UCPD, at the
9  UC Berkeley campus. Yao acted under color of state law, and is sued in his official and individual
10  capacities.

11       23.    Defendant LeRoy M. Harris ("Harris") is the Patrol Lieutenant for the UCPD, at the
12  UC Berkeley campus. Harris acted under color of state law, and is sued in his official and individual
13  capacities.

14  **RELEVANT FACTS**

15  **Defendants Possess Final Policy-Making Authority**

16       24.    UC Berkeley is a public university, created by the State of California in 1868, and
17  governed by the Regents of the University of California, a California corporation charged with the
18  administration of the University of California ("UC") as a public trust (Cal. Const., Art. IX, § 9).
19  UC Berkeley is the oldest of California's public research universities, and is considered by many to
20  be the most prestigious public university in the United States.

21       25.    The Board of Regents Standing Order 100.4 provides for the delegation of authority
22  for the governance of UC to the UC President. Order 100.4 provides the following:

> "[t]he President shall be the executive head of the University and shall have full authority and responsibility over the administration of all affairs and operations of the University, excluding only those activities which are the responsibility of the Secretary and Chief of Staff, Chief Investment Officer, General Counsel of the Regents, and Senior Vice President Chief Compliance and Audit Officer. The President may delegate any of the duties of the office except service as an ex officio Regent."

28       26.    The Board of Regents Standing Order 100.6 provides for the delegation of authority



First Amended Complaint               Case No. 3:17-cv-02255-MMC

for the governance of UC Berkeley to its Chancellor. Order 100.6 provides the following:

> "the Chancellor of each campus shall be the chief campus officer thereof and shall be the executive head of all activities on that campus, except as herein otherwise provided . . . . The Chancellor shall be responsible for the organization and operation of the campus, its internal administration, and its discipline; and decisions made by the Chancellor in accordance with the provisions of the budget and with policies established by the Board or the President of the University shall be final."

27. Accordingly, UC President Napolitano, former UC Berkeley Chancellor Dirks, and current UC Berkeley Chancellor Christ act, or have acted, as final policymakers in all matters relating to the setting and application of policies on the UC Berkeley campus, including the policies discussed in this First Amended Complaint.

28. Title 5 of the California Code of Regulations § 100000, *et seq.*, provides that persons not affiliated with the University may not participate in specified activities on University property, including any demonstration or gathering, without prior approval from a "Designated University Official," and subject to any time, place, and manner requirements the Designated University Official may impose. Section 100001 of the regulations defines a "Designated University Official" as "the University official delegated authority over the relevant operation from the Chancellor or chief administrative officer of the facility."

29. On information and belief, former Chancellor Dirks and acting Chancellor Christ have, personally or through instruction to persons under his or her authority, whether formally or informally, whether officially or as a result of permitting such individuals to so act, designated Defendants Sutton, Greenwell, Bennett, Yao, and Harris to act as Designated University Officials for the UC Berkeley campus. Accordingly, Defendants Sutton, Greenwell, Bennett, Yao, and Harris act as final policymakers with respect to creating and enforcing the policies discussed in this First Amended Complaint.

### UC Berkeley's Speaker Facilities Are Designated Public Fora

30. The indoor classrooms and auditoriums at issue in this action are made generally available by UC Berkeley to all registered student organizations, groups or persons invited by registered student organizations, and to all non-affiliated persons or entities. Such general availability



is often subject to certain content-neutral limitations, and to the ministerial decisions of UC Berkeley's administration, to the extent necessary to facilitate reservation and use of the facilities.

31.     Pursuant to the policies adopted by the Regents of the University of California and UC Berkeley, California state regulations, campus officials' admissions, and long-established Supreme Court precedent, UC Berkeley is *required* to maintain the campus' speaker facilities as a designated public forum, subjecting the restriction of constitutionally protected activities on campus to the most exacting constitutional scrutiny. The University does not have the discretion to transform the University into a limited public forum. While other universities, both in and outside California, may have this ability, UC Berkeley does not. Instead, the State of California carefully considered such issues, and promulgated regulations restricting the University's ability to engage in any activity that does not satisfy strict scrutiny under the First Amendment.

32.     Effective October 30, 2008, the Regents of the University of California adopted and promulgated its policy titled "Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California." The policy is codified at Title 5 of the California Code of Regulations §§ 100000–00015.

33.     Section 100004 of the regulation is titled "Approval for Activity on University of California Property." It provides that "[n]o non-affiliate shall hold or conduct any demonstration or gathering in or upon any University property without prior approval from the Designated University Official, and subject to such requirements *regarding time, place and manner* as the Designated University Official may impose . . ." and that "[c]riteria for approval of activities in this section *shall be content-neutral and specified in advance*." Cal. Code Regs. tit. 5, § 100004 (emphases added). Section 100000 defines "University Property" as "buildings and grounds that are operated by, or under the control of, the Regents of the University of California." Cal. Code Regs. tit. 5, § 100000.

34.     Likewise, section 100014 of the same title provides that a "[n]on-affiliates' ability to speak and communicate on campus adds to the vibrant exchange of ideas at the University. At the same time, *reasonable content-neutral regulations regarding the time, place, and manner* of such speech help preserve University property for the functions for which it is dedicated." Cal. Code Regs. tit. 5, § 100014 (emphasis added).

9

35.     Accordingly, while Defendants, and indeed UC Berkeley as a whole, may engage in reasonable, content-neutral regulations of non-affiliates' activities on campus, they may not engage in content-based discrimination. In other words, Defendants may *only* impose restrictions satisfying the constitutional protections afforded to public and designated public fora, and not more limiting, discretionary restrictions.

36.     Moreover, affiliates cannot be subjected to more exacting free-speech restrictions than non-affiliates. Any other arrangement of rights would be unreasonable and would violate California law and the Equal Protection Clause.

37.     California Education Code § 66301 states "[n]either the Regents of the University of California, . . . nor an administrator of any campus of those institutions, shall make or enforce a rule subjecting a student to disciplinary sanction solely on the basis of conduct that is speech or other communication that, when engaged in outside a campus of those institutions, is protected from government restriction by the First Amendment to the United States Constitution or Section 2 of Article 1 of the California Constitution." Cal. Educ. Code § 66301. In other words, where the government (including UC Berkeley) is, by operation of the First Amendment, prevented from restricting speech arising from "outside a campus of [UC] institutions," it is also prevented from restricting the same speech made by a student of that campus. Accordingly, Defendants may not subject a student to more oppressive restrictions than those the First Amendment allows the government to impose upon non-students off campus.

38.     Although non-affiliates and affiliates alike may use UC Berkeley facilities pursuant to the policies discussed above, "registered campus organizations" are afforded a more streamlined process by which to reserve classrooms and facilities. Accordingly, many student groups, including BCR, annually obtain such status, pursuant to the procedures established by the "Berkeley Campus Regulations Implementing University Policies" ("Berkeley Campus Regulations") and the UC Berkeley LEAD Center, the administrative body responsible for approving student group registration applications.[2]

---

[2] The Berkeley Campus Regulations are published by UC Berkeley at the following url: http://sa.berkeley.edu/uga/regs.



First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

39.     Pursuant to Berkeley Campus Regulations § 121, a group of students may apply for recognition by filing with the appropriate campus office: "[a] copy of its constitution or an equivalent document, and by-laws including the organization's name, purposes, requirements for membership, method of selecting officers, organization structure, procedure for operation and dissolution, amendments, and nondiscrimination and non-hazing clauses;" and "the names of at least four responsible officers or authorized representatives of the organization, the name of its University adviser, if any, and a statement that specific functions and activites [sic] in the organization as defined herein is limited to students, faculty and staff of the Berkeley campus."

40.     According to the LEAD Center, there are five steps to registering a new student organization: 1) "complete the new organization interest form;" 2) meet with a Peer Leadership Consultant, to provide the required draft constitution; 3) "submit completed RSO Registration Form;" 4) have between 4-8 members become certified signatories for the group; and 5) "[h]ave at least 2 of these signatories attend an in-person Signatory Orientation to understand the roles and responsibilities of the organization." Once registered, the group must annually re-register the student organization by filing a re-registration form, submitting four "Signatory Certifications," so that the signatories will have authorization to make use of the streamlined room reservation process, and have two such signatories attend a "Signatory Orientation." [3]

41.     Pursuant to Berkeley Campus Regulations § 222 "Designated University facilities and services may be reserved or requested for meetings . . . by [r]ecognized campus organizations, for events related to the purposes of the organizations . . . [as well as] [n]on-University organizations upon invitation of . . . recognized campus organizations," subject to certain ministerial requirements. [4]

42.     Once registered, a student group, such as BCR, may reserve classroom space "on a

---

[3] As of the date of this filing, the LEAD Center's publication on how to register a new student group is available at the following url: http://lead.berkeley.edu/manage-your-organization/new-rso-registration/. The publication on how to re-register a returning student group is available at the following url: http://lead.berkeley.edu/manage-your-organization/register-your-org/.
[4] The ministerial requirements set forth in Berkeley Campus Regulations § 222(d) must be read in light of Cal. Code Regs. tit. 5, § 100004, which requires UC Berkeley's criteria for approval to be "content neutral and specified in advance."



First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

*first-come, first-serve basis* determined by the date the request for space is made."[5] (emphasis added.)

43.     To make a reservation, the student group's signatory merely navigates to "25Live," UC Berkeley's classroom reservation portal, selects the desired classroom, and if the room is available, submits the reservation request.

44.     According to UC Berkeley's "Reservation Policies and Procedures for Registered Student Organizations," a classroom reservation may be denied for one of the following reasons: 1) "No rooms matching the criteria listed in the event request are available for [the group's] specified time(s) and date(s);" 2) "[the] reservation included activities or items that violate General Assignment Classroom Usage Policies," relating to, *inter alia*, the consumption of food and drink in the classroom and other content-neutral limitations on classroom use; or 3) "[the Registered Student Organization] has surpassed one of the semester long classroom reservation policy limits; such as the 20-hour per semester limit, 4-hour per weekend day limit, or the 2-at-a-time large capacity classroom reservation limit."[6]

45.     With the exception of Plaintiffs' events discussed in this First Amended Complaint, UC Berkeley ordinarily facilitates room reservations by carrying out its purely ministerial duties.

