BRYAN H. HECKENLIVELY (SBN 279140)
bryan.heckenlively@mto.com
JESLYN A. EVERITT (SBN 274701)
jeslyn.everitt@mto.com
ELIZABETH A. KIM (SBN 295277)
elizabeth.kim@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

CHARLES F. ROBINSON (SBN 113197)
charles.robinson@ucop.edu
MARGARET L. WU (SBN 184167)
margaret.wu@ucop.edu
UNIVERSITY OF CALIFORNIA
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA  94607-5200
Telephone:     (510) 987-9800
Facsimile:     (510) 987-9757

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| YOUNG AMERICA'S FOUNDATION and BERKELEY COLLEGE REPUBLICANS, <br><br> Plaintiffs, <br><br> vs. <br><br> JANET NAPOLITANO, in her official capacity as President of the University of California, *et al.*; <br><br> Defendants. | Case No.  3:17-cv-02255-MMC <br><br> **DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br><br> Judge:       Hon. Maxine M. Chesney <br> Date:        Feb. 16, 2018 <br> Time:        9:00a.m. <br> Courtroom: 7, 19th Floor |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................ 1

STATEMENT OF RELIEF SOUGHT ................................................................................ 1

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 3

    A. The Yiannopoulos Event Erupted in Violence ................................................ 3

    B. The Alleged High-Profile Speaker Policy ...................................................... 3

    C. The University Imposed Limited Time-Place-Manner Restrictions to Ensure Safety at the Horowitz Event ...................................................................... 3

    D. The University Imposed Limited Time-Place-Manner Restrictions to Ensure Safety at the Coulter Event ........................................................................ 4

    E. The University's Major Events Policy .......................................................... 7

    F. Plaintiffs Successfully Hosted Shapiro Event Under the Major Events Policy ...................................................................................................... 9

    G. The Court Dismisses Plaintiffs' Complaint ................................................... 11

III. LEGAL STANDARD ............................................................................................ 11

IV. ARGUMENT ...................................................................................................... 11

    A. Plaintiffs Have Not  Pleaded Any Constitutional Violation ............................... 11

        1. Plaintiffs Have Not Plausibly Pleaded a Violation of Their First Amendment Free Speech Rights ............................................................ 11

            (a) The Venues at Issue Are Limited Public Forums ........................... 11

            (b) The Alleged Restrictions Are Viewpoint and Content Neutral ....... 14

            (c) The Heckler's Veto Doctrine Does Not Render the Alleged Restrictions Content or Viewpoint Based ...................................... 17

            (d) The Alleged Restrictions Are Reasonable in Light of the Purpose of University Forums ................................................................... 18

            (e) The Alleged Restrictions Are Permissible Time-Manner-Place Restrictions ................................................................................. 19

                (i) The Alleged Restrictions and Major Events Policy Are Narrowly Tailored to Serve the Interests of Safety, Education, and Access to Resources ...................... 19

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

**TABLE OF CONTENTS**
**(continued)**

Page

(ii)     The Alleged Restrictions Left Open Ample
Alternative Channels for Communication........................... 21

2.     BCR Has Not Plausibly Pleaded a Retaliation Claim ................................ 22

(a)     BCR Has Not Alleged that Its Speech Was a Substantial or
Motivating Factor for Defendants' Conduct .................................. 23

(b)     BCR Has Not Alleged that Defendants' Actions Would
Impermissibly Chill Speech ........................................... 24

3.     Plaintiffs Have Not Stated a Violation of the Due Process Clause ............ 24

4.     Plaintiffs Have Not Stated a Violation of the Equal Protection
Clause ................................................................................. 26

5.     Plaintiffs' Facial Challenge to the Major Events Policy Also Fails............ 27

B.     Defendants Are Entitled to Qualified Immunity .................................... 28

C.     Plaintiffs' Claims for Punitive Damages Must Be Dismissed ................................ 30

V.     CONCLUSION ................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adams v. Small*,
542 F. App'x 567 (9th Cir. 2013)...........................................................................23

*Air Sunshine, Inc. v. Carl*,
663 F.3d 27 (1st Cir. 2011) ...................................................................................23

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......................................................................................12, 14

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .......................................................................................29, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................11, 16, 23

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ...............................................................................................24

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009).................................................................................20

*Blair v. Bethel Sch. Dist.*,
608 F.3d 540 (9th Cir. 2010).................................................................................24

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011).......................................................13, 19, 20, 22

*Bowman v. White*,
444 F.3d 967 (8th Cir. 2006).........................................................................19, 20

*Branch v. Tunnell*,
14 F.3d 449 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of
Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) .........................................................11

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ...............................................................................................27

*Carew-Reid v. Metro. Transp. Auth.*,
903 F.2d 914 (2d Cir. 1990)...................................................................................22

*Cervantes v. Countrywide Home Loans, Inc.*,
656 F.3d 1034 (9th Cir. 2011).................................................................................30

*Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*,
561 U.S. 661 (2010) .......................................................................................13, 15, 19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Clift v. City of Burlington*,
    925 F. Supp. 2d 614 (D. Vt. 2013) ............................................................. 15

*Colacurcio v. City of Kent*,
    163 F.3d 545 (9th Cir. 1998) .................................................................... 20

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ......................................................................... 12, 18

*Cousins v. Lockyer*,
    568 F.3d 1063 (9th Cir. 2009) .................................................................. 11

*Cox v. New Hampshire*,
    312 U.S. 569 (1941) ............................................................................ 21

*Ctr. for Fair Pub. Policy v. Maricopa Cty*,
    336 F.3d 1153 (9th Cir. 2003) .................................................................. 22

*Cuviello v. City & Cty. of San Francisco*,
    940 F. Supp. 2d 1071 (N.D. Cal. 2013) ......................................................... 27

*Davenport v. City of Alexandria*,
    710 F.2d 148 (4th Cir. 1983) (en banc) ......................................................... 16

*Davenport v. Randolph Cty. Bd. of Educ.*,
    730 F.2d 1395 (11th Cir. 1984) .................................................................. 25

*Edwards v. City of Couer d'Alene*,
    262 F.3d 856 (9th Cir. 2001) .................................................................... 22

*Engquist v. Or. Dep't of Agric.*,
    553 U.S. 591 (2008) ............................................................................ 27

*First Resort, Inc. v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017) ............................................................ 2, 16, 19

*Flint v. Dennnison*,
    488 F.3d 816 (9th Cir. 2007) .................................................................... 12

*George v. Rehiel*,
    738 F.3d 562 (3d Cir. 2013) .................................................................... 23

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ......................................................................... 25, 26

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ............................................................................ 29

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981) ..................................................................................19, 22

*Herbert v. Ventetuolo,*
    638 F.2d 5 (1st Cir. 1981) (per curiam) ...................................................25

*Hill v. Colorado,*
    530 U.S. 703 (2000) .......................................................................................15

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ...........................................................................................25

*Hope v. Pelzer,*
    536 U.S. 730 (2002) .......................................................................................29

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) .......................................................................................20

*Krainski v. Nev. Ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.,*
    616 F.3d 963 (9th Cir. 2010)......................................................................29

*Los Angeles Cty. Bar Ass'n v. Eu,*
    979 F.2d 697 (9th Cir. 1992).................................................................22, 28

*Matney v. Cty. of Kenosha,*
    86 F.3d 692 (7th Cir. 1996).........................................................................24

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097 (9th Cir. 2008)....................................................................11

*Menotti v. City of Seattle,*
    409 F.3d 1113 (9th Cir. 2005)...............................................................15, 16

*Mir v. Little Co. of Mary Hosp.,*
    844 F.2d 646 (9th Cir. 1988).......................................................................11

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) ...........................................................................................26

*O'Brien v. Welty,*
    818 F.3d 920 (9th Cir. 2016)........................................................................23

*OSU Student Alliance v. Ray,*
    699 F.3d 1053 (9th Cir. 2012).....................................................................14

*Pearson v. Callahan,*
    555 U.S. 223 (2009) .......................................................................................29

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ...................................................................................13, 14, 19

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh,*
    58 F. Supp. 2d 619 (W.D. Pa. 1999), aff'd, 229 F.3d 435 (3d Cir. 2000) ................19

*Pinard v. Clatskanie Sch. Dist. 6J,*
    467 F.3d 755 (9th Cir. 2006)...................................................................22, 23, 24

*Pratt v. Rowland,*
    65 F.3d 802 (9th Cir. 1995) ..............................................................................23

*Prince v. Jacoby,*
    303 F.3d 1074 (9th Cir. 2002) ...........................................................................14

*Protectmarriage.com-Yeson8 v. Bowen,*
    752 F.3d 827 (9th Cir. 2014) .............................................................................28

*Rock for Life-UMBC v. Hrabowski,*
    411 F. App'x 541 (4th Cir. 2010) .......................................................................29

*Rosenbaum v. City & Cty. of San Francisco,*
    484 F.3d 1142 (9th Cir. 2007)...............................................................17, 18, 26

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ...........................................................................13, 14, 15

*S. Or. Barter Fair v. Jackson Cty.,*
    372 F.3d 1128 (9th Cir. 2004)............................................................................28

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000) ........................................................................................14

*Seattle Mideast Awareness Campaign v. King Cty.,*
    781 F.3d 489 (9th Cir. 2015)..............................................................................17

*Smith v. Wade,*
    461 U.S. 30 (1983) ..........................................................................................30

*Startzell v. City of Philadelphia,*
    533 F.3d 183 (3d Cir. 2008)...............................................................................17

*Stone v. Becerra,*
    No. CV-10-138-RMP, 2011 WL 1565299 (E.D. Wash. Apr. 25, 2011), *aff'd,*
    520 F.App'x 542 (9th Cir. 2013)........................................................................23

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Stonewall Union v. City of Columbus*,
 931 F.2d 1130 (6th Cir. 1991) ..................................................................................21

4

*Swany v. San Ramon Valley Unified Sch. Dist.*,
 720 F. Supp. 764 (N.D. Cal. 1989) ..........................................................................25