46.     The availability of certain large facilities, including Wheeler Hall, Zellerbach Hall, and the Greek Theatre, are not generally made available through the "25Live" portal, and student group signatories are instead required to submit a written "Rental Inquiry Form," or similar form, providing details as to the timing and size of the event, and whether any special equipment is needed. Again, pursuant to UC-wide policies, UC Berkeley cannot engage in content-based valuations of the requests to use these facilities, regardless of whether or not the requestor is affiliated with the University. Cal. Code Regs. tit. 5, § 100004.

47.     When an entity that is not affiliated with the campus sponsors an event hosted by a registered student organization, the registered student organization generally reserves the classroom or auditorium directly. The outside sponsor is not required to directly request access to the desired

---

[5] As of the date of this filing, information concerning the classroom reservation procedure is available at the following url: http://sisproject.berkeley.edu/classroom/reservations/student/f16-onward.
[6] As of the date of this filing, the list of reasons for denying a classroom reservation is posted at the following url: http://sisproject.berkeley.edu/classroom/reservations/student/f16-onward#States.



First Amended Complaint                                                      Case No. 3:17-cv-02255-MMC

facility, or to satisfy obligations that might otherwise be required of it absent a registered student organization host.

48.     High-ranking UC Berkeley officials have confirmed, in writing, that the university is committed to adhering to its policy and practice of approving reservation requests on a content-neutral basis, despite their recent actions to the contrary with respect to events featuring conservative speakers. (Ex. A [BCR has the "right to invite whoever they'd like to speak [on campus]."].) Indeed, as discussed below, on or around September 14, 2017, Chancellor Christ admitted to the LA Times that the University has been getting "legal advice" that "we cannot exert those restrictions," when referring to unreasonable time, place, and manner restrictions imposed on an event featuring a controversial speaker in the 1990's, which was purportedly done as a "way of protecting the campus."

49.     Since UC Berkeley may only lawfully impose content-neutral restrictions and may only take ministerial actions when accommodating requests to use the campus facilities at issue, all such restrictions must satisfy the constitutional protections afforded to public and designated public fora – i.e., all restrictions must be free from viewpoint discrimination, any content-based speech restriction must be narrowly tailored to serve a compelling government interest, and any content-neutral time, place and manner restriction must be narrowly tailored to serve an important government interest and leave open ample alternative channels for the communication of the message. Nevertheless, as set forth below, even if the relevant facilities are deemed to be limited public fora, Defendants have violated Plaintiffs' constitutional rights.

**UC Berkeley Cancels BCR's Milo Yiannopoulos Speaking Engagement**

50.     At times in recent decades, UC Berkeley has been a campus known for its tolerance of various viewpoints. Its welcoming atmosphere, however, has become distinctly more hostile to conservative views in recent years, a trend that accelerated after the 2016 Presidential election.

51.     Prior to February 1, 2017, BCR invited and acquired all necessary approval from appropriate UC Berkeley administrators to host a speaking engagement featuring Milo Yiannopoulos, a contentious conservative writer, speaker, and former senior editor of Breitbart News (the "Milo Event"). The event was scheduled to begin at 8:00 p.m. in Pauley Ballroom on the

13

UC Berkeley campus – a venue more than large enough to accommodate the expected sellout crowd of 500 attendees. The event was widely publicized in the San Francisco Bay area, and was subject to significant debate amongst the public and government officials, including high-ranking officials at the City of Berkeley. Indeed, on January 31, 2017, Berkeley City Councilwoman Cheryl Davila emailed Berkeley Mayor Jesse Arreguin about the event, asking "[a]re you addressing this? He should not be speaking @ UCB.. Please let me know."

52.     In the hours leading up to the Milo Event, dozens of black-clad, masked agitators and demonstrators (self-styled "antifa," short for "anti-fascist"), appearing to act in concert, set fires and threw objects at buildings in downtown Berkeley near the campus to protest Milo Yiannopoulos' appearance.

53.     While UCPD was present on the scene, few arrests were made, and all police officers, including both UCPD and Berkeley city police, appeared to obey a stand-down order that required the officers not to intervene or make arrests in the many physical altercations that occurred between the violent mob and those seeking to attend the Milo Event.

54.     In a subsequent meeting between BCR representatives, including BCR member Naweed Tahmas, Lt. Harris, and UC Berkeley administrator Millicent Morris Chaney ("Ms. Chaney"), UCPD informed BCR that it was UCPD policy not to intervene in any non-life-threatening situations during the commission of a riot or violent demonstration, such as the violent protest surrounding the canceled Milo Event. In other words, the UCPD has an official "stand-down" policy for *any* altercation it witnesses on campus that does not involve the imminent loss of life.

55.     At approximately 6:00 p.m. on February 1, the University administration announced that the Milo Event was canceled, and as result of the violent demonstration, instituted a nearly campus-wide "lockdown" that was not lifted until approximately 10:55 p.m. on the same evening.

**UC Berkeley Surreptitiously Adopts Unwritten Policy Regarding "High-Profile Speakers"**

56.     On or around March 1, 2017, University administration officials, including UC Berkeley administrators and members of UCPD, met with officials from the City of Berkeley Mayor's Office and the Berkeley Police Department ("Berkeley PD"), to discuss adopting a new policy that would impose more stringent restrictions on events involving "high-profile speakers"



(the "High-Profile Speaker Policy"). This unwritten policy ostensibly restricts the time and place of all events involving "high-profile" speakers. Specifically, these events must, or are often required, to conclude by 3:00 p.m. (described by University administrators as a "curfew"), and must be held in a "securable" location – also an undefined term. Prior to July 14, 2017, when the University released a written policy for "Major Events Hosted by Non-Departmental Users," neither the University, nor Defendants, had set forth the exact nature and scope of the High-Profile Speaker Policy, despite requests from BCR, and have failed to provide any criteria making clear who is considered a "high-profile" speaker under the policy; to whom this policy has been applied since its formation; or what, if anything, renders a particular venue on the UC Berkeley campus "securable." The policy is both amorphous and infinitely malleable. As discussed, below, UC Berkeley later released a written policy for "Major Events Hosted by Non-Departmental Users" that establishes the contours of the High-Profile Speaker Policy.

57.    On April 19, 2017 – several weeks after the High-Profile Speaker policy apparently was adopted – in an email sent to BCR member Naweed Tahmas, copying Captain Yao, UCPD Patrol Lieutenant Harris stated that at the March 1 meeting, the University, UCPD, City of Berkeley, and Berkeley PD "agreed that all events involving high profile [sic] speakers be conducted during daytime hours." Lt. Harris' email does not explain or give guidance concerning what distinguishes a "high-profile" speaker from a non-"high-profile" speaker; what hours during the day a "high-profile" speaker may speak on campus; or what venues would be made available for such speakers. A true and correct copy of this email, with personal contact information redacted, is attached hereto as **Exhibit B**.

58.    UC Berkeley's High-Profile Speaker Policy was not made known to BCR, YAF, or the general student body at the time of its adoption on or around March 1, 2017, or for several weeks thereafter.

### UC Berkeley Applies the Secret High-Profile Speaker Policy to Cancel the David Horowitz Event

59.    In February or early March, 2017, BCR began organizing events on the UC Berkeley Campus, with the goal of offering prominent conservative speakers the opportunity to express

15



conservative viewpoints, and to engage in a dialogue with UC Berkeley students and the public about those viewpoints.

60.    Their efforts included BCR contacting YAF to request that YAF sponsor such an event by providing funding and logistical assistance, and by recruiting a conservative speaker. As a result of these efforts, BCR and YAF invited David Horowitz, a prominent conservative writer and frequent speaker on college campuses for decades, to speak on the UC Berkeley campus in mid-April, 2017 ("Horowitz Event").

61.    On March 23, 2017, BCR representatives met with University administrators and UCPD to discuss event logistics and security. Citing undisclosed safety concerns, UCPD rejected BCR's request that the event be held in room 100 of the Genetics & Plant Biology ("GPB") building on the central UC Berkeley campus.

62.    In an email commemorating the meeting, Ms. Chaney, a Student Organization Coordinator for UC Berkeley, informed BCR that 100 GPB was "not an adequate venue to ensure [Mr. Horowitz's] safety and therefore the campus will seek an alternative room to 100 GPB but ask for flexibility with the start/end times and days of the week so an appropriate venue can be identified before moving forward on the event plans." Ms. Chaney also asked that BCR discuss "what are acceptable ranges of start/end times (ex.: would anytime Tues, 4/11 bet. noon to 6pm or Wed. 4/12 bet. 11am and 6pm work?)," and asked that a representative of BCR be available for a follow-up conference call with UCPD.

63.    In a March 28, 2017 email, Lt. Harris of the UCPD emailed BCR inquiring if BCR had contacted YAF "to determine the flexibility of lecture times and a contact person to discuss Mr. Horowitz's security requirements."

64.    BCR responded to Lt. Harris' inquiry the same day, confirming the April 12, 2017 4:00-6:00 p.m. time for the event.

65.    On March 29, 2017, BCR again contacted the University to secure a room from 4:00-6:00 p.m. on April 12, 2017, for the Horowitz Event. Marissa Reynoso, Director of the UC Berkeley Student Organization Advising & Leadership Development, stated that she was "trying to get an update" and apologized for the delay.

First Amended Complaint                                      Case No. 3:17-cv-02255-MMC

66.     The following day, March 30, 2017, UCPD's Captain Yao and University administration informed BCR that Mr. Horowitz could not speak past 3:00 p.m., due to purported security reasons. The UCPD also strongly suggested that BCR and YAF limit attendance at the Horowitz Event to students only, and further strongly recommended that organizers not release the location of the speech to attendees until hours before the event itself. At no time did the Defendants disclose to BCR or YAF that it was enforcing the High-Profile Speaker Policy in connection with the Horowitz Event. Evidently, however, the University's earlier requested "flexibility" was more than a request – it was a mandate enforced pursuant to the unwritten High-Profile Speaker Policy.