5

6

*United for Peace and Justice v. City of New York*,
 243 F. Supp. 2d 19 (S.D.N.Y.), *aff'd*, 323 F.3d 175 (2d Cir. 2003) (per curiam)....................16

7

8

*United States v. Salerno*,
 481 U.S. 739 (1987) ..................................................................................................28

9

*United States v. Stevens*,
 559 U.S. 460 (2010) ..................................................................................................28

10

11

*United States v. Williams*,
 553 U.S. 285 (2008) ..................................................................................................25

12

13

*Valley Surgical Ctr. LLC. v. Cty. of Los Angeles*,
 No. CV1302265DDPAGRX, 2016 WL 1273158 (C.D. Cal. Mar. 31, 2016) ..........23

14

*Van Susteren v. Jones*,
 331 F.3d 1024 (9th Cir. 2003)...................................................................................27

15

16

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
 429 U.S. 252 (1977) ..................................................................................................27

17

18

*Walker v. King*,
 No. 116CV01665EPGPC, 2017 WL 1018295 (E.D. Cal. Mar. 15, 2017)...............23

19

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ....................................................................................15, 16, 20, 25

20

21

*Wash. St. Grange v. Wash. St. Republican Party*,
 552 U.S. 442 (2008) ..................................................................................................28

22

23

*Widmar v. Vincent*,
 454 U.S. 263 (1981) ....................................................................................14, 19, 20, 29

24

25

*Wood v. Moss*,
 134 S. Ct. 2056 (2014) ....................................................................................... 2, passim

26

*Wright v. Incline Vill. Gen. Improvement Dist.*,
 665 F.3d 1128 (9th Cir. 2011)...................................................................................27

27

28

*Yates v. Norwood*,
 841 F. Supp. 2d 934 (E.D. Va. 2012)........................................................................26

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**STATE CASES**

*Ryan v. Cal. Interscholastic Fed'n-San Diego Section,*
94 Cal. App. 4th 1048 (Cal. Ct. App. 2001) ............................................................25

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................1, 11

**STATE REGULATIONS**

Cal. Code Regs. Title 5, § 100004 ................................................13

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on February 16, 2018, at 9:00 a.m., before the Honorable Maxine M. Chesney in Courtroom 7 on the 19th floor of the above-entitled court located in San Francisco, California, Defendants Janet Napolitano, Nicholas B. Dirks, Carol T. Christ, Stephen C. Sutton, Joseph D. Greenwell, Margo Bennett, Alex Yao, and Leroy M. Harris will and hereby do move to dismiss Plaintiffs' First Amended Complaint. This motion is made pursuant to Fed. R. Civ. P. 12(b)(6) and is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities, the Request for Judicial Notice and Declaration of Bryan H. Heckenlively, all pleadings and papers on file, and such other matters as may be presented to this Court.

## STATEMENT OF RELIEF SOUGHT

Defendants seek an order pursuant to Rule 12(b)(6) dismissing with prejudice the First Amended Complaint and each of its causes of action for failure to state a claim for relief.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

The University of California is deeply committed to free speech on its campuses. When radical groups used violent and destructive tactics to shut down the speech of Milo Yiannopoulos on the Berkeley campus and threatened to use the same tactics at events featuring conservative speakers David Horowitz and Ann Coulter, the University of California, Berkeley (hereinafter, "UC Berkeley" or "the University") responded with careful planning and a willingness to expend significant resources so that the events could proceed at a time and place and in a manner that would not endanger students, speakers, attendees, or any others in the University community. The University also enacted a new Major Events Policy governing events hosted in particular campus venues to ensure that events organized by entities other than University departments, including student groups, would not compromise the safety of attendees, speakers, or the wider campus. As demonstrated by the recent successful event Plaintiffs hosted featuring Ben Shapiro, the University's significant efforts have borne fruit despite the hostility and violence seen in recent months on campuses and in public spaces around the country.

Plaintiffs' First Amended Complaint ("FAC") nonetheless flows from the premise that the University has "muzzled" conservative speakers, but even after amending their complaint Plaintiffs cannot allege facts supporting that assertion.  That is because the University never banned any speech.  Rather, UC Berkeley instituted permissible restrictions on when, where, and under what circumstances major speaker events could occur in campus venues to address specific and credible security threats.  Plaintiffs have not and cannot adequately plead a violation of any constitutional rights, but even if they could, Defendants are entitled to qualified immunity.

*First*, Plaintiffs' First Amendment free speech claim fails because the relevant campus venues are limited public forums and the alleged restrictions were reasonable and viewpoint neutral. Even if Plaintiffs had plausibly pleaded that the venues were designated public forums, the alleged restrictions still would survive constitutional scrutiny because the University regulated only the time, place, and manner of speech—for example requiring that events be held in a securable venue on a date that such a venue was available—and were content neutral, narrowly tailored to serve the important government interests of safety, education, and regulating access to university resources, and left open ample alternative channels of communication.  Likewise, Plaintiffs' viewpoint discrimination, retaliation, and equal protection claims fail because Plaintiffs have not alleged that any Defendant acted *because of* opposition to their speech or viewpoint—just as the Court found in dismissing the original complaint.  Plaintiffs' due process claim fails because the Major Events Policy is not unconstitutionally vague and does not afford unfettered discretion to restrict speech.

*Second*, Plaintiffs' claims for damages must be dismissed because Defendants are entitled to qualified immunity.  Far from demonstrating that Defendants violated clearly established law, the allegations of the FAC support the opposite conclusion:  Defendants took reasonable steps to facilitate Plaintiffs' events while balancing the competing concerns for security, the University's limited resources, and its educational mission.  As in *Wood v. Moss*, 134 S. Ct. 2056 (2014), Defendants had valid security reasons for imposing reasonable time-place-manner restrictions.

*Third*, Plaintiffs have again failed to plead facts showing that Defendants acted with the requisite intent to support a punitive damages claim.

Plaintiffs have added a limited number of new conclusory allegations and even fewer new

1  facts, but the thrust of their claims remain the same and they should again be dismissed—this time

2  without leave to amend.

3  II.   **FACTUAL AND PROCEDURAL BACKGROUND**

4         A.      **The Yiannopoulos Event Erupted in Violence**

5         On February 1, 2017, the Berkeley College Republicans (BCR) hosted a speaking event

6  featuring Milo Yiannopoulous, a contentious conservative commentator.  (FAC ¶ 51.)  The

7  widely-publicized event was scheduled to begin at 8:00 p.m. in a large campus venue.  (*Id.*)  In the

8  hours leading up to the event, dozens of people violently protested the event by setting fires,

9  throwing objects, and engaging in physical altercations.  (*Id.* ¶ 52.)  University of California Police

10 Department ("UCPD") and Berkeley Police struggled to contain "the violent mob."  (*Id.* ¶ 53.)

11 Given the violence and imminent security risks, the University canceled the event and imposed a

12 campus-wide lockdown that lasted until approximately 10:55 p.m. that evening.  (*Id.* ¶ 55.)

13        B.      **The Alleged High-Profile Speaker Policy**

14        Following the violence at the Yiannopoulos event, BCR and YAF (collectively,

15 "Plaintiffs") allege that on or around March 1, 2017, unnamed University administrators and

16 members of UCPD met with officials from the City of Berkeley Mayor's Office and Berkeley

17 Police Department "to discuss adopting a new policy that would impose more stringent restrictions

18 on events involving 'high-profile speakers.'" (FAC ¶ 56.)  According to Plaintiffs, this policy

19 restricted the "time and place of all events involving 'high-profile' speakers" by requiring such

20 events to conclude by 3:00 p.m. and to be held in securable locations.  (*Id.*)

21        Plaintiffs contend that Defendants enforced the supposed "High-Profile Speaker Policy"

22 against them, while allowing Vicente Fox Quesada, the former president of Mexico, to speak on

23 campus at 4:00 p.m. on April 17, 2017, and Maria Echaveste to speak on campus from 6:45 to

24 8:00 p.m. without imposing any restrictions.  (*Id.* ¶¶ 159-61.)  Plaintiffs do not allege any threats to

25 security accompanying the speeches of Mr. Fox or Ms. Echaveste.

26        C.      **The University Imposed Limited Time-Place-Manner Restrictions to Ensure
                  Safety at the Horowitz Event**

27

28

Shortly after the violence that thwarted Mr. Yiannopoulos's speaking event, Plaintiffs invited prominent conservative writer and speaker, David Horowitz, to speak on campus in mid-April 2017.  On March 23, 2017, BCR met with unnamed University administrators and UCPD officers to discuss logistics and security for the event.  (FAC ¶ 61.)  At this meeting, "UCPD rejected BCR's request that the event be held in Room 100 of the Genetics and Plant Biology building on the central UC Berkeley campus" because of safety concerns. (*Id.*)  Plaintiffs allege numerous communications with unnamed University administrators and UCPD officers Yao and Harris in an attempt to find a safe alternative venue for the Horowitz event.  (*Id.* ¶¶ 62-68.)

As a part of these discussions, Plaintiffs allege that UCPD's Captain Yao and unnamed University administrators required the Horowitz event to end by 3:00 p.m. for security reasons and strongly suggested that Plaintiffs limit the event to students only and not disclose the location of the event in advance.  (*Id.* ¶ 66.)  In addition, Stephen Sutton, UC Berkeley Interim Vice Chancellor for the Division of Student Affairs, in an email dated April 6, 2017, recommended that the event occur at the Clark Kerr Krutch Theater, which Plaintiffs allege is more than one mile from the center of the UC Berkeley campus, and start by 1:00 p.m.  (*Id.* ¶ 67.)  Vice Chancellor Sutton explained that these restrictions were necessitated by "UCPD's objective analysis of how best to mitigate risk, ensure safety for all, and maximize the chances that the event will take place as planned" based on UCPD's "comprehensive review" done "[i]n the wake of events surrounding the cancelled appearance by Milo Yiannopoulos." (*Id.*)  The Krutch Theater is approximately 0.9 miles from the center of campus and about equidistant from the primary residence halls (Units 1, 2, and 3) as the Genetics and Plant Biology Building.  (Heckenlively Decl. ¶¶ 6-7 & Exhs. 5 & 6.)  Finally, Plaintiffs allege that on April 10, 2017, unnamed University and UCPD officials required a security fee of $5,788 for the Horowitz event.  (FAC ¶ 68.)  Rather than comply with restrictions, Plaintiffs chose to cancel the event.  (*Id.* ¶ 70.)