67.     On April 6, 2017, Stephen Sutton, UC Berkeley Interim Vice Chancellor for the Division of Student Affairs, entered the conversation and informed BCR member Branden West, and Mr. Horowitz, that the Horowitz Event must be held more than one mile from the center of the UC Berkeley campus, at the Clark Kerr Krutch Theater, and that it must start by 1:00 p.m., stating in relevant part:

> In the wake of events surrounding the cancelled appearance by Milo Yiannopoulos, law enforcement professionals (UCPD) conducted a comprehensive review of the event's advance planning, security arrangements, and logistical details. Among the findings were two, key points: the timing of an event, as well the location and nature of the venue, can play an important role when it comes to the safety and security of the speaker, attendees and individuals engaged in lawful protest.

> For that reason, UCPD has recommended that the [sic] your upcoming speaking engagement be held at 1:00 pm in the Krutch Theater. These recommendations are based solely and exclusively on UCPD's objective analysis of how best to mitigate risk, ensure safety for all, and maximize the chances that the event will take place as planned. In that context, the campus greatly appreciates recent public comments by representatives of the BCR who offered full support for increased security measures in and around high- profile events featuring potentially controversial speakers.

68.     On April 10, 2017, the University and UCPD informed BCR, for the first time, that BCR and YAF would need to pay a security fee in the amount of $5,788, for the Horowitz Event to proceed a mere six days later.

69.     Defendants have discretion when deciding whether and to what extent a security fee should be imposed on an event, as made clear months later when Defendants purport to have waived

First Amended Complaint                                          Case No. 3:17-cv-02255-MMC

thousands of dollars in fees under the "unique circumstances" associated with Plaintiffs' September 14, 2017 event featuring Ben Shapiro. This exorbitant fee for the Horowitz Event was imposed as a matter of discretion, despite the fact that UCPD refused as a matter of policy to provide actual security by intervening in any violence short of life-threatening bodily harm, and despite the fact that BCR and YAF had agreed to limit attendance to the Horowitz Event to students only.

70.     As a result of Defendants' actions, BCR was forced to cancel the Horowitz Event on April 10, 2017. The enforcement of the High-Profile Speaker Policy unreasonably restricted the Horowitz Event to 1:00-3:00 p.m., during a time when many students are still in class on the main UC Berkeley campus, sought to prevent Plaintiffs from releasing the event details until mere hours before the event, and required that the event be relegated to a facility far from the central campus making it impossible for most students to attend in the narrow mid-day time required by the UC Berkeley administration. The fact that attendance at the event was further limited to students only, created a further conundrum for the organizers – who would attend their event during peak class time? In addition, the discretionary imposition of the significant security fee by Defendants on a student group six days before an event that few students could now attend, thanks to UC Berkeley's vaguely articulated security concerns and an unwritten policy, decidedly *not* announced in advance, rendered it impractical for BCR to host the event, given all the other requirements imposed by Defendants. Accordingly, the Horowitz Event was canceled.

71.     Plaintiffs incurred monetary damages as a result of this cancellation, including in connection with the creation of promotional materials for the event, the scheduling of travel arrangements, and the time and effort expended by YAF's paid staff in planning the event and planning to travel to and support the event onsite.

### BridgeCal, YAF, and BCR Invite Ann Coulter to Speak on Campus

72.     BridgeCal is a UC Berkeley chapter for BridgeUSA, a national nonpartisan organization that aims to reinvigorate the practice of open and frank political discussions on university campuses, and to challenge people's opinions through exposure to contrary points of view.

73.     On or before early March 2017, BridgeCal, in conjunction with BCR, began planning a speaker series on the topic of illegal immigration. BridgeCal and BCR hoped to engage the student

First Amended Complaint                                   Case No. 3:17-cv-02255-MMC

body and the public in a dialogue about the topic of illegal immigration, by providing an opportunity for students to engage directly with both liberal and conservative speakers of prominence.

74. BridgeCal invited Maria Echaveste, a former advisor and White House Deputy Chief of Staff, to provide a liberal viewpoint on illegal immigration. Ms. Echaveste's appearance was confirmed by BridgeCal on March 17, 2017, and then a venue for her speech was confirmed with the University on March 22, 2017.

75. BridgeCal sought the assistance of BCR to recruit a conservative speaker to address the same topic within the same month as Ms. Echaveste. As a result of this dialogue between BridgeCal and BCR, BridgeCal approached YAF about supporting the event, and having secured the support commitment, invited Ann Coulter to speak on the UC Berkeley campus, to provide the conservative viewpoint on the topic of illegal immigration as a counterpoint to Ms. Echaveste's remarks.

76. Ann Coulter is an American conservative social and political commentator, twelve-time, New York Times best-selling author, a syndicated columnist, and a lawyer by training. She frequently appears on television, radio, and as a speaker at public and private events, and has described herself as someone who likes to "stir up the pot" and frequently draws criticism from both liberal and conservative commentators for her polemical views.

77. On March 17, 2017, BridgeCal member Ross Irwin, in conjunction with and on behalf of BCR and YAF, emailed UC Berkeley Student Organization Coordinator, Ms. Chaney, informing the University that "we believe we have a 50% chance of Ann Coulter coming to speak in the last week of April. The other 50% would be her coming next semester. . . . What do we need to know about security fees and if there are fees for booking large auditoriums like Pauley . . . ." BridgeCal initiated dialogue with UC Berkeley's administrators about the Coulter speaking event ("Coulter Event") on the same day that BridgeCal confirmed Ms. Echaveste's appearance with Ms. Echaveste. A true and correct copy of this email, which was forwarded by Mr. Irwin to BCR member Naweed Tahmas, with personal contact information redacted, is attached hereto as **Exhibit C**.

78. On March 28, 2017, Ms. Coulter formally accepted BridgeCal, BCR, and YAF's invitation to speak at UC Berkeley on April 27, 2017. As scheduled, Ms. Coulter's presentation was to take place eight days after Ms. Echaveste's opening of the student-sponsored speaker series on illegal

19

1   immigration, a topic of widespread interest to students and the broader UC Berkeley community.

2       79.     On the same day, March 28, 2017, a BCR member and UC Berkeley student, Matt

3 Ronnau, copying BCR member Naweed Tahmas, emailed Ms. Chaney, the UC Berkeley Student

4 Organization Coordinator, informing the University that BCR would be hosting Ms. Coulter in an on-

5 campus speaking engagement on April 27, 2017, during the week initially indicated in BridgeCal's

6 March 17, 2017 email. Mr. Ronnau also stated that BCR had submitted a request for a room that could

7 fit at least 500 people, indicating that "[i]t would be ideal to have Pauley Ballroom or Hertz Hall from

8 7:00-9:00 [p.m.], so just please let me know what we need to do in order to be granted this." A true

9 and correct copy of this email, with personal contact information redacted, is attached hereto as

10 **Exhibit D**.

11       80.     Pauley Ballroom and Hertz Hall are large, centrally located venues on the UC Berkeley

12 campus that are large enough to accommodate the anticipated interest in the Coulter Event. Pauley, for

13 example, holds up to 999 people according to the University's online representations, and Hertz Hall

14 holds up to 678 people for events.

15       81.     On March 29, 2017, BCR and YAF entered into a Contract for Sponsorship of Speaker

16 with Young America's Foundation, obligating YAF to cover a minimum of $13,000 in costs

17 associated with hosting Ms. Coulter on the UC Berkeley campus, including, but not limited to,

18 honorarium, transportation, security, and housing costs for Ms. Coulter and her security team.

19       82.     BCR, YAF, and BridgeCal immediately began preparing for the Coulter Event,

20 including by seeking to secure a venue and security for the event. Ms. Coulter informed BCR and

21 YAF, which in turn notified Defendants, that Ms. Coulter would be accompanied by an additional

22 personal security team.

23 **UC Berkeley Applies the High-Profile Speaker Policy**

24 **to Cancel the Ann Coulter Event**

25       83.     On April 2, 2017, BCR contacted UC Berkeley administrators and UCPD to request a

26 meeting to discuss event logistics and security.

27       84.     On April 3, 2017, BCR representatives met with representatives of the UC Berkeley

28 administration to discuss event logistics and security.

First Amended Complaint                              Case No. 3:17-cv-02255-MMC

85.     On April 6, 2017, BCR representatives, Jose Diaz, Naweed Tahmas, and Branden West met UCPD representatives, Captain Yao, Lt. Harris, and University administrators Ms. Chaney and Marissa Reynoso, who, for the first time, disclosed the existence of the unwritten and unpublished High-Profile Speaker Policy, and informed BCR that UC Berkeley would be enforcing this policy in connection with the Coulter Event. UCPD instructed BCR that the event must conclude by 3:00 p.m., and that the University and UCPD would select a "securable" venue on campus. UCPD also informed BCR that if these requirements were not met, the event could not proceed.

86.     At the April 6 meeting, UCPD also strongly encouraged BCR and BridgeCal not to publicly disclose where the speech eventually would take place, and strongly encouraged the groups to restrict attendance at the event to students only, informing them that the University would impose a higher "security fee" on the event if non-students were allowed to attend. In response to BridgeCal's specific request that UCPD issue a statement before the event that UCPD would be on hand to protect the safety of students attending the Coulter Event, so that students would be encouraged to attend, UCPD explicitly declined to do so, stating that the University would not issue any public statement regarding the University's commitment to protecting students from violent protesters at the Coulter Event.

87.     BCR immediately objected to the imposition of the timing and venue constraints on the Coulter Event as unreasonable, and informed UCPD that because classes would be in session at and before 3:00 p.m., it would be extremely difficult, if not impossible, for the event to be held in a sufficiently large room to seat the hundreds of expected attendees, and that holding it during class time would also make it impractical for thousands of students to attend, who might otherwise wish to do so. These concerns would be multiplied if the event were also restricted to students only, unlike many other University speaking events, which are open to University affiliates and community members.