**D.    The University Imposed Limited Time-Place-Manner Restrictions to Ensure Safety at the Coulter Event**

Around the same time, Plaintiffs began efforts to bring Ann Coulter, a conservative commentator, to campus as a counterpoint to progressive speaker Maria Echaveste.  (FAC ¶¶ 73-

75.)  On March 28, 2017, BCR member Matt Ronnau informed Ms. Chaney that Ms. Coulter had

agreed to speak at the University on April 27, 2017, from 7:00-9:00 p.m., and he requested a room

that could accommodate at least 500 people.  (*Id.* ¶ 79 & Exh. D.)  On March 29, 2017, Plaintiffs

allege that they entered into contract with Ms. Coulter through which YAF agreed to cover a

minimum of $13,000 in costs associated with hosting Ms. Coulter on campus.  (*Id.* ¶ 81.)

Plaintiffs allege that BCR met with University administrators on April 3, 2017, to discuss

"event logistics and security."  (*Id.* ¶ 84.)  Three days later, BCR met with UCPD representatives

Captain Yao, Lt. Harris, and University administrators Ms. Chaney and Marissa Reynosso.  (*Id.*

¶ 85.)  Plaintiffs allege that at this April 6 meeting, unnamed members of UCPD instructed BCR

that the Coulter event must conclude by 3:00 p.m., informed BCR that the University and UCPD

would select a "securable" campus venue, and "strongly encouraged" BCR and BridgeCal not to

publicly disclose the location of the event and to limit it to student attendees.  (*Id.* ¶¶ 85-86.)

BCR representatives met again with Ms. Chaney to discuss event logistics and security on

April 10, 2017.  (*Id.* ¶ 89.)  In an email dated April 12, 2017, Ms. Chaney explained to BCR

representatives that "due to the safety and security issues concerning this event (which includes that

of your attendees, the speaker's personal safety, the surrounding campus constituents and

residential communities) UCPD has indicated that it cannot recommend approval of this event in

any campus facility that ENDS later than 3:00 p.m."  (*Id.*, Exh. E & ¶¶ 90-91.)  Ms. Chaney also

explained that the University was working to secure a venue at the law school from 1 to 3 p.m. on

April 27, 2017, but that the venue was not yet confirmed.  (*Id.*, Exh. E.)  Ms. Chaney further stated

that if this timing was not suitable for Ms. Coulter, that the University would work to accommodate

a different date during the following week (May 1-7) or the following semester, and Ms. Chaney

highly recommended moving the event to the beginning of the fall semester to maximize the

group's ability "to host Ms. Coulter in an environment that is secure and prepared for productive

dialogue."  (*Id.*)  Plaintiffs allege that Lt. Harris also explained to BCR representatives that the

3 p.m. "curfew" was necessitated by "UCPD's 'research' into Ms. Coulter and the February activity

by the violent demonstrators in connection with the canceled [Yiannopoulos] [e]vent" and

corresponding assessment of "security threats."  (*Id.* ¶ 92.)  On April 14, 2017, Dean Greenwell

1   extended the allowable end time for the event to 3:30 p.m., and Mr. Irwin acknowledged Plaintiffs'

2   acceptance of this end time in an email dated April 17, 2017.  (*Id.* ¶ 69 & Exhs. E-F.)  There is no

3   allegation that the University had located or promised a venue to Plaintiffs.

4           The following day, on April 18, 2017, Dean Greenwell called BCR representative Naweed

5   Tahmas to inform him that the University had not been able to secure a room for April 27.  (*Id.*

6   ¶ 98.)  Later that evening Vice Chancellor Scott Biddy and Vice Chancellor for Student Affairs

7   Stephen Sutton sent an email to the BCR representatives confirming that "despite extensive efforts

8   on the part of UCPD and the staff within Student Affairs, we have been unable to find a safe and

9   suitable venue for your planned April 27th event featuring Ann Coulter" and "must now work

10  together to reschedule her appearance for a later date."  (*Id.*, Exh. B.)  The email emphasized the

11  University's "unqualified support for our students' right to bring speakers of their choosing to the

12  University, and our deep commitment to the values and principles embedded in the First

13  Amendment of the U.S. Constitution" while acknowledging that the "campus retains responsibility

14  for ensuring safety and security during such events."  (*Id.*)  The email referenced the recent violent

15  protests "surrounding the planned appearance by Milo Yiannopoulos in February, as well as

16  several riots which have occurred in recent weeks in the City of Berkeley" and explained "[w]e

17  base our decisions regarding an event's timing and location on the objective analysis of the law

18  enforcement professionals of UCPD as to how best to ensure safety for all while maximizing the

19  chances that the event can take place as planned."  (*Id.*)  The email explained that UCPD had,

20  based on a "comprehensive review of potential sites and security arrangements," "determined that,

21  given currently active security threats, it is not possible to assure that the event could be held

22  successfully—or that the safety of Ms. Coulter, the event sponsors, audience, and bystanders could

23  be adequately protected—at any of the campus venues available on April 27th."  (*Id.*)  Again,

24  there is no allegation that any venue had previously been offered, promised, or booked.

25          Nonetheless, Plaintiffs allege that the University unilaterally canceled Ms. Coulter's

26  speaking event.  (*Id.* ¶ 101.)  Ms. Coulter then publicly announced her intention to speak on

27  campus without University support or approval.  (*Id.*)  On April 20, 2017, Ellen Topp, the Interim

28  Chief of Staff for Student Affairs, on behalf of Vice Chancellors Sutton and Biddy, emailed

Plaintiffs expressing grave concern with "Ms. Coulter's announcement that she intends to come to campus on April 27th without regard for the fact that we don't have a protectable venue available on that date" and "very specific intelligence regarding threats that could pose a grave danger to the speaker, attendees, and those who may wish to lawfully protest the event." (*Id.* ¶ 103 & Exh. H.) This email informed Plaintiffs that "an appropriate, protectable venue" that could "accommodate a substantial audience and meet the security criteria established by [UCPD]" would be available on May 2, 2017, from 1:00-3:00 p.m., during the week that Ms. Chaney had suggested considering in her April 12, 2017 email. (*Id.*, Exh. H.) Plaintiffs rejected the University's proposed alternative time and venue, alleging it fell during a "dead week" in which no classes are held. (*Id.* ¶¶ 104-05.)

Following the filing of Plaintiffs' original Complaint, the University continued to work with Plaintiffs to find a suitable time and place for the Coulter event. In an exchange between counsel on April 25, 2017, Plaintiffs' counsel gave several demands for the Coulter event to go forward, including that the event must occur on April 27, 2017, at a central location on the main campus, in a "[r]oom holding hundreds of participants," and with "sufficient security to ensure the safety of attendees." (FAC ¶ 107 & Ex. I.) Defendants' counsel responded within hours that the University could not commit to providing a securable indoor venue for Ms. Coulter's speech on April 27, but would "ensure a very robust police presence at and around Sproul Plaza . . . to attempt to maintain safety" at 2 p.m. on April 27, 2017, the day and time on which Ms. Coulter had publicly indicated that she intended to come to Sproul Plaza to speak. (*Id* ¶ 107 & Ex. J.) Defendants' counsel also emphasized that "the University absolutely does not intend to prevent Ms. Coulter from coming to campus or from speaking on April 27 or any other day." (*Id.*)

In a press release dated April 25, 2017, YAF stated that it would not "jeopardize the safety of its staff or students" by going forward with the event. (Heckenlively Decl., Exh. 3.) The New York Times reported that Ms. Coulter canceled her speech "because she had lost the backing of conservative groups that had initially sponsored her appearance." (*Id.*, Exh. 4.)

### E. The University's Major Events Policy

The University has publicly committed to implementing a new Major Events Policy governing events sponsored by non-departmental users, including student organizations. In late

June, the University published a timeline setting forth a multi-phase process for the development, review, and approval of the new Major Events Policy.  (FAC ¶ 117, Exh. K.)  Pursuant to this timeline, the University implemented the Major Events Policy on an interim basis on August 14, 2017 after a stakeholder comment period and will adopt a final policy in January 2018 following additional public comment and administrative review.  (*Id.* ¶ 118, Exh. L.)

The purpose of the Major Events policy is to set forth objective and neutral criteria for assessing the administrative and security needs associated with campus events organized by non-University entities and individuals.  (*Id.*, Exh. L ("This policy is explicitly intended to support the right and ability of non-departmental users to host Major Events of their choosing on campus and will be applied without regard for perspectives or positions expressed in connection with those events.").)  The Major Events policy governs events hosted by non-departmental users, i.e., student organizations, that satisfy enumerated content- and viewpoint-neutral criteria for defining "major events" that are subject to the policy, such as the number of expected attendees.  (*Id.* ¶¶ 123, 127, Exh. L at 2.)  The policy sets forth "Security Procedures," that are triggered by content- and viewpoint-neutral criteria, e.g., the number of attendees.  (*Id.*, Exh. L at 7.)  UCPD is expressly prohibited from assessing security needs based on "viewpoints, opinions, or anticipated expression of event speakers, sponsors, [or] participants."  (*Id.*)  The "goal" of UCPD's security recommendations is to "[m]inimize risks to the health and safety of event participants and audience; [m]inimize risks to the campus and surrounding community; [m]aximize the ability of the event sponsors to successfully hold the events; and [p]rotect the excise of rights of free expression by the event sponsors, participants, and community."  (*Id.*).  The policy provides for an administrative appeals process.  (*Id.* at 8.)

The Major Events policy also requires that event sponsors agree to "reimburse costs of basic event security … based on standard, approved, and published recharge rates."  (*Id.* at 9.)  These fees are based on content- and viewpoint-neutral criteria, including characteristics of the venue, time of day, and number of expected attendees.  The policy explicitly precludes security fees "based on concerns that the subject matter of the event or the viewpoints, opinions, or anticipated expression … might provoke disturbances or response costs required by such

1   disturbances." (*Id.*)  Thus, the University would pay any such security costs.