88.     BCR attempted to negotiate an end-time of 5:00 p.m. – four hours earlier than BCR initially requested, and approximately three hours before sunset on April 27, 2017 – but thought this reasonable request complied with Defendants' requirement that the event be held during the daytime, it was summarily rejected by Defendants.

89.     On April 10, 2017, BCR met with UC Berkeley administrator Ms. Chaney to discuss

21

1   event logistics and security, and the imposition of the High-Profile Speaker Policy on the April 27,

2   2017 Coulter Event.

3       90.     On April 11, 2017, after being informed that the 3:00 p.m. deadline was non-

4   negotiable, BCR requested a meeting with UC Berkeley Dean of Students Joseph D. Greenwell to

5   further plead its case, and offered to end the event at 4:00 p.m. on April 27. Despite making significant

6   scheduling efforts, BCR was never permitted to speak in-person with Greenwell. Instead, Dean

7   Greenwell merely emailed BCR member Naweed Tahmas, copying Captain Yao, Lt. Harris, Stephen

8   Sutton, and others, expressing that even a 4:00 p.m. end-time would not be permitted, but the 3:30

9   p.m. end-time was confirmed. A true and correct copy of this email, with personal contact information

10  redacted, is attached hereto as **Exhibit E**.

11      91.     On April 13, 2017, BCR representatives Naweed Tahmas, Pieter Sittler, and Troy

12  Worden met with a UCPD representative Lt. Harris, and University administrator Ms. Chaney, to

13  discuss the imposition of the University's unreasonable time, place, and manner restrictions on the

14  Ann Coulter speaking engagement. Despite BCR's concession to limit the event to students only, and

15  its reasonable request for an only slightly later end-time of 5:00 p.m., UCPD informed BCR that the

16  3:30 p.m. end-time was non-negotiable.

17      92.     At the April 13, 2017 meeting, Lt. Harris expressed that according to UCPD's

18  "research" into Ms. Coulter and the February activity by the violent demonstrators in connection with

19  the canceled Milo Event, Ms. Coulter's speech was likely to spark outrage, giving rise to alleged

20  security threats and justifying the imposition of the curfew.

21      93.     Based on the UCPD's representations on multiple occasions in the weeks before the

22  Coulter Event, it appears that Defendants do not rely on any objective criteria (e.g. anticipated crowd

23  size, past media attention, number of New York Times best-selling books, status as a current or former

24  head of state, winning of a Nobel Peace Prize, number of campaigns for public office, size of Twitter

25  following, number of television viewers during recent appearances, etc.) to determine whether an

26  invited speaker is considered "high-profile." Instead, Defendants selectively impose their unwritten,

27  unpublished High-Profile Speaker Policy based on their subjective beliefs that the anticipated content

28  of the speaker's speech is likely to spark "public outrage," as that term is selectively defined by

DHG

DHILLON LAW GROUP INC.

First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

Defendants, thereby triggering "security" concerns and leading to the need to restrict the speaker to a "securable" facility and time of speaking, with "securable" being an infinitely malleable, discretionary concept.

94.     Based on the selective application of the High-Profile Speaker Policy to date (in the Horowitz Event and Coulter Event situations), it appears that the true aim of the High-Profile Speaker Policy is to make it as difficult as possible for a disfavored speaker to hold a successful event at UC Berkeley, by forcing the event timing to conflict with classes, by requiring that the event take place when large venues are occupied with classes, by requiring that the venue be far from where students are likely to be gathered, and therefore difficult to reach during the narrow window of time allotted during the daytime, by urging that the event not be publicized until just before the event, by restricting the event to students only (the same students who are attending class on the central campus and therefore cannot drive off campus to attend an event that is not publicized until hours before the event, if at all), and finally, if those artificial hurdles are not sufficient to accomplish the goal of deterring the event, by imposing a large and last-minute "security fee" on the sponsoring group as the *coup de grace*.

95.     The High-Profile Speaker Policy is unconstitutionally vague, overbroad, and impermissibly affords Defendants absolute discretion in identifying what events and which speakers are subject to the policy.

96.     Not surprisingly, by providing Defendants carte blanche to control campus speech, Defendants have been and are enforcing the High-Profile Speaker Policy in a manner that discriminates based on the viewpoint expressed by the speaker and the hosting Registered Student Organization, in violation of BCR and YAF's constitutional rights to free speech, due process, and equal protection. Defendants are further allowing their subjective opinions about the anticipated reactions from critics – including a mob of masked, off-campus, "antifa" – to dictate whether they choose to define a speaker to be subject to the High-Profile Speaker Policy, and thereby impose a host of hurdles to their appearance that do not apply to speakers presumed acceptable to the same critical mob and to University administrators.

97.     On April 17, 2017, Ross Irwin, a representative of BridgeCal, copying BCR member



First Amended Complaint                                        Case No. 3:17-cv-02255-MMC

1   Naweed Tahmas, emailed UC Berkeley administration and UCPD, confirming the 3:30 p.m., April

2   27, 2017, end-time for the Coulter Event. A true and correct copy of this email, with personal

3   contact information redacted, is attached hereto as **Exhibit F**.

4          98.     The following day, April 18, 2017, Dean Greenwell called BCR representative

5   Naweed Tahmas, claiming that the University could not secure a room for the Coulter Event, and

6   that the University was canceling the event due to safety concerns, but that it could be rescheduled

7   for the Fall semester – which was over five months later, and after thousands of students who

8   would otherwise have attended the Coulter Event would have graduated, including then-President

9   of BCR, Jose Diaz. During this conversation, Mr. Tahmas asked Greenwell whether the Coulter

10  Event still would be subject to the curfew and venue restrictions of the High-Profile Speaker Policy

11  if it was rescheduled to the Fall semester, given that Defendants would then have a minimum of

12  five months to prepare. Greenwell admitted that the purported safety concerns would remain

13  equally applicable to the event no matter when the event eventually was held, and therefore BCR

14  and YAF still would be subject to the High-Profile Speaker Policy, even if Ms. Coulter spoke

15  during the Fall semester. In short, despite the University's opportunity to prepare, Ms. Coulter

16  would *never* be afforded the chance to speak to students during the after-class times and central

17  campus locations routinely afforded to "high-profile" but liberal speakers on the campus not

18  subjected to the High-Profile Speaker Policy, such as Ms. Echaveste, the first speaker in the

19  BCR/BridgeCal immigration series.

20         99.     During the April 18 call to Mr. Tahmas, after initially indicating otherwise, Dean

21  Greenwell admitted that the High-Profile Speaker Policy was not in writing, and by extension is

22  not published. This was also confirmed in an April 18, 2017 email from Captain Yao, copying Lt.

23  Harris, UCPD Chief of Police, Bennett, and UC Berkeley administrator, Joseph Greenwell and Ms.

24  Chaney, to Mr. Tahmas. A true and correct copy of this email, with personal contact information

25  redacted, is attached hereto as **Exhibit G**.

26         100.    As reflected by the negotiations between Plaintiffs and the Defendants, it is apparent

27  that no matter how remote the threat, Defendants will not permit the expression of disfavored

28  conservative viewpoints at desirable places and times on the UC Berkeley campus, without

24

1    subjecting the event to unreasonable restrictions that are not applied to favored speakers.

2        101.    Upon learning that Defendants unilaterally had canceled the event, even after

3    Plaintiffs had acceded to each of the University's unreasonable time, place, and manner restrictions

4    on their constitutionally protected speech in an effort to ensure that the speech went forward on the

5    day Ms. Coulter had been invited, Ms. Coulter publicly disclosed on social media her intention to

6    give a speech at UC Berkeley, despite the Defendants' unconstitutional efforts to restrict the

7    expression of conservative viewpoints on campus.

8        102.    As a result of the national firestorm surrounding these events, prominent progressive

9    politicians and government officials publicly scolded UC Berkeley for trying to block the Coulter

10   Event. Senator Sanders reportedly told the Huffington Post, regarding efforts to block the Coulter

11   Event, "I don't like this. I don't like it…you know, people have a right to give their two-cents

12   worth, give a speech, without fear of violence and intimidation." In a television interview on CNN,

13   Senator Warren, a former Harvard Law School professor, commented on the events at UC

14   Berkeley, advising listeners "my view is let her [Ms. Coulter] speak, and just don't show up. If you

15   don't like it, don't show up." On April 19, 2017, Robert Reich, UC Berkeley Professor of Public

16   Policy, and former U.S. Secretary of Labor during President Bill Clinton's administration, shared

17   publicly via social media: "Today, officials at the University of California, Berkeley, where I'm a

18   professor, canceled a planned speech by Ann Coulter. They cited safety concerns . . . This is a

19   grave mistake. Coulter should be allowed to speak . . . It's one thing to cancel an address at the last

20   moment because university and local police are not prepared to contain violence . . . It's another

21   thing entirely to cancel an address before it is given, when police have adequate time to prepare for

22   such eventualities." Despite the nearly ubiquitous condemnation of Defendants' actions,

23   Defendants continued to deny Plaintiffs a venue for the April 27 event.

24       103.    On April 20, 2017, under mounting national pressure from UC Berkeley students,

25   faculty, and staff, and the public, including national media commentators and noted First

26   Amendment lawyers and politicians, Ellen Topp, the Interim Chief of Staff for Student Affairs, on

27   behalf of Vice Chancellors Sutton and Scott Biddy, emailed, among others, BCR member Naweed

28   Tahmas, and YAF's Vice President, Patrick Coyle, stating in relevant part:

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ms. Coulter's announcement that she intends to come to campus on April 27th without regard for the fact that we don't have a protectable venue available on that date is of grave concern. Our police department has made it clear that they have very specific intelligence regarding threats that could pose a grave danger to the speaker, attendees, and those who may wish to lawfully protest the event. At the same time, we respect and support Ms. Coulter's own First Amendment rights.

Given our serious reservations and concerns regarding Ms. Coulter's stated intentions, last night the Chancellor asked us to look beyond the usual venues we use for large public gatherings to see if there might be a protectable space for this event that would be available during the compressed and extremely busy window of time between now and the end of the academic year.