2        The University disputes that it ever had a "High-Profile Speaker Policy," as alleged in the

3   FAC, but to the extent such "High-Profile Speaker Policy" existed, it has been rescinded and

4   replaced by the Major Events Policy.  (*Id.*)

5                **F.        Plaintiffs Successfully Hosted Shapiro Event Under the Major Events Policy**

6        On July 10, 2017, BCR member Naweed Tahmas informed UC Berkeley administrators

7   that BCR and YAF had invited conservative commentator Ben Shapiro to speak at UC Berkeley

8   on September 14, 2017 at 7:00 p.m. and requested a campus venue that could accommodate 500

9   people.  (FAC ¶ 133.)  On July 18, 2017, UC administrator Ms. Chaney responded to Mr. Tahmas,

10  explaining that "despite extensive efforts, we have been unable to identify an available campus

11  venue that meets your stated criteria," because "there are but a handful of venues of that size on

12  campus" and "they tend to get booked up long in advance."  (*Id.* ¶ 134 & Exh. O.)  Because other

13  venues were unavailable, the University "tentatively reserved a few venues on BCR's behalf that

14  … include smaller spaces on the date requested and larger venues on other dates in September."

15  (*Id.*, Exh. O.)  Ms. Chaney further explained that there would need to be a UCPD security

16  assessment, and asked BCR to choose a date and time during which to meet with UCPD.  (*Id.*)  On

17  July 20, 2017, Mr. Tahmas responded with selected times and dates for the meeting with UCPD

18  and to inquire about the availability of Zellerbach Hall.  (*Id.* ¶ 136, Exh. P.)  On July 21, 2017,

19  Ms. Chaney informed Mr. Tahmas that the University had secured two options for BCR's chosen

20  date and time: Alumnae Hall (300 person capacity) and Zellerbach Hall (2689 person capacity).

21  (*Id.*)  Ms. Chaney noted that the administration would make Zellerbach available to BCR without

22  its regular venue charges.  (*Id.*)  Plaintiffs assert on information and belief that "campus

23  administrators intentionally and falsely stated" that Zellerbach Hall was not "available upon

24  BCR's initial request."  (*Id.* ¶ 138.)  As Ms. Chaney wrote in her email, however, Zellerbach was

25  "undergoing some floor restoration" during the week including September 14, but the

26  administration had "determined that it can be used" for the Shapiro event.  (*Id.*, Exh. P.)

27        Though the University waived the venue fees for Zellerbach and staffing costs of the

28  venue, it did impose the basic security fee under the Major Events policy based on "standard

                                                    -9-                              3:17-cv-02255

UCPD recharge rates for overtime in Fiscal Year 2018 as applied to all campus events." (*Id.* ¶ 141 & Exh. S.)  Security fees are based on standard criteria under the Major Events policy, including venue size, location, number of entrances and exits, time of day, audience size, use of ticketing, and whether the performer or speaker comes with a personal security team.  (*Id.*, Exh. L, at 9.) The original estimated fee of $15,738 for the Shapiro event was reduced to $9,162 when UCPD reduced the maximum audience size to 1,064 people based on its determination that allowing the audience to access the balcony would pose threats of "significant injury should someone stumble, trip, or get pushed over the balcony railing" and serious harm should anyone throw objects from the balcony onto the audience below.  (*Id.* Exh. S & ¶ 150)  The University also required that all tickets be purchased and picked up by 5:30 p.m. on the day before the event.  (*Id.* ¶ 149.)[1]

Pursuant to the procedures set forth in the Major Events policy, Plaintiffs administratively appealed the security recommendations, requesting that Zellerbach Hall balcony be opened and that same-day will-call ticketing be allowed.  (*Id.* ¶ 152, Exh. T.)  Vice Chancellor for Undergraduate Education Catherine Koshland reviewed Plaintiffs' appeal and, in a written decision, granted their request for same-day will-call ticketing, but denied their request to reopen the Zellerbach Hall balcony.  (*Id.*, Exh. T.)  Vice Chancellor Koshland explained that violent protests on August 27, 2017 in the City of Berkeley had prompted a secondary security review of Zellerbach Hall under the Major Events policy, and that she concurred with UCPD's determination that "the balcony poses an unnecessary risk to safety and security."  (*Id.*, Exh. T.)

On September 14, 2017, Plaintiffs hosted the Shapiro event without any violent incidents. (*Id.* ¶ 156.)  Plaintiff YAF posted on Twitter: "We did it. Conservative ideas can be heard at UC Berkeley," and Plaintiff BCR retweeted Mr. Shapiro's tweet: "Well done, @UCPD_Cal and @berkeleypolice! Thank you for restoring order and ensuring the exercise of free speech!" (Heckenlively Decl. ¶¶ 10-11 & Exhs. 9-10.)  Plaintiffs allege that UCPD seized approximately 100 stand-by tickets without explanation, but they do not allege that any individuals were unable

---

[1] Plaintiffs allege that representatives of Cal Performances, which operates Zellerbach Hall, told them that unclaimed tickets could be distributed on a standby basis on the date of the event.  (FAC ¶ 149.)  Defendants deny this allegation.

1    to attend the event as a result.  (FAC ¶ 155.)

2        **G.    The Court Dismisses Plaintiffs' Complaint**

3        Following the Shapiro event, on September 29, 2017, the Court granted Defendants'

4    motion to dismiss the original complaint.  (Dkt. No. 27.)  The Court held, *inter alia*, that Plaintiffs

5    had not alleged that Defendants intentionally discriminated based on viewpoint, but afforded them

6    leave to amend to attempt to remedy that defect and others.  (Transcript of Sept. 29, 2017 Hearing

7    ("Tr.") at 69:9-25.)  Plaintiffs filed the FAC on November 10, 2017.  The FAC largely repeats the

8    original complaint, but it also adds some new allegations about the Shapiro event and Major

9    Events policy that were mostly in the briefing before the Court on the prior motion, asserts

10   unsupportable legal conclusions about the nature of the forums at issue, and wrongly conflates

11   Plaintiffs' invented "High-Profile Speaker Policy" with the new Major Events policy.

12   **III.   LEGAL STANDARD**

13       A Rule 12(b)(6) motion for failure to state a claim must be granted "where the complaint

14   lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo*

15   *v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6)

16   motion, a complaint must plead facts "to state a claim to relief that is plausible on its face."

17   *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks omitted).

18   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

19   do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may consider the complaint

20   and (1) documents "whose contents are alleged in [the] complaint and whose authenticity no party

21   questions," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by*

22   *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); (2) matters subject to judicial

23   notice, *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

24   **IV.   ARGUMENT**

25       **A.    Plaintiffs Have Not  Pleaded Any Constitutional Violation**

26           **1.    Plaintiffs Have Not Plausibly Pleaded a Violation of Their First
                     Amendment Free Speech Rights**

27

28           **(a)    The Venues at Issue Are Limited Public Forums**

1    The campus facilities that Plaintiffs sought to reserve for their events are "limited public

2    forums" because they have not been opened intentionally for indiscriminate use by the general

3    public.  Public university campus space—indoor or outdoor—is generally not a traditional public

4    forum like a public park or sidewalk.  It is therefore up to the university to determine whether any

5    of its spaces will be a forum for speech and, if so, what parameters will govern the forum.  This is

6    because "the government does not create a public forum by inaction or by permitting limited

7    discourse, but only by *intentionally* opening a nontraditional forum for public discourse."

8    *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (emphasis added).

9    Thus, if a university affirmatively opens a particular space to indiscriminate use by the general

10   public, it becomes a designated public forum.  If, however, a university opens a particular space

11   for narrower range of speech activities—e.g., for use by a specified set of users or to discuss a

12   specified range of subjects—then it becomes a limited public forum.  *Flint v. Dennison*, 488 F.3d

13   816, 830 (9th Cir. 2007) ("The limited public forum is a sub-category of a designated public

14   forum that refers to a type of nonpublic forum that the government has intentionally opened to

15   certain groups or to certain topics" (internal quotation marks and citation omitted)).  Finally, if the

16   university opens a particular space for speech but retains control for each event on a speaker-by-

17   speaker or subject-by-subject basis to determine whether to grant access to the forum, then the

18   university has created a *nonpublic* forum.  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666,

19   679 (1998).

20   The University has carefully differentiated between different spaces on the Berkeley

21   campus to ensure that only two are designated public forums.  Specifically, under the Campus

22   Regulations Implementing University Policies, Sproul Plaza and Lower Sproul Plaza are

23   designated as "areas for public expression" that may be used (without amplified sound) by any

24   speaker without a permit or reservation.  (Heckenlively Decl., Exh. 8 § 331.)   Those are the only

25   two designated public forums.  By contrast, other spaces on campus are limited public forums (or

26   nonpublic forums) because they are available only for specified purposes and users.  Those

27   facilities may be reserved by (a) "[r]ecognized campus organizations, for events related to the

28   purposes of the organizations," (b) "[t]he recognized student government . . ., official alumni

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

organizations and similar University-related organizations, and ... units of the University, for events related to their purposes," and (c) members of University faculty and staff "for extracurricular events related to their duties or University activities." (*Id.* § 222.) These spaces are also available to "non-university organizations," but only upon "invitation of student governments, other University units, or recognized campus organizations" and subject to six requirements, including that "[t]he use must confer a benefit to the University" and that University-affiliated individuals or organizations will be given priority. (*Id.*) These specific regulations on who may use the venues make clear that UC Berkeley has *not* intentionally opened any space other than Sproul Plaza and Lower Sproul Plaza for indiscriminate use by the public.

Plaintiffs incorrectly contend in the FAC that "UC Berkeley is *required* to maintain" the venues at issue here as designated public forums under systemwide University of California regulations. (FAC ¶¶ 31-35.) Not so. The cited regulations expressly do not apply to registered student organizations or any other university affiliates; they govern use of university facilities by non-affiliates. Cal. Code Regs. tit. 5, § 100004. Plaintiff BCR is a registered student organization, so these regulations are inapplicable here. Plaintiff argues that it would be unreasonable to treat affiliates of the University differently from non-affiliates, but is not clear why that would be given that the two groups are differently situated.