Fortunately, that expanded search identified an appropriate, protectable venue that is available **May 2nd, 2017, from 1:00 - 3:00 PM**. While it is not one we have used for these sorts of event in the past, it can both accommodate a substantial audience and meet the security criteria established by our police department. We are directly informing the Coulter organization of this development and we look forward to working with you and them. We will disclose the exact location of the venue to the public once we have finalized details with you and Ms. Coulter. We will be publicly announcing this new date and time today (April 20th) at 12:30 PM.

A true and correct copy of the entire email, with personal contact information redacted, is attached hereto as **Exhibit H**.

104.    As indicated by the University's email, the High-Profile Speaker Policy would remain in place for the proposed May 2, 2017 rescheduled event. May 2, 2017 is during what the University refers to as a "dead week" in which no classes are held on campus, and students are encouraged to prepare for final examinations, which immediately follow the dead week. Many students leave the campus altogether during this week, as they have no classes requiring their attendance, and they prefer to study for finals off campus, without distractions.

105.    Because of the dead week timing (including the mid-day "curfew" scheduling), many students who otherwise would have been available to attend the Coulter Event could not do so on May 2, 2017, the date proposed by Defendants. Accordingly, BCR and YAF rejected Defendants' transparent attempt to save face because the proposed date could not accomplish BCR and YAF's stated purpose for the event of exposing students to conservative viewpoints on illegal immigration.



First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

106.    On April 25, 2017, Harmeet K. Dhillon, legal counsel for YAF and BCR, sent an email to Bryan Heckenlively, counsel for Defendants, requesting that UC Berkeley provide a central venue on campus for the Coulter Event to proceed on the scheduled date of April 27, 2017. A true and correct copy of the email is attached hereto as **Exhibit I**.

107.    Mr. Heckenlively responded by stating that UC Berkeley "is unable to satisfy your request to provide a secure, indoor venue for Ms. Coulter's appearance on April 27," and further stating that while Ms. Coulter could speak outside, on Sproul Plaza, on April 27, the "University has serious concerns about security" but the University will "attempt to maintain safety." A true and correct copy of the email is attached hereto as **Exhibit J**.

108.    In other words, the purported security threat was sufficiently perceptible to deny Defendants' equal access to UC Berkeley facilities, weeks in advance of the event – but, illogically, that same security threat was evidently not sufficiently perceptible to prohibit Ms. Coulter from speaking outdoors entirely, less than 48 hours before the purported event. Defendants have never provided an explanation for their inconsistent reliance on purported security threats to haphazardly impose unreasonable and arbitrary restrictions on the Coulter Event.

109.    Because Defendants refused to provide YAF and BCR with a securable indoor venue for the Coulter Event, Plaintiffs were unable to host the event, and Ms. Coulter did not speak on campus in any capacity.

110.    Over the course of the nearly four weeks of discussions leading up to the Coulter Event, Defendants began raising more and more issues about the event, and piling on more arbitrary restrictions (a tactic Defendants repeated in connection with Plaintiffs' September 14, 2017 event featuring Ben Shapiro), until efforts to hold the event became futile. Initially, University officials indicated that multiple on-campus venues would be available for the Coulter Event, including:

        a.      Booth Auditorium (represented as being available April 27, 2017);

        b.      Anderson Auditorium;

        c.      Zellerbach Auditorium;

        d.      Dwinelle 155 (represented as being available the evening of April 27, 2017);



1    e.    Valley Life Sciences Building, Room 2050;

2    f.    Haas Faculty Wing, Room F295; and

3    g.    Memorial Stadium (represented as being available April 27, 2017).

4    111.    Had Defendants acted to approve BCR's reservation request, these venues would have

5    been available for the Coulter Event. Indeed, Booth Auditorium and Pauley Ballroom remained

6    available to be used for the Coulter Event up to and on April 27, 2017, yet Defendants claimed no

7    securable venue existed.

8    112.    After offering and discussing all of the above potential venues with BCR and YAF,

9    Defendants suddenly announced to BCR, YAF, and BridgeCal the imposition of the newly adopted

10   High-Profile Speaker Policy, which unreasonably restricted the time and place at which Ms.

11   Coulter could speak. After initially canceling the event, the University and Defendants offered a

12   purported alternative date of May 2– one which effectively relegated the event out of existence, as

13   discussed above.

14   113.    Following BCR and YAF's rejection of the sham alternative date of May 2, the

15   University and Defendants maliciously and publicly made numerous false statements about the

16   series of events leading up to their unilateral cancellation of the Coulter Event, falsely indicating

17   that the University only learned that Ms. Coulter would be speaking on campus through the press,

18   and that BCR had failed to provide four weeks' notice that the event would be held on the

19   University campus.

20   114.    These representations are categorically false. As described above, the UC Berkeley

21   and Defendants were provided with ample notice no less than six weeks prior to the event, and

22   BCR provided the University with confirmed date of April 27, 2017, on March 28, 2017, more than

23   four weeks prior to the event, which is documented by email communications between BridgeCal,

24   BCR, YAF and UC Berkeley officials.

25   115.    The Defendants attempted to bully BCR and BridgeCal out of holding the Coulter

26   Event at all, by escalating the arbitrary requirements on the event, concealing the High-Profile Speaker

27   Policy until shortly before the University's cancellation, and concealing their true intentions behind a

28   smokescreen of platitudes and misrepresentations. The High-Profile Speaker Policy, with its infinitely

malleable "securable location" parameters, ensures that University officials can pick and choose which speech to permit, and then justify their illegitimate censorship by pointing to their then-unwritten and unconstitutional policy.

116. Plaintiffs incurred monetary damages as a result of Defendants' actions, including in connection with their creation of promotional materials for the Coulter Event, the scheduling of travel and security arrangements, and the time and effort expended by YAF's paid staff in planning the event.

**UC Berkeley Euphemizes the "High-Profile Speaker Policy" as the "Major Events Policy"**

117. In or around June and July 2017, in the wake of the nearly ubiquitous condemnation of Defendants' handling of the Coulter Event, UC Berkeley formally announced plans to adopt an interim, and then final, policy on "Major Events Hosted by Non-Departmental Users" ("Major Events Policy"). A true and correct copy of the draft Major Events Policy as released on or around July 14, 2017 is attached here as **Exhibit K**. According to a policy enactment timeline released by UC Berkeley, the interim policy was to be enforced during the Fall semester of 2017, and then revised following a public comment period, before being approved in its final form for permanent enforcement beginning in January 2018.[7]

118. On August 14, 2017, UC Berkeley promulgated a revised version of the draft Major Events Policy released in July, for enforcement on an interim basis during the Fall 2017 semester. A true and correct copy of the revised Major Events Policy is attached here as **Exhibit L**.

119. The revised version of the Major Events Policy included both substantive changes and non-substantive changes to the draft policy that had been released a few months earlier. For example, the revised version of the policy requires two-weeks' pre-approval for all promotional material used for Major Events, instead of the five-weeks' pre-approval required under the initial draft of the policy.

120. In additional to this substantive change, the revised policy also removed the sentence "[a]ll publicity materials, including but not limited to flyers, posters, banners, emails, and social media, must be reviewed by the LEAD Center prior to posting or distribution," and replaced it with

---

[7] As of the date of this filing, the policy enactment timeline remains available at the following url: http://deanofstudents.berkeley.edu/content/procedures-non-departmental-users-request-access-campus-facilities.



First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

the following more palatable sentence: "The LEAD Center will review publicity materials to verify that event details (such as date, time, and location) are accurate." Notably, the policy is silent on what the conditions are under which the LEAD Center may refuse to approve both on- and off-campus speech by students and the public in connection with Major Events. It is clear, however, that pre-approval for such speech is required, and that failure to acquire this pre-approval "may result in denial of the sponsor's facility use request."

121.    The Major Events Policy provides a written framework for the application and enforcement of the High-Profile Speaker Policy. Defendants remain free to enforce the High-Profile Speaker Policy under the auspices of the Major Events Policy, including all curfew and venue restrictions.

122.    In effect, the Major Events Policy redesignates "high-profile" events as "Major Events," provides a vague definition for what constitutes a "Major Event," and permits Defendants to adopt and enforce "security measures" that "may include, but are not limited to, adjusting the venue, date, and/or time of the event; providing additional law enforcement; imposing controls or security checkpoints; and creating buffer zones around the venue" – namely, all the unreasonable restrictions already imposed under the unwritten High-Profile Speaker Policy. Ex. L. The policy does not "specif[y] in advance" the particular security measures that will be applied to events, as is required by state regulations. Cal. Code Regs. tit. 5, § 100004.

123.    The policy applies to "Major Events" which are nebulously defined as being any event at which one or more of the following conditions apply:

   a. Over 200 persons are anticipated to attend;

   b. Authorized campus officials determine that the complexity of the event requires the involvement of more than one campus administrative unit;

   c. Authorized campus officials determine that the event is likely to significantly affect campus safety and security (based on assessment from the University of California Police Department, hereafter "UCPD") or significantly affects campus services (including kiosk guards, service roads, or parking);



d.   Authorized campus officials determine that the event has a substantial likelihood of interfering with other campus functions or activities;

e.   The event is a dance or concert, regardless of how many attendees;

f.   Alcohol is intended to be served; or

g.   Outdoor amplified sound is requested. Ex. L.

124.   As a result of the vagueries used in defining the scope of the policy, campus officials, including Defendants, have unfettered discretion in deciding whether and to what extent to enforce the unreasonable 8-week notice period, and/or the unlimited array of "security measures" that the Major Events Policy permits or requires, including all such restrictions applied at the Horowitz and Coulter Events.

125.   The Major Events Policy does not apply to events hosted by "Departmental Users," such as UC Berkeley faculty. Accordingly, a student group may circumvent the policy's various restrictions by finding a faculty member willing to co-sponsor the very same speaker with none of the restrictions.

126.   Because a majority of the UC Berkeley faculty is left-leaning progressives, the policy intensifies an existing disparity between progressive speech, which is already widely exposed to students on campus, and non-progressive speech, which is often in short supply on campus.