Courts have repeatedly found that university venues and programs are limited public forums for similar reasons. *See, e.g.*, *Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (student organization program is a limited public forum); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (campus facilities opened to various student groups); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983) (school mail facilities opened for periodic use by civic and church organizations); *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011) (university's sidewalks, pedestrian mall, and rotunda were limited public forums because they were open for use only "by a discrete group of people—the [university] community; its students, faculty, and employees; and their sponsored guests").

A nonpublic forum is not the same thing as a limited public forum; a university can create

a limited public forum (as opposed to a designated public forum) without retaining the control and "selective access" characteristic of a nonpublic forum.[2]  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1062 (9th Cir. 2012).  Thus, the analysis in *Arkansas Educ. Television Commission,* 523 U.S. at 679-80, concluding that the candidate debate at issue there was a *nonpublic forum* because the government exercised "non-ministerial judgments" is not relevant to differentiating between *designated* public forums and *limited* public forums.  In any event, it is clear from the regulations that campus officials at UC Berkeley must make non-ministerial decisions regarding use of the venues.  The regulations ask administrators to determine, for example, whether a campus organization's use is related to the purpose of the organization, whether a reservation by an outside group would "confer a benefit to the University," and whether "special security provisions" are required.  (Heckenlively Decl., Exh. 8 § 222-226.)  This is the type of "selective access," as opposed to "general access," described in *Arkansas Educational Television Commission.*

Because the venues at issue are limited public forums, restrictions on expressive activity need only be viewpoint neutral and reasonable in light of the purpose served by the forum. *Rosenberger*, 515 U.S. at 829.  That standard is met here.  As explained below, the restrictions were both content and viewpoint neutral (although only viewpoint neutrality is required), and they were reasonable in light of the purpose of the forum.

### (b)     The Alleged Restrictions Are Viewpoint and Content Neutral

This Court previously observed that Plaintiffs had not plausibly pleaded viewpoint discrimination or that the University's actions were pretextual or taken for reasons other than security (Tr. at 47), and the FAC contains no new allegations regarding Defendants' actions or motives to address this shortcoming.

---

[2] Plaintiffs have argued previously that *Widmar v. Vincent*, 454 U.S. 263 (1981), establishes that campus facilities are *designated* public forums, but that case was decided before the Supreme Court even created the limited public forum as a subcategory.  Since creating that category in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 44–45 (1983), the Supreme Court and the Ninth Circuit have both described *Widmar* as a limited public forum case.  *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302–03 & n.12 (2000); *Prince v. Jacoby*, 303 F.3d 1074, 1091 (9th Cir. 2002) ("As in *Widmar*, Spanaway Lake High School has created a limited public forum . . . .").

1    When determining content or viewpoint neutrality, "the principal inquiry . . . is whether the

2    government has adopted a regulation of speech *because of* disagreement with the message it

3    conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis added).  For

4    content neutrality, a "[g]overnment regulation of expressive activity is content neutral so long as it

5    is justified without reference to the content of the regulated speech" even if the regulation "has an

6    incidental effect on some speakers or messages but not others." *Id.* (internal quotation marks

7    omitted).  "The government's purpose is the controlling consideration." *Id.*  Similarly, when

8    determining *viewpoint* neutrality, courts ask whether the Government was *motivated by*

9    disagreement with the speaker's viewpoint.  *See Martinez*, 561 U.S. at 696 (applying *Ward* to hold

10   policy justified without reference to viewpoint was viewpoint neutral).  This is because

11   "[v]iewpoint discrimination is [] an egregious form of content discrimination" that occurs when

12   "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for

13   the restriction." *Rosenberger*, 515 U.S. at 829.

14   Thus, in *Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005), the court held that an

15   emergency order barring all protests in certain locations during a World Trade Organization

16   ("WTO") conference was content neutral because it "had everything to do with the need to restore

17   and maintain civic order, and nothing to do with the content of Appellants' message," *id*. at 1128-

18   29, and the order was also viewpoint neutral because it "applied equally to persons who wished to

19   protest about any topic," *id*. at 1130 n.30.  This was so even though the emergency order permitted

20   officers to question individuals seeking to access the restricted zone to determine whether they had

21   a "reasonable purpose" for entering the zone, which included shopping or working, but did not

22   include any protest activity.  *Id.* at 1125, 1130.  "As a matter of law [the order] was not a regulation

23   of speech content, but rather was 'a regulation of the places where some speech may occur'" even if

24   the order "predominantly affected protestors with anti-WTO views."  *Id*. at 1129; *see also Clift v.

25   City of Burlington*, 925 F. Supp. 2d 614, 635 (D. Vt. 2013) ("[A] regulation is not content-based

26   simply because an enforcing officer might have to consider what an individual is saying" (citing

27   *Hill v. Colorado*, 530 U.S. 703, 721-22 (2000).).

28

1    Applying these standards here, the FAC contains no facts demonstrating that the Major

2   Events Policy or any Defendant restricted Plaintiffs' protected speech "*because of* not merely in

3   spite of" the viewpoints of Plaintiffs, their proposed speakers, or any protesters. *Moss*, 572 F.3d at

4   970 (emphasis in original)); *see also Ward*, 491 U.S. at 791  Rather, as in *Ward* and *Menotti*, the

5   alleged restrictions were content and viewpoint neutral because, even accepting all factual

6   allegations as true, the "purpose" or motivation of the University's actions was to ensure the safety

7   of its students and community, and the University restricted only the time, manner, and location of

8   the speech—not whether the speakers could come or what they could say.  *See, e.g.*, FAC ¶¶ 67, 85-

9   86, 92, 103, 150 & Exhs. A-E, H, S, T; *Davenport v. City of Alexandria*, 710 F.2d 148, 151 (4th

10  Cir. 1983) (en banc) public safety is content-neutral basis to regulate speech); *see also First Resort,*

11  *Inc. v. Herrera*, 860 F.3d 1263, 1277-78 (9th Cir. 2017) (no viewpoint discrimination where

12  ordinance did "not regulate [entities] based on any such anti-abortion views," but rather "because of

13  the threat to women's health posed by their false or misleading advertising").

14    Plaintiffs' conclusory allegations that the University would not permit conservative

15  viewpoints (*e.g.*, FAC ¶¶ 96, 100-101, 127, 165) are not entitled to an assumption of truth.

16  Plaintiffs contend that Vicente Fox Quesada and Maria Echaveste were allowed to speak on campus

17  "without incident or interference from Defendants."  (FAC ¶¶ 160-61.)  Notably absent are any

18  allegations that Mr. Fox or Ms. Echaveste spoke in unsecured venues or that UCPD had an

19  objective basis on which to conclude that specific threats required a different security plan for either

20  speaker.  Content and viewpoint neutrality does not require the University to blind itself to the

21  different security or logistical needs presented by different events.  *See, e.g.*, *United for Peace and*

22  *Justice v. City of New York*, 243 F. Supp. 2d 19, 26, 28-29 (S.D.N.Y.), *aff'd*, 323 F.3d 175 (2d Cir.

23  2003) (per curiam) (city's differential treatment of protest and "cultural" parades not content based,

24  but rather based on different security and planning needs).  Rather, the factual allegations in the

25  FAC make clear that the only basis for Defendants' actions—and certainly the "more likely

26  explanation"—was to provide security and serve the educational objectives of the University.

27  *Ashcroft v. Iqbal*, 556 U.S. 662, 681-82 (2009); *see also* FAC ¶¶ 67, 85-86, 92, 103, 150 & Exhs.

28  A-E, H, S, T.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1

2

               **(c)**       **The Heckler's Veto Doctrine Does Not Render the Alleged Restrictions Content or Viewpoint Based**

3

       Plaintiffs' assertion that the University permitted a "heckler's veto" does not defeat content

4

or viewpoint neutrality.  A heckler's veto is "an impermissible content-based speech restriction

5

where the speaker is silenced due to an anticipated disorderly or violent reaction of the audience."

6

*Rosenbaum v. City & Cty. of San Francisco*, 484 F.3d 1142, 1158 (9th Cir. 2007).  Because all of

7

the venues at issue are limited public forums, *see supra* Part IV.A.1(a)-(b), the heckler's veto

8

doctrine does not apply unless Plaintiffs can demonstrate that the safety concerns Defendants

9

identified are "mere pretext for suppressing expression because public officials oppose the

10

speaker's point of view."  *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 502-

11

03 (9th Cir. 2015).  Plaintiffs have not and cannot allege facts demonstrating that the safety

12

concerns were pretextual.  To the contrary, they understood there was a possibility "of a violent

13

outbreak" at the Shapiro event.  (FAC, Exh. Q.)

14

       Even if the heckler's veto doctrine applies to the campus venues at issue, Plaintiffs have failed

15

to allege any *facts* demonstrating any "genuine nexus" between the views of any hecklers and

16

Defendants' views.  *Rosenbaum*, 484 F.3d at 1159.  The Ninth Circuit has rejected application of the

17

heckler's veto doctrine where defendants were "not motivated by fear of any hostile or unruly reaction

18

by citizens who complained about appellants' activities."  *Rosenbaum*, 484 F.3d at 1159.  Absent a

19

"genuine nexus" between the heckler's views and the defendant's action, simply "imput[ing]" the view

20

of the heckler to the defendant would "lead to an absurd result" in which any response to a complaint

21

about expressive activity "would automatically be transformed into a First Amendment violation."  *Id.*

22

Similarly, the Third Circuit rejected a heckler's veto challenge where police moved speakers because

23

they had attracted a crowd that was blocking vendors and not because of any message or viewpoint.

24

*Startzell v. City of Philadelphia*, 533 F.3d 183, 200 (3d Cir. 2008).