127.   The Major Event Policy purports to require that all authorized campus officials assess security risks without regard to the "content or viewpoints anticipated to be expressed during the event." Ex. L. However, as made clear by Defendants enforcement of the policy to Plaintiffs' September 14, 2017 event featuring Ben Shapiro, it is UC Berkeley's custom and practice to ignore this requirement (which is also set forth in UC-wide policies) and to impose security measures based solely on the content or viewpoints anticipated to be expressed during the event, and the anticipated protests against the event.  The Major Events Policy is a euphemism for the "heckler's veto" barred by well-settled First Amendment jurisprudence.

128.   In the months since the adoption of the Major Events Policy, several UC Berkeley students and student groups have decried the unreasonableness of the Major Events Policy, including its eight-week notice period and the broad discretion it grants Defendants to levy security fees. On

31

First Amended Complaint                                                      Case No. 3:17-cv-02255-MMC

October 26, 2017, for example, the UC Berkeley student newspaper, The Daily Californian, reported that Manu Meel, executive vice president of external affairs of BridgeUSA at UC Berkeley, said that "[a] lot of student organizations are unable to afford such expensive fees," and "[s]tudents who are serious about inviting constructive speakers are prevented from doing so." UC Berkeley has reportedly received nearly 300 individual comments, most from students, regarding the Major Events Policy. A copy of the Daily Cal article is attached here as **Exhibit M**.

129.    As but another example, in or around September 2017, the Chabad Jewish Student Center and the pro-Israel student club, Tikvah, invited Alan Dershowitz, a noted conservative legal scholar and Harvard Law School professor emeritus, to speak on campus. Defendants blocked the event, stating that the hosts failed to provide UCPD with the necessary eight weeks' notice required by the Major Events Policy, so that UCPD could perform a security assessment.

130.    After Mr. Dershowitz threatened to sue the university, UC Berkeley Boalt School of Law's Dean Erwin Chemerinsky invited Mr. Dershowitz to speak, thereby by-passing the Major Events Policy. The event was able to proceed within two weeks of Dean Chemerinsky's invitation to Mr. Dershowitz.

131.    It defies all logic that UC Berkeley's purported security concerns that necessitated the eight-week notice period under the Major Events Policy were rapidly alleviated when Mr. Dershowitz was invited by someone other than a student group. Yet, this appears to be UC Berkeley's position, as the event was ultimately allowed to proceed on two weeks' notice, after a dean made the request.

132.    The Major Events Policy does not advance any legitimate security interest, or any other interest that UC Berkeley claims to have, as made obvious by Defendants' allowing Mr. Dershowitz to speak immediately after disallowing the same speech on the same terms, when it was requested by a non-departmental user. Instead of advancing any legitimate interest, the Major Events Policy systematically suppresses disfavored viewpoints that are not shared by the "departmental users" – i.e. the faculty and administration of UC Berkeley.

### Defendants Unreasonably Restrict Ben Shapiro Event

133.    On July 10, 2017, BCR's External Vice President, Naweed Tahmas, emailed UC Berkeley administrators, informing them that BCR, with the financial backing and logistical support

First Amended Complaint                                        Case No. 3:17-cv-02255-MMC

of YAF, had invited noted conservative commentator and New York Times bestselling author Ben Shapiro to speak at UC Berkeley on September 14th at 7:00 p.m. ("Shapiro Event"), providing nearly ten weeks' notice to campus administrators. BCR requested a room that could accommodate 500 people on the main UC Berkeley campus for the event. A true and correct copy of the email is attached here as **Exhibit N**.

134.    On July 18, 2017, UC Berkeley Student Organization Coordinator, Ms. Chaney, informed BCR that "despite extensive efforts, we have been unable to identify an available campus venue that meets your stated criteria," and expressed that the administration "expect[s] that no one has signed, or will sign a contract committing your organization to a specific time, date, and location before a venue is identified and agreed to." Ms. Chaney also warned BCR that it will need to comply with the "new interim event policy." A true and correct copy of the email is attached here as **Exhibit O**.

135.    On July 20, 2017, Plaintiffs first learned from a Bay Area news producer, Jeremy Siegel, who contacted Mr. Tahmas directly, that UC Berkeley administrators were apparently willing to forego all rental costs for Zellerbach Hall (a suitable venue for the Shapiro Event) if the facility were reserved by BCR for such use.

136.    As no UC Berkeley administrator had made such an offer to directly to BCR or its agents, BCR promptly emailed Ms. Chaney to confirm that Zellerbach Hall was available and that all rental costs for the facility would by waived. A true and correct copy of the email thread is attached here as **Exhibit P.**

137.    On July 21, 2017, Ms. Chaney confirmed by email to BCR that Zellerbach Hall was available at 7:00 p.m. on September 14, 2017, without providing any explanation for why the administration had not previously offered this venue to BCR and had, in fact, claimed its unavailability. Ex. P.

138.    On information and belief, Zellerbach Hall had been available upon BCR's initial request, and campus administrators intentionally and falsely stated otherwise, for the purpose of blocking the Shapiro Event, until University officials felt compelled to make a public statement addressing Plaintiffs' public claims that the Shapiro Event was being blocked.

33



First Amended Complaint                                      Case No. 3:17-cv-02255-MMC

139.    Ms. Chaney also informed BCR that the facility could safely accommodate up to 1,984 persons, and that "in light of the unique circumstances of this event, campus administration has agreed to make Zellerbach available for this event *without charge to BCR*." Ex. P (emphasis added).

140.    Thereafter, Plaintiffs increased the number of expected attendees from 500 to 1,984, the maximum permitted by the administration for that facility, for the express purpose of "expos[ing] as many students as possible to a viewpoint that is traditionally not heard in a UC Berkeley classroom." Ex. P.

141.    In addition, the administration's promise of an event "without charge" – as touted proudly to the press – was illusory, as UC Berkeley ultimately demanded that Plaintiffs pay "the basic security fee of $15,738." Ex. N. This "basic security fee" was purportedly used to pay for the services of additional UCPD officers at the event, who were billed out to Plaintiffs at an approximate average rate of over $200 per hour, which equates to an average annual salary exceeding $400,000.

142.    The unreasonable fee imposed on the Shapiro Event was approximately three times the amount charged as a security fee for an event featuring Supreme Court Justice Sonia Sotomayor in the same facility in 2011, and several other events in comparable indoor venues across the UC Berkeley campus.

143.    After much deliberation, Plaintiffs agreed to pay the entire security fee, so that the Shapiro Event could proceed. The security fee was later reduced by about 40% to $9,162, as a late concession for having slashed audience capacity in half.

144.    In light of UCPD's weak and ineffectual response to the violent, masked agitators at the February 1, 2017 Milo Event, BCR contacted UCPD Captain Alex Yao, on August 22, 2017, for assurances that payment of the  security fee would result in security actually being provided at the Shapiro Event. BCR also requested that UCPD issue a statement that "campus police want a safe and peaceful lecture." A true and correct copy of the email is attached here as **Exhibit Q**.

145.    UCPD and the administration responded with rhetoric and posturing, but without any assurances or commitments that the security and safety that BCR was being forced to purchase, would be provided. A true and correct copy of UC Berkeley's response is attached here as **Exhibit R**.

146.    On August 29, 2017, BCR members Troy Worden, Armando Gonzalez, and Matt Ronnau, and Bradley Devlin met with Ginarose Perino, the Rental Business Manager of Zellerbach Hall, Rob Bean, the events director for Zellerbach Hall, and Ms. Chaney, to discuss the details regarding the Shapiro Event.

147.    At this meeting, Ms. Perino, Mr. Bean, and Ms. Chaney informed BCR, for the first time, that all persons attending the Shapiro Event would need to purchase a ticket at the Zellerbach Hall Box Office in person by 5:30 p.m. the day before the Shapiro Event, and that no ticket sales would be permitted after that time.

148.    Staff members at the Zellerbach Hall Box Office later confirmed to Bradley Devlin that same-day ticket sales had been permitted for previous events at Zellerbach Hall. In other words, the restriction placed on ticket sales was unique to the Shapiro Event. This circumstance likely arose from Defendants' exercising the authority granted to them by the Major Events Policy, which broadly allows for the implementation of "security measures." Upon information and belief and, this arbitrary 5:30 p.m. day-before ticket-pickup cutoff has not been imposed by the University on any speaker other than Mr. Shapiro.

149.    Concerned that several hundred attendees might not be able to come to campus to purchase a ticket by 5:30 p.m. the day before, the BCR members at the meeting asked if attendees could print the tickets at home. Ms. Perino and Mr. Bean denied this request, but informed Plaintiffs that all tickets that were not collected by the deadline could be handed out on a standby basis on the day of the Shapiro Event.

150.    A week and a half later, on September 5, 2017, Vice Chancellor Stephen Sutton emailed BCR, informing BCR that the University would implementing additional "security measures" in the wake of "violent incidents in the City of Berkeley and Charlottesville." Under these additional restrictions, Plaintiffs would not be allowed to use the top two floors of Zellerbach Hall for the Shapiro Event, thereby reducing the anticipated available ticket count from over 1,900, to just over 1,042. Campus officials claimed concern over the possibility that protesters might throw objects off the balcony, onto the audience below, and that if an altercation occurred, individuals may fall off the

First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

balcony. A true and correct copy of Mr. Sutton's email to BCR, with personal contact information redacted, is attached here as **Exhibit S**.

151.     Campus officials never explained to Plaintiffs the basis for this fantastical concern, or discussed alternative security measures that might be taken to mitigate such threat, such as deploying additional security on the upper level balcony, or requiring attendees to check large items upon entering the venue. Instead, Defendants opted for the unreasonable solution: reduce the expected audience by nearly half, in yet another example of the "heckler's veto."

152.     BCR appealed the administrations' decisions to close the Zellerbach Hall balcony and to forbid same-day ticketing to Vice Chancellor for Undergraduate Education, Catherine P. Koshland. Ms. Koshland rejected the appeal as to the balcony closure, but stated that "we can provide will-call service" for same-day ticket pickup. The University did not retract the agreement to allow stand-by tickets on the day of the event. A true and correct copy of Ms. Koshland's email to BCR regarding that decision is attached here as **Exhibit T**.