25

       Here, as in *Rosenbaum* and *Startzell*, Plaintiffs have not alleged a genuine nexus between

26

the protester's views and Defendants' actions, and thus any claim premised on the audience's

27

reaction to Plaintiffs' speech must be dismissed.  The critical fact that Plaintiffs rely on to allege

28

that the University considered the "tastes and criminal actions of a masked mob" is an April 21,

2017 letter from then-Chief Campus Counsel Christopher Patti to Plaintiffs' counsel, in which Mr. Patti pointed to "mounting intelligence that some of the same groups that previously engaged in local violent action also intended violence at the Coulter Event." (FAC ¶ 163.) As was the case with the original Complaint, Plaintiffs notably do not attach Mr. Patti's letter. In fact, what the letter says in context is that the University was concerned about "serious violence that has occurred at recent events on and around the campus—including most recently, last weekend's clashes *between opposition groups of protesters* in Downtown Berkeley," and that it had received intelligence that "some of the *same groups*"—that is, the groups on *opposing* sides of the political spectrum—would engage in violence at the Coulter event. (Heckenlively Decl. ¶ 8 & Exh. 7 (emphasis added); *see also* RJN at pp. 2-4.) Thus, any suggestion that the University was motivated by a particular protester's message or view is demonstrably false.

Nor do Plaintiffs allege any facts demonstrating that Defendants applied the Major Events Policy to "silence [a speaker] due to an anticipated disorderly or violent reaction of the audience." *Rosenbaum*, 484 F.3d at 1158. Plaintiffs baldly assert that the Major Events Policy "was adopted and enforced in a viewpoint discriminatory manner," (FAC ¶ 177), but the FAC is bereft of any allegations showing that Defendants silenced any speaker, much less that they did so because they agreed with the viewpoints of a hostile crowd. The only facts in the FAC support the conclusion that Defendants have applied the facially neutral Major Events policy in a viewpoint-neutral manner: the Cal Hacks student group was unable to reserve Wheeler Auditorium because they missed the deadline to book the venue for their "hackathon" and the Berkeley Forum, a non-partisan student group, had to limit the size of an event with President Obama's former press secretary to 200 people in order to avoid application of the policy. (*Id.*, Exh. M.)

### (d) The Alleged Restrictions Are Reasonable in Light of the Purpose of University Forums

In a limited public forum, restrictions need only be reasonable in light of the purpose served by the forum; they need not "be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. When assessing reasonableness, the Supreme Court has declared that

> First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment . . . . Cognizant that judges lack the on-the-ground

expertise and experience of school administrators . . . we have cautioned courts in various contexts to resist substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.

*Martinez*, 561 U.S. at 685-86 (internal quotation marks and citations omitted).  Courts have thus upheld restraints that preclude far more speech than the modest restrictions imposed here, e.g., a complete ban on outside non-sponsored speakers in limited public forums.  *See Bloedorn*, 631 F.3d at 1235.  Moreover, the University's "mission is education, and decisions of [the Supreme] Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."  *Widmar*, 454 U.S. at 267.  In light of that mission, the University could reasonably restrict the time and location of events that were likely to disrupt the educational environment due to violence, campus-wide lockdowns, and property damage to University facilities.  *See id.*; *see, e.g.*, FAC ¶¶ 52, 55.

> **(e)** **The Alleged Restrictions Are Permissible Time-Manner-Place Restrictions**

Even if the alleged restrictions had been imposed in a designated public forum like Sproul Plaza (they were not), they would have been constitutional "time, place and manner regulations" because they were content neutral, narrowly tailored to serve an important government interest, and left open ample alternative channels of communication.  *Perry Educ. Ass'n*, 460 U.S. at 45-46.  The same is true of the Major Events Policy.

> **(i)** <u>The Alleged Restrictions and Major Events Policy Are Narrowly Tailored to Serve the Interests of Safety, Education, and Access to Resources</u>

The alleged restrictions and the Major Events Policy are narrowly tailored to serve at least three important interests: public safety, the educational mission of the University, and management of University resources.  *First*, public safety is a significant governmental interest. *See, e.g.*, *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) (recognizing a significant governmental "interest in protecting the 'safety and convenience' of persons").  The interest in public safety is particularly compelling when coupled with the need to provide a safe learning environment for students.  *See, e.g.*, *Bowman v. White*, 444 F.3d 967, 980, 982 (8th Cir. 2006) ("education" and "safety" are "fundamental human need[s] without which the desire to speak one's mind becomes moot"); *Pi Lambda Phi Fraternity, Inc. v. Univ. of*

1 *Pittsburgh*, 58 F. Supp. 2d 619, 625 (W.D. Pa. 1999) (university has "a compelling interest in

2 maintaining a safe educational environment"), *aff'd*, 229 F.3d 435 (3d Cir. 2000).

3       *Second*, courts routinely recognize "protecting the educational experience of the students in

4 furtherance of the University's educational mission" as a "significant interest." *Bowman*, 444

5 F.3d at 980. "This interest is significant because an educated electorate is essential to the vitality

6 of our democracy and a lack of proper education diminishes the value of our free speech rights."

7 *Id.* (citing *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)). Thus,

8 the Supreme Court has expressly noted "a university's authority to impose reasonable regulations

9 . . . upon the use of its campus and facilities" in furtherance of its educational mission. *Widmar*,

10 454 U.S. at 267 n.5.

11       *Third*, courts recognize a significant interest in "access to scarce university facilities," and

12 the need to regulate "'competing uses of that space.'" *Bloedorn*, 631 F.3d at 1238-39 (quoting

13 *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009)); *see also Bowman*, 444 F.3d at 980-

14 81 (recognizing interest in "diversity of uses of University resources").

15       The narrow tailoring requirement is satisfied so long as the government's asserted interest

16 "'would be achieved less effectively absent the regulation.'" *Colacurcio v. City of Kent*, 163 F.3d

17 545, 553 (9th Cir. 1998) (quoting *Ward*, 491 U.S. at 799). Narrow tailoring does not require that

18 the University adopt "the least restrictive or the least intrusive means" of serving its legitimate

19 interests; rather, a regulation is valid "[s]o long as the means chosen are not substantially broader

20 than necessary to achieve the government's interest." *Ward*, 491 U.S. at 798-800.

21       Here, each of the alleged restrictions applied before and after implementation of the Major

22 Events Policy was sufficiently tailored to meet one or more of the substantial government interests

23 described above. The FAC alleges specific and credible security threats, *see, e.g.*, FAC ¶¶ 67, 85-

24 86, 92, 103, 150 & Exhs. A-E, H, S, T, that leave no doubt that the University's interests in safety

25 and protecting the educational experience of its students "would be achieved less effectively

26 absent" the time, place, and manner restrictions imposed. *See Colacurcio*, 163 F.3d at 553.

27 Similarly, the University's interests in furthering its educational mission and regulating its

28 resources would have been "achieved less effectively" had Plaintiffs been permitted to use a venue

of their choosing on a day and time of their choosing, without adequate security. The University is not obligated, for example, to cancel class or another scheduled activity to accommodate Plaintiffs' demands, or to host the event in a space it has deemed not securable.

Nor do Plaintiffs plausibly allege that these restrictions burden substantially more speech than necessary to achieve the University's interests. Plaintiffs have not alleged that the University *prevented* Mr. Horowitz, Ms. Coulter, or Mr. Shapiro from speaking on campus. The location restrictions did not unconstitutionally burden speech as the Krutch Theater location for the Horowitz event is a similar distance from the primary campus dormitories as the Genetics and Plant Biology Building location preferred by Plaintiffs, and the Sproul Plaza location where the University committed to providing a police presence on April 27 for Ms. Coulter was in the center of campus. (Heckenlively Decl., Exhs. 2, 5 & 6.) For the Shapiro event, the University covered the venue costs of Zellerbach Hall and provided Plaintiffs with double the originally requested audience capacity at a central campus venue. With respect to the time restrictions, the University also offered to work with Plaintiffs to identify a mutually agreeable date for the Coulter event, and the Shapiro event occurred on the date and evening time that Plaintiffs requested. Plaintiffs' complaint that some students might be unable to attend an event in the afternoon also does not represent a substantial burden; the same is true for all events, as classes and activities are scheduled in the evening as well. In any event, the afternoon requirement is not in the Major Events policy.

The security fees imposed on the Horowitz and Shapiro events were also narrowly tailored to meet the University's interests in safety and management of limited resources. The fees covered actual, basic security costs based on standard rates, and did not include any additional costs that might arise as a result of disturbances provoked by protestors. *See Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (affirming license fee designed to meet the expenses incident to the administration of the law and the cost of maintaining public order); *Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1137 (6th Cir. 1991) (upholding fee for processing costs and traffic control where there was no evidence the fees "were excessive or unreasonable").

            (ii)      <u>The Alleged Restrictions Left Open Ample Alternative Channels for Communication</u>

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1   The alleged restrictions and Major Events Policy also leave open ample alternative

2   channels for communication.  A court "generally will not strike down a governmental action for

3   failure to leave open ample alternative channels of communication" unless the action "will

4   foreclose an entire medium of public expression across the landscape of a particular community or

5   setting." *Ctr. for Fair Pub. Policy v. Maricopa Cty*, 336 F.3d 1153, 1170 (9th Cir. 2003); *see also*

6   *Carew-Reid v. Metro. Transp. Auth.*, 903 F.2d 914, 919 (2d Cir. 1990) (alternative channel

7   requirement does not require providing "access to every or even the best channels or locations for

8   the [plaintiffs'] expression").  The government actor may not "effectively prevent[] a speaker from

9   reaching his intended audience." *Edwards v. City of Couer d'Alene*, 262 F.3d 856, 866 (9th Cir.

10   2001).  Thus, the Eleventh Circuit held that a university policy restricting outside speakers from a

11   designated public forum on campus left open ample alternative channels because plaintiff could

12   "preach his message to [university] community members as they enter and exit [] campus,"

13   *Bloedorn*, 631 F.3d at 1241-42, and the Supreme Court held that  limiting solicitations to fixed

14   locations at a fairgrounds left open ample alternative channels for communication because plaintiff

15   could conduct the desired activity "at some point within the forum," *Heffron*, 452 U.S. at 654-55.