153.     In the days leading up to the Shapiro Event, UC Berkeley administrators whipped up fear and hysteria in the student body, with campus-wide announcements suggesting that Mr. Shapiro was in some way a threat to their safety. On September 7—one week before Shapiro arrived on campus—Provost Paul Alivisatos emailed the student body and employees regarding Shapiro's talk: "We are deeply concerned about the impact some speakers may have on individuals' sense of safety and belonging. No one should be made to feel threatened or harassed simply because of who they are or for what they believe." He offered student and staff mental health and safety counseling and support resources for those who felt harmed by Shapiro's yet-to-occur speech.

154.     Prior to the Shapiro Event, BCR and YAF tried to work with campus officials to establish ground rules or a policy for how disruptions inside the auditorium would be dealt with during the event. The administration refused to craft any such policy. Instead, at the outset of the Shapiro event, Vice Chancellor of Finance Rosemarie Rae took to the podium, lauding the rights of protestors, and signaling that UCPD had *no* policy, much less a duly formulated and pre-announced policy,  regarding disruptions to the event, stating, "[a]t UC Berkeley, we respect the action and intention of public protest . . . UCPD and the campus *will be making decisions* about how disruptions

First Amended Complaint                                        Case No. 3:17-cv-02255-MMC

at this event will be addressed." By irresponsibly communicating to the crowd that there was no fixed policy on dealing with disruptive protesters within the event, starkly contrasted with the excessive and late-imposed restrictions on the event itself, the University communicated a message elevating the rights of protesters over the rights of speakers, contrary to its duty to provide a neutral forum.

155.    On September 14, 2017, the day of the Shapiro Event, campus officials reneged on their promise to release all tickets that had not been collected. Instead, UCPD seized the approximately 100 stand-by tickets without explanation, presumably as an additional exercise of their unfettered authority granted under the Major Events Policy. As a result, considerably less than the 1,042 seats Plaintiffs were permitted to be used for the Shapiro Event, were actually occupied, despite that dozens of people waited in line for stand-by tickets.

156.    Plaintiffs nevertheless overcame Defendants' antics – which included initially informing BCR that no venue existed, restricting ticket sales, charging an unconscionable security fee after falsely informing the media (before informing Plaintiffs) that no rental costs would be charged, and seizing all standby tickets – and the Shapiro Event was held in Zellerbach Hall on September 14, 2017, under a heavy police presence, with all attendees passing through a metal detector.

157.    Despite the University's concerns over students' "sense of safety and belonging," and Vice Chancellor Rae's lauding of protests, no one disrupted the event from within the auditorium. The audience was engaged throughout the program, which concluded in a question and answer session, generating educational and interesting conversation between Mr. Shapiro and several students who did not share Mr. Shapiro's political views.

158.    Plaintiffs incurred monetary damages as a result of Defendants' unconstitutional actions, including in connection with their creation of promotional materials for the Shapiro Event, the scheduling of travel and security arrangements, the payment of an unreasonable security fee, and the time and effort expended by YAF's paid staff in planning the Shapiro Event, which event was arbitrarily restricted in scope to less than half the intended size of the event.

### UC Berkeley's Discriminatory and Unreasonable Speech Restrictions

159.    Despite Defendants' discriminatory restrictions on BCR and YAF-hosted events, Defendants routinely allow nationally-renowned speakers on campus to express non-conservative

First Amended Complaint                                Case No. 3:17-cv-02255-MMC

viewpoints, without enforcing curfews; charging unreasonable security fees; restricting ticket sales and seizing standby tickets; falsely claiming that no on-campus venues are securable; limiting speakers' appearances to a single, two-hour period in a calendar year, when students are not on campus for scheduled classes; banning advance publicity of the events; or relegating the event to a facility a mile from the main campus.

160.    For example, on April 17, 2017, Vicente Fox Quesada, the former president of Mexico, was permitted to speak on campus at 4:00 p.m. to hundreds of people, without incident or interference from Defendants.

161.    On the same day, April 17, BridgeCal successfully hosted the first event of its planned two-speaker series, featuring Maria Echaveste, former presidential advisor and White House Deputy Chief of Staff to President Bill Clinton, who was permitted to speak at a central location on campus from 6:45 p.m. to 8:00 p.m., without incident or interference from Defendants. The event was open to the public.

162.    Following the adoption of the unreasonable, vague, and overbroad Major Events Policy, campus officials continue to impose unique and unreasonable restrictions on Plaintiffs' events, in addition to the many unreasonable restrictions required by the Major Events Policy for all "Major Events," such as the eight-week notice and two-week promotional material pre-approval requirements.

163.    In addition to substituting their private speech criteria for the free speech requirements mandated by the Constitution, UC Berkeley officials concede that they allow the tastes and criminal actions of a masked mob to define who they allow to speak at UC Berkeley. In a letter dated April 21, 2017 to legal counsel for YAF and BCR, Campus Counsel Christopher M. Patti admitted to Harmeet K. Dhillon that UC Berkeley's decision to cancel the Coulter Event was triggered by a "security assessment" by the UCPD which revealed "mounting intelligence that some of the same groups that previously engaged in local violent action also intended violence at the Coulter Event." Mr. Patti appears to be referring to the so-called "antifa" groups from outside the campus indulging in violence at Berkeley to silence conservatives gathering in or around the UC Berkeley campus – who appear to have more power and rights on the campus than students showing their faces, paying tuition, and

First Amended Complaint                                        Case No. 3:17-cv-02255-MMC

seeking a balanced educational environment at a publicly-funded institution of higher learning.

164.    Following the filing of the original complaint in this action, Chancellor Christ openly admitted – and in so doing waived attorney-client privilege otherwise applicable – that UC Berkeley has previously engaged in discriminatory speech-restricting practices when faced with an undesirable speaker, by enforcing unreasonable time, place and manner restrictions, but that the administration is now being advised by legal counsel against engaging in such viewpoint discrimination. On or around September 14, 2017, the LA Times published an article containing the following questions posed to Chancellor Christ, and her corresponding answer:

> **Who has been the most controversial speaker in your time at Berkeley, before this latest round of speakers?**
>
> There was a speaker making the rounds in the '90s who denied the Holocaust, David Irving. The thing that's the really interesting policy issue is at that point we had him speak in a small, really out-of-the-way room as a way of protecting the campus. The legal advice we've been getting now is that we cannot exert those restrictions. If we have a room on the campus that has been used, like Wheeler Auditorium, for speakers, we can't deny that room to speakers on the basis of their viewpoints. We can't discriminate on the use of space. So that takes a tool away from us in terms of time, place, manner that we have used in the past.

A copy of the article is attached here as **Exhibit U**.

165.    As was done in the past with undesirable speech, Defendants are employing a purposeful and concerted effort to stifle the expression of conservative viewpoints on campus by discriminatorily imposing the speech restrictions on BCR- and YAF-sponsored speakers. Defendants could have taken appropriate security measures to ensure the safety of those attending conservative speaking engagements – as is their duty to all students on campus – but they have refused to do so. Defendants could have insisted that the Berkeley Police Department do its job of keeping the public and University students and speakers safe, if the taxpayer-funded UCPD is incapable of or refuses to perform its duties on campus. Instead, Defendants punt the issue of when and where one may express conservative viewpoints on campus to their own whims and the whims of the "antifa" mob which, inexplicably, has been allowed free rein by the Berkeley Police Department and UCPD.

166.    The University's subjugation to a heckler's veto of BCR and YAF's freedom to

First Amended Complaint                                      Case No. 3:17-cv-02255-MMC

1    engage in constructive political discourse, as admitted by then-Chief Campus Counsel Patti,

2    violates the First and Fourteenth Amendments to the U.S. Constitution.

3        167.    At all times relevant to this First Amended Complaint, each of the acts and policies

4    related to Defendants alleged herein were attributed to Defendants, who acted under color of a statute,

5    regulation, custom, or usage of the State of California.

6        168.    Defendants knew or should have known that they were violating Plaintiffs YAF and

7    BCR's well-settled constitutional rights by enforcing these speech restrictions based upon the content

8    and viewpoint to be expressed at the Plaintiffs' events. Indeed – they have admitted publicly that the

9    University's lawyers have told the University to stop its illegal content and viewpoint discrimination.

10        169.    Defendants knew or should have known that by enforcing the unwritten, High-Profile

11    Speaker Policy, and the amply allowed "security measures" permitted by Major Events Policy, against

12    YAF and BCR because Defendants and/or an expected antifa mob disagreed or may disagree with the

13    viewpoint of YAF and BCR's speech, Defendants violated YAF and BCR's well-settled constitutional

14    rights.

15        170.    Defendants knew or should have known that by allowing the violent, hateful demands

16    of a masked mob of outside agitators to silence certain speech on campus based solely on its content,

17    Defendants violated YAF and BCR's well-settled constitutional rights.

18        171.    YAF and BCR have suffered and continue to suffer irreparable harm from Defendants'

19    speech-restricting policies, customs, and practices.

20        172.    YAF and BCR have no adequate or speedy remedy at law to correct or redress the

21    deprivation of their rights by Defendants.

22        173.    Unless these policies, customs, and practices are enjoined, YAF and BCR will continue

23    to suffer irreparable injury.

**FIRST CLAIM FOR RELIEF**

**Violation of the First Amendment Right to Freedom of Expression (42 U.S.C. § 1983)**

**(By YAF and BCR Against All Defendants)**

27        174.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully

28    set forth herein.

First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

1    175.    Applicable UC Berkeley venues for speaking engagements accessible for use by BCR

2    and YAF are designated public fora – as they must be, under state-wide regulations, and long-standing

3    Supreme Court precedent. Accordingly, UC Berkeley is required to allow BCR and YAF to bring

4    speakers of their own choosing to speak on campus, free from viewpoint discrimination, content-based

5    speech restrictions that are not narrowly tailored to serve a compelling government interest, and

6    content-neutral time, place and manner restrictions that are not narrowly tailored to serve an important

7    government interest or that fail to leave open ample alternative channels for the communication of the

8    message.