16   Plaintiffs do not allege any facts demonstrating that the University foreclosed an entire

17   medium of public expression to Plaintiffs.  The University did not *bar* Mr. Horowitz, Ms. Coulter,

18   Mr. Shapiro or any other conservative speaker from speaking on campus, in a large campus venue,

19   or to a large audience of students.  And the successful Shapiro event demonstrates that the Major

20   Events policy does not impose any substantial burden on speech.  The limited restrictions imposed,

21   like those in *Heffron* and *Bloedorn*, allowed Plaintiffs to reach their intended audience without

22   unnecessarily risking the safety and security of attendees, the speakers, or the broader campus.

23   **2.   BCR Has Not Plausibly Pleaded a Retaliation Claim**

24   BCR also alleges a claim for retaliation in violation of the First Amendment. On such a

25   claim, a plaintiff must allege that "(1) he was engaged in a constitutionally protected activity,

26   (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in

27   the protected activity and (3) the protected activity was a substantial or motivating factor in the

28   defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *see*

1    *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016) (applying *Pinard* framework in a university

2    setting).   BCR has not plausibly alleged the second or third element.

3                   **(a)      *BCR Has Not Alleged that Its Speech Was a Substantial or***
                            ***Motivating Factor for Defendants' Conduct***

4            The *facts* alleged in the FAC make clear that the motivating factor for Defendants' actions

5    was maintaining security on campus.   (*See supra* Part II.A.)   There are no facts alleged that, if

6    proven, would establish Defendants' decisions were motivated by anything else.   It is not enough

7    that the facts are *consistent with* a retaliatory or discriminatory purpose, rather, they must

8    plausibly suggest such a purpose and leave no room for other "more likely explanations."  *See*

9    *Iqbal*, 556 U.S. at 681-82; *Moss*, 572 F.3d at 970.[3]

10           The assertions that Defendants "treat[ed] BCR and its members differently from similarly

11   situated students" and retaliated against them "because of their conservative beliefs," (FAC ¶ 184),

12   are conclusions not entitled to an assumption of truth.  *See, e.g.*, *Adams v. Small*, 542 F. App'x 567,

13   568 (9th Cir. 2013) (rejecting retaliation claim where plaintiff did not allege facts to support

14   conclusory allegations of a retaliatory motive).   These assertions are also inconsistent with the facts

15   alleged regarding Defendants' actions with respect to the Shapiro event.   Applying the Major

16   Events policy, the University provided BCR with a central venue, at the time and date of Plaintiffs'

17   choosing, with an audience capacity that was double the requested size.   The application of the

18   Major Events policy to other student groups, including Cal Hacks and the Berkeley Forum, also

19   _____

20   [3] *See also Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011) (dismissing retaliation claim
     where there was an "obvious alternative explanation" for the delay); *George v. Rehiel*, 738 F.3d

21   562, 586 (3d Cir. 2013) (dismissing retaliation claim where "[t]he TSA Officials' suspicion was
     an obvious alternative explanation for their conduct"); *Pratt v. Rowland*, 65 F.3d 802, 808-09 (9th

22   Cir. 1995) (reversing district court's grant of a preliminary injunction because timing of the
     transfer decision did not support a finding of retaliatory intent when there was a more likely

23   explanation for the transfer, namely allowing the inmate to be closer to his family); *Walker v.
     King*, No. 116CV01665EPGPC, 2017 WL 1018295, at *5 (E.D. Cal. Mar. 15, 2017) (dismissing

24   retaliation claim where a more likely explanation for the transfer was to distance plaintiff from a
     violent inmate); *Valley Surgical Ctr. LLC. v. Cty. of Los Angeles*, No. CV1302265DDPAGRX,

25   2016 WL 1273158, at *5-6 (C.D. Cal. Mar. 31, 2016) (dismissing retaliation claim upon
     considering an "obvious alternative explanation"); *Stone v. Becerra*, No. CV-10-138-RMP, 2011

26   WL 1565299, at *3-4 (E.D. Wash. Apr. 25, 2011), *aff'd*, 520 F.App'x 542 (9th Cir. 2013)

27   (dismissing retaliation claim because timing alone was insufficient evidence of retaliatory motive
     and the more likely explanation for the cell search was that "it was actually random").

28

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  contradict Plaintiffs' conclusory allegation that the policy has been applied in a discriminatory

2  fashion.

3       Plaintiffs' retaliation claim also fails because the facts alleged in the FAC and incorporated

4  by reference show that Defendants would have taken the same actions even in the absence of the

5  protected conduct.  *Pinard*, 467 F.3d at 770 (where a plaintiff pleads a prima facie case for

6  retaliation, "the government can escape liability by showing that it would have taken the same

7  action even in the absence of the protected conduct") (quotation marks and citation omitted).

8  Defendants' actions were driven by credible intelligence reporting grave security risks, and there is

9  no plausible basis to conclude they would have acted differently in the face of the same security

10  concerns had events had been planned by a student group without conservative viewpoints.

**(b)**    ***BCR Has Not Alleged that Defendants' Actions Would
Impermissibly Chill Speech***

11

12       Plaintiffs also have not alleged that Defendants' conduct chilled their speech.  To the

13  contrary, courts have held that reasonable time, place, and manner restrictions, such as those

14  imposed by the University here, do not impermissibly chill speech.  *See, e.g.*, *Matney v. Cty. of*

15  *Kenosha*, 86 F.3d 692, 699 (7th Cir. 1996) (noting that any chill on speech from a permissible

16  time, place, manner restriction is constitutionally tolerable).  "[D]e minimis deprivations of

17  benefits and privileges on account of one's speech do not give rise to a First Amendment claim."

18  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 544 (9th Cir. 2010).  "Rather, for adverse, retaliatory

19  actions to offend the First Amendment, they must be of a nature that would stifle someone from

20  speaking out," with the quintessential examples being "exercises of governmental power that are

21  regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his

22  or her speech."  *Id.* (quotation marks and citation omitted).  Here, as in *Blair*, Defendants have not

23  disciplined or punished BCR or its members for their speech, and any deprivation is de minimis.

**3.    Plaintiffs Have Not Stated a Violation of the Due Process Clause**

24

25       Plaintiffs' due process claim fails because they have not alleged deprivation of a

26  constitutionally-protected liberty or property interest.  *See Bd. of Regents of State Colls. v. Roth*,

27  408 U.S. 564, 577 (1972).  Nor could they make such an allegation.  There is no property interest

28

in attending or hosting a speaker event.  *See, e.g.*, *Swany v. San Ramon Valley Unified Sch. Dist.*, 720 F. Supp. 764, 774 (N.D. Cal. 1989) (no due process right to attend graduation ceremony). Indeed, due process protections do not even extend to core educational experiences such as extracurricular activities and interscholastic sports.  *See, e.g.*, *Davenport v. Randolph Cty. Bd. of Educ.*, 730 F.2d 1395, 1397 (11th Cir. 1984); *Herbert v. Ventetuolo*, 638 F.2d 5, 6 (1st Cir. 1981) (per curiam); *Ryan v. Cal. Interscholastic Fed'n-San Diego Section*, 94 Cal. App. 4th 1048, 1061 (Cal. Ct. App. 2001).  And there is no liberty interest in speaking at the time and place and in the manner of one's choosing, beyond what the First Amendment already protects.  To hold otherwise would eviscerate the doctrines permitting content-neutral time, place, and manner restrictions in designated public forums and reasonable, viewpoint-neutral restrictions in limited public forums.

Plaintiffs also fail in their effort to plead an as-applied vagueness claim.  To state such a claim, Plaintiffs would have to demonstrate that the restrictions "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  Even where the First Amendment is implicated, "perfect clarity and precise guidance" are not required, *Ward*, 491 U.S. at 794, because "we can never expect mathematical certainty from our language."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  For an as-applied challenge, so long as the challenged "terms are clear in their application to plaintiffs' proposed conduct … plaintiffs' vagueness challenge must fail."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010).  Here, Plaintiffs assert that the "High-Profile Speaker Policy, later recast as the Major Events Policy … is vague," (FAC ¶ 189), but they fail to allege any facts demonstrating that *as applied to them* the Major Events Policy does not provide fair notice of what is required or encouraged "seriously discriminatory enforcement."  *See Williams*, 553 U.S. at 304.  Even if Plaintiffs could show that the enumerated criteria for qualifying as a "major event" are unclear, which they cannot, there can be no dispute that the policy would apply to Plaintiffs' request for a 500-person, central venue in the evening for the Shapiro event.  *See Humanitarian Law Project*, 561 U.S. at 23 ("Even if there might be theoretical doubts regarding [definitions of terms] … the defendant's vagueness challenge failed because his 'case present[ed] no such problem.'").

1    Nor does the University's reliance on the security recommendations by UCPD render the

2    time-manner-place restrictions or the Major Events Policy impermissibly vague or afford officials

3    "unfettered discretion."  That UCPD may exercise *some* discretion in its policing decisions does

4    not render the policy unconstitutionally vague.  *See, e.g.*, *Yates v. Norwood*, 841 F. Supp. 2d 934,

5    942 (E.D. Va. 2012) ("[D]ecisions concerning the resources required to maintain order and safety

6    under varying circumstances necessarily call for the exercise of discretion based on law

7    enforcement expertise and familiarity with the potential dangers facing a locality.")  In *Grayned*,

8    for example, the Court held that an anti-noise ordinance prohibiting "any noise or diversion which

9    disturbs or tends to disturb the peace or good order of such school session or class" was

10   sufficiently precise even though individual officers had discretion to decide whether a picketer

11   was subject to the ordinance.  408 U.S. at 108-10.  "As always, enforcement requires the exercise

12   of some degree of police judgment," but that discretion was sufficiently cabined by the

13   requirement that any noise not interfere with school activities.  *Id.* at 114.  UCPD recommended or

14   approved the times and places for events based on an "objective analysis of how best to mitigate

15   risk, ensure safety for all, and maximize the chances that the event[s] will take place as planned"

16   given the constraints of available campus venues, specific intelligence, and limited University

17   resources.  (FAC ¶¶ 67, 92, 150, Exhs. A, H, S, T.)  And the text of the Major Events Policy—

18   including the right of appeal—demonstrates that Defendants' discretion is cabined by enumerated

19   conditions that control the scope of the policy and of security assessments.