9    176.    Defendants, acting under color of state law and according to UC Berkeley custom,

10   pattern, and practice, have failed to meet these constitutional standards by adopting and enforcing a

11   facially and as-applied unconstitutional, and unwritten, High-Profile Speaker Policy, later recast as the

12   Major Events Policy, that requires, or permits Defendants unfettered discretion to impose: curfews;

13   unreasonable security fees; unreasonable event-notice requirements to campus officials; unreasonable

14   restrictions on both on- and off-campus speech; unreasonable ticket-sales restrictions; and all other

15   unreasonable time, place and manner restrictions discussed above, which Defendants have enforced

16   according to the their whim and taste, or the demands of an off-campus mob of masked agitators.

17   177.    Even if the applicable venues are limited public fora because UC Berkeley has

18   somehow failed to adhere to policies set by the Regents of the University of California and the

19   California State Legislature, and restricted any given forum in manner so as to transform it into a

20   limited public forum, Defendants' actions fail to meet constitutional scrutiny because the High-Profile

21   Speaker Policy, later recast as the Major Events Policy, is facially and as-applied unreasonable, and

22   was adopted and enforced in a viewpoint discriminatory manner that does not comport with the

23   definition of the forum, with the effect of chilling, marginalizing, or banning the expression of

24   conservative viewpoints on the UC Berkeley campus.

25   178.    The High-Profile Speaker Policy, later recast as the Major Events Policy, is

26   unconstitutionally vague, and therefore void as a matter of law, both on its face, and as it is being

27   applied to Plaintiffs.

28   179.    As a direct and proximate consequence of Defendants' violations of BCR and YAF's

First Amended Complaint                                        Case No. 3:17-cv-02255-MMC

1    federal civil rights under 42 U.S.C. § 1983 and the First Amendment, BCR and YAF have suffered

2    and will suffer irreparable injury that cannot fully be compensated by an award of monetary damages.

3        180.    Pursuant to 42 U.S.C. §§ 1983 and 1988, BCR and YAF are entitled to declaratory

4    relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining

5    enforcement of the restrictions allowed or required by the High-Profile Speaker Policy, later recast as

6    the Major Events Policy. Additionally, BCR and YAF are entitled to monetary damages arising from

7    the unconstitutional actions of Defendants Dirks, Christ, Sutton, Greenwell, Yao, and Harris, sued

8    herein in their individual capacities, including for expenses incurred in connection with promotional

9    material, travel costs, and security costs for the affected events, as well as reasonable costs of suit. At

10   this time, Plaintiffs estimate that their damages exceed $87,000.

11       181.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

12   rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42

13   U.S.C. § 1988.

14                               **SECOND CLAIM FOR RELIEF**

15                        **First Amendment Retaliation (42 U.S.C. § 1983)**

16                             **(By BCR Against All Defendants)**

17       182.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully

18   set forth herein.

19       183.    BCR and its members have engaged in constitutionally protected speech, namely,

20   holding and expressing conservative viewpoints by inviting conservative speakers to speak on the UC

21   Berkeley campus, including Milo Yiannopoulos, David Horowitz, Ann Coulter, and Ben Shapiro.

22       184.    By treating BCR and its members differently from similarly situated students, student

23   organizations, and members of the public because they are conservative and because of their

24   conservative beliefs, among other things, Defendants, acting under color of state law and according to

25   policy and practice, have retaliated against BCR and its members for holding and expressing

26   disfavored views, and in so retaliating, have engaged in conduct that would chill a person of ordinary

27   firmness from continuing to engage in the protected speech activity.

28       185.    BCR and its members' actions in holding and expressing disfavored views was a

                                              42

substantial and motivating factor in Defendants' retaliation against them by imposing unlawful restrictions on BCR and its members' federal civil rights secured under 42 U.S.C. § 1983 and the First Amendment, causing BCR to suffer and continue in the future to suffer irreparable injury that cannot be fully compensated by an award of monetary damages.

186.    Pursuant to 42 U.S.C. §§ 1983 and 1988, BCR is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining Defendants' retaliation against BCR and its members for their utterances of protected speech. Additionally, BCR is entitled to monetary damages arising from the unconstitutional actions of Defendants Dirks, Christ, Sutton, Greenwell, Yao, and Harris, sued herein in their individual capacities, as well as reasonable costs of suit.

187.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

### Violation of the Fourteenth Amendment Right to Due Process (42 U.S.C. § 1983)

### (By YAF and BCR Against All Defendants)

188.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

189.    Defendants, acting under color of state law and according to a pattern and practice, have enacted the unwritten and/or unpublished High-Profile Speaker Policy, later recast as the Major Events Policy, which is vague, overbroad, and improperly affords Defendants unfettered discretion in its application, and therefore deprives BCR and YAF of their clearly established due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

190.    As a direct and proximate consequence of Defendants' violations of BCR and YAF's federal civil rights under 42 U.S.C. § 1983 and the Fourteenth Amendment, BCR and YAF have suffered and will suffer irreparable injury that cannot fully be compensated by an award of monetary damages.

191.    Pursuant to 42 U.S.C. §§ 1983 and 1988, BCR and YAF are entitled to declaratory

43

relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining
enforcement of the High-Profile Speaker Policy, later recast as the Major Events Policy. Additionally,
BCR and YAF are entitled to monetary damages arising from the unconstitutional actions of
Defendants Dirks, Christ, Sutton, Greenwell, Yao, and Harris, sued herein in their individual
capacities, as well as reasonable costs of suit. At this time, Plaintiffs estimate that their damages
exceed $87,000.

192.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their
rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42
U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

**Violation of the Fourteenth Amendment Right to Equal Protection (42 U.S.C. § 1983)**

**(By YAF and BCR Against All Defendants)**

193.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully
set forth herein.

194.    By treating BCR, its members, and YAF differently from similarly situated students,
student organizations, and members of the public because they are conservative and because of their
conservative beliefs, among other things, Defendants, acting under color of state law and according to
policy and practice, have engaged in actions that discriminate on the basis of political status and belief
and have therefore deprived BCR and YAF of their clearly established equal protection rights
guaranteed by the Fourteenth Amendment to the United States Constitution.

195.    As a direct and proximate consequence of Defendants' violations of BCR and YAF's
federal civil rights under 42 U.S.C. § 1983 and the Fourteenth Amendment, BCR and YAF have
suffered and will suffer irreparable injury that cannot be fully compensated by an award of monetary
damages.

196.    Pursuant to 42 U.S.C. §§ 1983 and 1988, BCR and YAF are entitled to declaratory
relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining
enforcement of the High-Profile Speaker Policy, later recast as the Major Events Policy. Additionally,
BCR and YAF are entitled to monetary damages arising from the unconstitutional actions of

44



First Amended Complaint                                    Case No. 3:17-cv-02255-MMC

Defendants Dirks, Christ, Sutton, Greenwell, Yao, and Harris, sued herein in their individual capacities, as well as reasonable costs of suit. At this time, Plaintiffs estimate that their damages exceed $87,000.

197.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following:

i.    For compensatory and punitive damages against Defendants Dirks, Christ, Sutton, Greenwell, Yao, and Harris, sued in their individual capacities, on all claims, to the fullest extent permitted by law;

ii.    For a judicial declaration that Defendants have violated and are violating BCR and YAF's rights under the First and Fourteenth Amendment to the United States Constitution, by selectively enforcing against BCR and YAF the High-Profile Speaker Policy, later recast as the Major Events Policy, which policies are unconstitutionally vague, overbroad, call for content-based discrimination and for the prior restraint of speech, unreasonably restrict the time, place, and manner of political speech, permit unconstitutional discretion as to the setting of security fees, or otherwise permit unreasonable and excessive security fees, and has resulted in the burdening and even banning of expression of conservative viewpoints on the UC Berkeley campus;

iii.    For temporary, preliminary, and permanent injunctive relief, enjoining Defendants from: applying any unwritten or unpublished policy restricting the exercise of political expression on the UC Berkeley campus; selectively enforcing the High-Profile Speaker Policy, later recast as the Major Events Policy, against BCR and YAF; and unilaterally canceling any speaking event hosted by BCR and/or YAF scheduled in compliance with written, published University policies that comport with constitutional requirements for protected speech, due process, and equal protection.

iv.    For an award of attorneys' fees incurred in bringing this Action against Defendants, pursuant to 42 U.S.C. § 1988.

v.    For costs of suit incurred herein; and

45

vi.    For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Date: November 10, 2017          DHILLON LAW GROUP INC.

                                 By: /s/ Harmeet K. Dhillon
                                     HARMEET K. DHILLON (SBN: 207873)
                                     harmeet@dhillonlaw.com
                                     KRISTA L. BAUGHMAN (SBN: 264600)
                                     kbaughman@dhillonlaw.com
                                     GREGORY R. MICHAEL (SBN: 306814)
                                     gmichael@dhillonlaw.com
                                     DHILLON LAW GROUP INC.
                                     177 Post Street, Suite 700
                                     San Francisco, California 94108
                                     Telephone: (415) 433-1700
                                     Attorneys for Plaintiffs Young America's Foundation
                                     and Berkeley College Republicans


                        **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Young America's
Foundation and Berkeley College Republicans demand trial by jury on all claims in this action of all
issues so triable.

Date: November 10, 2017          DHILLON LAW GROUP INC.

                                 By: /s/ Harmeet K. Dhillon
                                     HARMEET K. DHILLON (SBN: 207873)
                                     harmeet@dhillonlaw.com
                                     DHILLON LAW GROUP INC.
                                     177 Post Street, Suite 700
                                     San Francisco, California 94108
                                     Telephone: (415) 433-1700
                                     Attorneys for Plaintiffs Young America's Foundation
                                     and Berkeley College Republicans



First Amended Complaint                                   Case No. 3:17-cv-02255-MMC