20              **4.    Plaintiffs Have Not Stated a Violation of the Equal Protection Clause**

21   Plaintiffs also fail to allege a claim for violation of the Equal Protection Clause.  They

22   must plausibly allege that Defendants' conduct had both a discriminatory purpose and a

23   discriminatory effect.  *Rosenbaum*, 484 F.3d at 1152-53.  A discriminatory purpose requires that

24   the state actor "selected or reaffirmed a particular course of action at least in part 'because of,' not

25   merely 'in spite of,' its adverse effects upon an identifiable group."  *Id.* (quotation marks and

26   citation omitted).  A discriminatory effect means that the state actor treated "differently persons

27   who are *in all relevant respects alike*."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis

28   added).  Plaintiffs allege neither discriminatory purpose nor discriminatory effect.

1    First, Plaintiffs have not alleged facts that create a plausible inference that any Defendant

2    acted with an intent or purpose to discriminate against Plaintiffs for their speech or based on any

3    other classification. *See supra* Parts IV.A.1(b), 2(a).  Conclusory allegations by themselves do not

4    establish an equal protection violation without proof of invidious discriminatory intent.  *Vill. of*

5    *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

6    Second, Plaintiffs have not alleged a discriminatory effect, i.e., that two similarly situated

7    groups were treated differently.  Plaintiffs appear to be claiming that Defendants treated the

8    Horowitz, Coulter, and Shapiro events differently than other events involving Maria Echaveste

9    and Vicente Fox Quesada.  (FAC ¶¶ 160-61.)  But this misses a critical distinction: the FAC does

10   not allege that the Fox or Echaveste events involved concrete threats of violent protests requiring

11   hundreds of UCPD officers to secure the premises.  The organizers of those events were not

12   similarly situated in all material respects as required to establish a violation of the Equal

13   Protection Clause.  *See, e.g.*, *Van Susteren v. Jones*, 331 F.3d 1024, 1026-27 (9th Cir. 2003)

14   (partisan and independent candidates differently situated where the former must run in a primary

15   election); *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011)

16   (owners and public differently situated with respect to beach access); *Cuviello v. City & Cty. of*

17   *San Francisco*, 940 F. Supp. 2d 1071, 1097 (N.D. Cal. 2013) (persons who were not engaged "in

18   the same sorts of activities as Plaintiffs, *e.g.*, leafleting, demonstrating, unfurling banners" were

19   not similarly situated).[4]

20   ### 5.   **Plaintiffs' Facial Challenge to the Major Events Policy Also Fails**

21   Finally, to the extent Plaintiffs challenge the Major Events policy on its face for vagueness

22   or overbreadth, their claim fails.  Facial invalidation "is, manifestly, strong medicine" that "has

23   been employed by the Court sparingly and only as a last resort."  *Broadrick v. Oklahoma*, 413

---

24

25   [4] Plaintiffs' equal protection claim also fails because Defendants acted pursuant to a legitimate

26   government interest.  Rational basis review applies because Defendants' actions did not implicate
     a suspect classification or a fundamental right (there is no fundamental right to speak in the exact

27   time and place of your choosing).  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008).  But,
     even if the Court were to apply more heightened scrutiny, Defendants' actions were necessary to

28   achieve the compelling state interest of safety.  *See supra* Part IV.A.1(e).

1   U.S. 601, 613 (1973).  To state a facial challenge, Plaintiffs must either demonstrate that "no set of

2   circumstances exists under which [a policy] would be valid," *United States v. Salerno*, 481 U.S.

3   739, 745 (1987), or demonstrate that "a substantial number of [the policy's] applications are

4   unconstitutional, judged in relation to the [policy's] plainly legitimate sweep," *United States v.*

5   *Stevens*, 559 U.S. 460, 473 (2010).  *See also S. Or. Barter Fair v. Jackson Cty.*, 372 F.3d 1128, 1140

6   (9th Cir. 2004) (requiring "pattern of abuse" for facial challenge based on excessive discretion).

7          Plaintiffs fail to state a cognizable facial challenge to the Major Events policy under either

8   test.  Plaintiffs fail to allege any facts demonstrating either that the policy can never be validly

9   applied, or that a substantial number of its applications are unconstitutional.  Nor can they, as the

10  Shapiro event demonstrates that the Major Events policy neither silences nor substantially burdens

11  speech.  Moreover, as discussed *supra* Part IV.A.1(b)-(e), the Major Events policy is content and

12  viewpoint neutral and serves the significant government interests of safety, education, and access

13  to University resources.  Where, as here, a statute has a "plainly legitimate sweep," "a facial

14  challenge must fail."  *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 (2008).

15         Because the facial challenge fails, Plaintiffs' requests for injunctive and declaratory relief

16  should also be dismissed in their entirety.  Any purported claims for prospective  injunctive or

17  declaratory relief with respect to Plaintiffs' *as-applied* challenges are not ripe for adjudication

18  because they are not sufficiently concrete and would require the Court to speculate about the

19  nature of future events.  *See, e.g., Protectmarriage.com-Yeson8 v. Bowen*, 752 F.3d 827, 840 (9th

20  Cir. 2014) (finding as-applied challenge based on future activity not ripe).  And, under the

21  Eleventh Amendment, Plaintiffs cannot seek *retrospective* declaratory or injunctive relief in

22  connection with alleged past violations of their constitutional rights.  *Los Angeles Cty. Bar Ass'n v.*

23  *Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  Thus, Plaintiffs would be left only with damages claims—

24  even if the Court does not accept Defendants' arguments for dismissal on the merits.

25         **B.     Defendants Are Entitled to Qualified Immunity**

26         Plaintiffs' damages claims must be dismissed as well because Defendants are entitled to

27  qualified immunity.  "State officials are entitled to qualified immunity from suits for damages

28  'insofar as their conduct does not violate clearly established statutory or constitutional rights of

1    which a reasonable person would have known.'" *Krainski v. Nev. Ex rel. Bd. of Regents of Nev.*

2    *Sys. of Higher Educ.*, 616 F.3d 963, 968 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S.

3    800, 818 (1982)).  Qualified immunity "gives government officials breathing room to make

4    reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who

5    knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations

6    omitted).  When resolving whether a government official is entitled to qualified immunity, courts

7    ask: (1) whether the facts that a plaintiff has alleged show a violation of a constitutional right and,

8    if so, (2) whether that right was sufficiently clearly established such that a reasonable official

9    would have known the conduct violated the Constitution. *Pearson v. Callahan*, 555 U.S. 223, 232

10   (2009).  "For a constitutional right to be clearly established, its contours must be sufficiently clear

11   that a reasonable official would understand that what he is doing violates that right." *Hope v.*

12   *Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

13            Here, for the reasons set forth in Part IV.A, *supra*, Plaintiffs have not adequately alleged

14   any constitutional violation.  A reasonable official in Defendants' position would, therefore, have

15   had no reason to think that his or her particular conduct in imposing content- and viewpoint-

16   neutral regulations on Plaintiffs' events violated any clearly established right.  The contours of

17   Supreme Court case law on the forum analysis are hardly a model of clarity.  (Tr. at 4:7-13; 5:14-

18   20.)  A reasonable official in Defendants' position could certainly have concluded that the campus

19   venues at issue—university classrooms and auditoriums—are limited public forums that may be

20   regulated in service of their educational missions, *see Widmar*, 454 U.S. at 267 n.5, and a

21   reasonable official in Defendants' position could not have known that acts taken in pursuit of this

22   mission would be found unconstitutional.  This is particularly true where reasonable minds may

23   differ as to Defendants' assessment of security risks or suitable alternatives.  *See, e.g.*, *Rock for*

24   *Life-UMBC v. Hrabowski*, 411 F. App'x 541, 555 (4th Cir. 2010) (granting qualified immunity on

25   free speech claim even though the court concluded "[i]n hindsight" that defendants could have

26   addressed the safety concerns with less restrictive alternatives such as by providing additional

27   security).  As discussed *supra* Part IV.A.1(b), (e), courts have upheld a variety of security

28   measures as reasonable restrictions on speech and Defendants had no reason to conclude that

1  imposing time-manner-place restrictions to ensure safety would violate Plaintiffs' constitutional

2  rights.  Plaintiffs point to no case law clearly establishing how University officials must balance

3  the competing interests of safety and free speech on campus, much less how to do so when

4  differently situated speakers have different viewpoints.  *See, e.g.*, *Moss*, 134 S. Ct. at 2068 ("No

5  decision of which we are aware, however, would alert Secret Service agents engaged in crowd

6  control that they bear a First Amendment obligation to ensure that groups with different

7  viewpoints are at comparable locations at all times.")  Because the case law has not "placed the …

8  constitutional question beyond debate," Defendants are entitled to qualified immunity.  *al-Kidd*,

9  563 U.S. at 741.

10          C.    **Plaintiffs' Claims for Punitive Damages Must Be Dismissed**

11          This Court dismissed Plaintiffs' claims for punitive damages because Plaintiffs had failed

12  to allege the requisite intent.  (Tr. 53:24-54:12.)  Plaintiffs have again failed to allege that any

13  Defendant's conduct was "motivated by evil motive or intent, or . . . involves reckless or callous

14  indifference to the federally protected rights of others" as required to support a claim for punitive

15  damages under Section 1983.  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

16  **V.    CONCLUSION**

17          Plaintiffs' amendment attempts to address the legal deficiencies identified in Defendants'

18  prior motion, but for the foregoing reasons, Plaintiffs still cannot state a claim.  As further

19  amendment would be futile, the FAC should be dismissed with prejudice.  *See Cervantes v.*

20  *Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) ("[A] district court may

21  dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading

22  deficiencies and amendment would be futile.").

23

24  DATED:  December 8, 2017          MUNGER, TOLLES & OLSON LLP

25                                    By:  _____*/s/ Bryan H. Heckenlively*_____

26                                         BRYAN H. HECKENLIVELY
                                          Attorneys for Defendants

27

28

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT