1  JEFFERSON B. SESSIONS III
   Attorney General
2  JOHN M. GORE
   Acting Assistant Attorney General
3  TARA HELFMAN
   Senior Counsel
4       U.S. Department of Justice
        Civil Rights Division
5       950 Pennsylvania Ave., N.W.
        Washington, DC 20530
6       Telephone:  (202) 514-9826
        Facsimile:  (202) 514-0293
7       Email:  tara.helfman@usdoj.gov

8  STEVEN MENASHI
   Acting General Counsel, Department of Education
9  THOMAS E. CHANDLER
   Deputy Chief, Appellate Section
10 VIKRAM SWARUUP
   Attorney, Appellate Section

11              UNITED STATES DISTRICT COURT

12        FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14

15 YOUNG AMERICA'S
   FOUNDATION and BERKELEY          No. 3:17-cv-02255-MMC
   COLLEGE REPUBLICANS,
16                                    **UNITED STATES' STATEMENT OF**
       Plaintiffs,
17                                    **INTEREST**
       v.
18
   JANET NAPOLITANO, in her
19 official capacity as the President of
   the University of California, et al.,
20
       Defendants.
21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

PAGE

UNITED STATES' STATEMENT OF INTEREST ..................................................1

INTRODUCTION ..................................................................................................1

INTEREST OF THE UNITED STATES .................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .............................................2

DISCUSSION .........................................................................................................8

I.     PLAINTIFFS ADEQUATELY PLEADED THAT THE UNIVERSITY'S HIGH-PROFILE SPEAKER POLICY AND MAJOR EVENTS POLICY VIOLATE THE FIRST AMENDMENT .......................................................................8

     A.     The High-Profile Speaker Policy and the Major Events Policy Are Prior Restraints On Protected Speech That Invite Viewpoint Discrimination ................................11

     B.     The University's Interest In Campus Safety Does Not Outweigh Plaintiffs' First Amendment Rights ........................15

CONCLUSION .....................................................................................................17

# TABLE OF AUTHORITIES

PAGE

## CASES

*Amidon v. Student Ass'n of State Univ. of New York at Albany*,
    508 F.3d 94 (2d Cir. 2007) ............................................................16

*Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011).................10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................2

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) ................................9

*Child Evangelism Fellowship of, MD v. Montgomery Cty. Pub. Sch.*,
    457 F.3d 376 (4th Cir. 2006) ........................................................12

*Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings Coll. of Law v. Martinez*,
    561 U.S 661 (2010).....................................................................10

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988)......... 11, 16

*Desert Outdoor Advert., Inc. v. City of Moreno Valley*,
    103 F.3d 814 (9th Cir. 1996) ........................................................15

*Epona v. Cty. of Ventura*, 876 F.3d 1214 (9th Cir. 2017) ........................14

*Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) .................. 11, 13

*Healy v. James*, 408 U.S. 169 (1972) .......................................8, 15

*Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012) ..............................12

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ............1

*Kunz v. New York*, 340 U.S. 290 (1951).......................................16

*Niemotko v. Maryland*, 340 U.S. 268 (1951).......................................11

*Norton v. Discipline Committee of East Tenn. State Univ.*,
    399 U.S. 906 (1970)....................................................................16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ..........9, 10

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ...........................9, 10

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)................10

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*,
550 F.3d 788 (9th Cir. 2008) ........................................................................15

*Shelton v. Tucker*, 364 U.S. 479 (1960)................................................................2

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969)...............................................11

*Southworth v. Bd. of Regents of Univ. of Wis. Sys.*,
307 F.3d 566 (7th Cir. 2002) ................................................................. 11, 16

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ................................................. 1-2

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .................2, 16

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................................9

*Widmar v. Vincent*, 454 U.S. 263 (1981).............................................................1

## FEDERAL STATUTES

20 U.S.C. § 1011a(a)(2)(C) ...........................................................................1

28 U.S.C. § 517 ...........................................................................................1

Cal. Code Regs. tit. 5, § 100004 .................................................................16

## OTHER

Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION,
135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987)......................................1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES' STATEMENT OF INTEREST

## INTRODUCTION

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."  In particular, the Department of Education is committed to ensuring that "institution[s] of higher education . . . facilitate the free and open exchange of ideas."  20 U.S.C. § 1011a(a)(2)(C).  In the United States' view, Plaintiffs have properly pleaded that speech regulations imposed by the University of California, Berkeley ("UC Berkeley" or "University"), violated their First Amendment rights.

## INTEREST OF THE UNITED STATES

The United States has an interest in protecting the individual rights guaranteed by the First Amendment.  The right to free speech lies at the heart of a free society and is the "effectual guardian of every other right."  Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION, 135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987).  State-run colleges and universities are no exception from this rule, especially since "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'"  *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted).  Thus, public universities have "an obligation to justify [their] discriminations and exclusions under applicable constitutional norms."  *Widmar v. Vincent*, 454 U.S. 263, 267 (1981).

The United States has a significant interest in the vigilant protection of constitutional freedoms in institutions of higher learning.  As the Supreme Court has noted, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization

will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).  In recent years, however, many institutions of higher education have failed to answer this call, and free speech has come under attack on campuses across the country. Such failure is of grave concern because freedom of expression is "vital" on campuses.  *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).  Indeed, "our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508–509 (1969).  Accordingly, it is in the interest of the United States to ensure that State-run colleges and universities do not trample on individuals' First Amendment rights.

## FACTUAL AND PROCEDURAL BACKGROUND

This case is before the Court on a motion to dismiss.  Accordingly, the Court must accept all of Plaintiffs' well-pleaded allegations as true.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007).  For purposes of this Statement of Interest, the United States also accepts Plaintiffs' allegations as true.  The United States takes no view regarding whether Plaintiffs will succeed in proving these allegations at trial.

Berkeley College Republicans (BCR), a registered student organization at the University of California, Berkeley, and Young America's Foundation (YAF), a national non-profit organization that provides financial and logistical support to conservative student groups, challenge the University's written and unwritten speech policies.  They allege that UC Berkeley, "the 'birthplace of the Free Speech Movement,'" Doc. 32 (Amended Complaint) ¶ 1, adopted a double standard toward campus speech, applying a restrictive set of rules to BCR while applying a permissive set of rules to other campus groups.  These policies burdened and, in

some cases, shut out BCR's speakers from campus while welcoming other viewpoints.

The challenged policies were adopted in the wake of violent disturbances in downtown Berkeley on February 1, 2017, the day that BCR was scheduled to host a lecture by Milo Yiannopolis at the University.  Doc. 32 ¶ 52.  According to Plaintiffs, University police were present as dozens of masked individuals committed arson and vandalism in protest of the scheduled event.  Yet "few arrests were made, and all police officers, including both [University] and Berkeley city police appeared to obey a stand-down order that required the officers not to intervene or make arrests in the many physical altercations that occurred between the violent mob and those seeking to attend the [speech]."  *Id.* ¶ 53.  In response to the violent protests, University administrators canceled the lecture.  *Id.* ¶ 55.

Plaintiffs allege that the University further responded to the protests by adopting an unwritten High-Profile Speaker Policy ("Policy") that suppressed constitutionally protected political speech "simply because that expression [might] anger or offend students, UC Berkeley administrators, and/or community members who do not share Plaintiffs' viewpoints."  Doc. 32 ¶ 1.  According to a University of California Police Department ("UCPD") Lieutenant, on or about March 1, 2017, "a meeting . . . occurred involving UC (Admin and UCPD), the City of Berkeley Mayor's Office and Berkeley Police Dept. in which it was agreed that events involving high profile speakers would be conducted during daytime hours."  *Id.*, Ex. B.  However, the University did not notify Plaintiffs of the Policy's existence until April 6, 2017, even though it had been applying the Policy to BCR for weeks.  *Id.* ¶ 85.

Under the Policy, events featuring "high-profile" speakers could not run past a 3 p.m. "curfew," thereby lowering student turnout due to class conflicts.  Doc. 32 ¶¶ 3, 70, 87.  Additionally, the Policy required covered events to be held in

a "securable" location, even though it did not define what made a location "securable." *Id.* ¶ 56. Critically, University administrators enjoyed full discretion to determine who constituted a "high-profile speaker" and thus when to enforce the Policy. According to the Plaintiffs, the University did not define "high-profile speakers" in accordance with any objective criteria, but rather in accordance with administrators' "subjective beliefs that the anticipated content of the speaker's speech is likely to spark 'public outrage.'" *Id.* ¶ 93. Consequently, while other student organizations' events were subject to purely ministerial formalities, University administrators subjected BCR's events to a highly discretionary, unpublished set of rules. *Id.* ¶ 45.

According to the Complaint, Defendants first applied the Policy to BCR while Plaintiffs were attempting to organize a campus event featuring David Horowitz, to be held in April 2017. BCR had been working with University administrators for weeks before the University even disclosed that it was applying a new approach to the student organization. On April 6, 2017, the University's Interim Vice Chancellor notified BCR that "increased security measures in and around high-profile events featuring potentially controversial speakers" necessitated a special approach to the Horowitz event. Doc. 32 ¶ 67. After weeks of vacillation by UC Berkeley administrators as to the time and venue of the event, the Vice Chancellor explained that the event would have to take place approximately one mile from the center of campus from 1 to 3 p.m., a time that coincided with peak class hours. *Id.* ¶ 62. Because the University "strongly recommended that BCR and YAF limit attendance . . . to students only," *id.* ¶ 66, many of whom could not attend due to class conflicts, BCR found itself with no logical alternative but to cancel the speaking engagement, *id.* ¶ 70.

At the same time Plaintiffs were attempting to schedule the Horowitz event, they were also trying to schedule a guest lecture by Ann Coulter. The Coulter

event was to be part of a speaker series on illegal immigration jointly sponsored by Plaintiffs and BridgeCal, the University's chapter of BridgeUSA, "a national nonpartisan organization that aims to reinvigorate the practice of open and frank political discussions on university campuses, and to challenge people's opinions through exposure to contrary points of view." Doc. 32 ¶ 72. Previously, BridgeCal had hosted two other speakers in this same series—a former president of Mexico and a former White House adviser. The University administrators did not apply the High-Profile Speaker Policy to these events, which they permitted as evening lectures open to the general public. *Id.* ¶¶ 160–161. However, the University administrators did apply the Policy to Plaintiffs when BCR attempted to invite Coulter to speak.

According to the Complaint, BCR informed administrators that they wished to host Coulter on April 27, 2017, from 7 to 9 p.m. in a room that could accommodate at least 500 people. Doc. 32 ¶ 79. But when Plaintiffs met with University police and administrators on April 6, 2017, "UCPD instructed BCR that the event must conclude by 3:00 p.m., and that the University and UCPD would select a 'securable' venue on campus. UCPD also informed BCR that if these requirements were not met, the event could not proceed." *Id.* ¶ 85. Plaintiffs allege that UCPD officials encouraged them not to disclose the location of the event until hours before it began and to restrict attendance to students only. *Id.* ¶ 86. Plaintiffs objected to the timing requirements because they would conflict with peak class hours, and instead proposed an end time of 5 p.m. *Id.* ¶¶ 87–88. But on April 13, 2017, University police responded with a non-negotiable 3:30 p.m. end time, citing the likely "outrage" and "security threats" Coulter's speech would spark. *Id.* ¶¶ 90–92.

Plaintiffs agreed to this earlier (and suboptimal) end time, along with all the University's other conditions. However, one week before Coulter was to speak on

campus, University administrators informed Plaintiffs that they could not provide BCR with a room for the event. They advised Plaintiffs that the Coulter lecture would have to be postponed for five months, at which time it would still be subject to the High-Profile Speaker Policy. Doc. 32 ¶ 98.

According to the Complaint, "under mounting pressure from UC Berkeley students, faculty, and staff, and the public, including national media commentators and noted First Amendment lawyers and politicians," University administrators informed Plaintiffs they could host Coulter on May 2, 2017, from 1 to 3 p.m. Doc. 32 ¶ 103. However, this date fell squarely within "dead week"—a week when no classes are held and many students leave campus to prepare for final exams. *Id.* ¶ 104. As a result, Plaintiffs rejected this date and requested an indoor venue for the original date of April 27, 2017, which administrators once again rejected. *Id.* ¶ 107.

In April 2017, Plaintiffs filed this lawsuit alleging that the High-Profile Speaker Policy violated their constitutional rights under the First and Fourteenth Amendments. *See* Doc. 1 (Complaint). Soon thereafter, UC Berkeley began developing an interim policy on "Major Events Hosted by Non-Departmental Users" ("Major Events Policy"). Doc. 32 ¶ 117. The Major Events Policy has been applied on an interim basis and is expected to be finalized in January 2018. *Id.*

Under this policy, an event is "major" if one or more of the following conditions apply: (1) more than 200 people are anticipated to attend; (2) administrators decide the "complexity of the event requires involvement of more than one campus administrative unit"; (3) administrators decide the event is "likely to significantly affect campus safety and security" or campus services; (4) administrators decide the event "has a substantial likelihood of interfering with other campus functions or activities"; (5) the event is a dance or concert; (6)

1  alcohol will be served; or (7) outdoor amplified sound is requested.  Doc. 32, Ex.

2  L, at 2.  According to the policy, administrators must exercise their discretion

3  without considering the content or viewpoints that may be expressed at the event.

4  *Id.*  The policy does not apply to events hosted by "Departmental Users," such as

5  University faculty.  *Id.* at 3.

6        Plaintiffs allege that, under this policy, events that are characterized as major

7  are subject to specific restrictions.  For example, they must end "at a time

8  determined by the campus administration" based on a security assessment.  Doc.

9  32, Ex. L, at 6.  Campus administrators also have discretion to impose security

10  measures, including (but expressly not limited to) "adjusting the venue, date, and

11  time of the event; providing additional law enforcement presence at the event;

12  imposing controls or security checkpoints at the event; and creating buffer zones

13  around the event venue."  *Id.* at 8.  Moreover, event organizers must generally

14  provide eight weeks' notice to campus administrators and agree to reimburse any

15  security fees.  *Id*. at 5, 9.

16        Plaintiffs allege that the University applied the Major Events Policy to a

17  speech by Ben Shapiro that they hosted on September 14, 2017.  Specifically,

18  Plaintiffs allege that they were initially told that no venue was available, and later,

19  after a venue had been secured, they were charged a significant security fee.

20  Doc. 32 ¶¶ 134, 143.  In addition, administrators required attendees to collect

21  tickets in person by 5:30 p.m. the day before the event, a restriction that had not

22  previously been placed on events at the same venue.  *Id.* ¶ 147.  Plaintiffs allege

23  that through these and other actions, University administrators unreasonably

24  restricted the event, resulting in monetary damages to Plaintiffs.  *Id.* ¶ 158.

25        As a result of the hurdles Plaintiffs faced in bringing speakers of their choice

26  to campus, Plaintiffs filed this lawsuit alleging that the High-Profile Speaker

27  Policy violated their constitutional rights under the First and Fourteenth

28

Amendments.  *See* Doc. 1.  The University moved to dismiss, contending, *inter alia*, that Plaintiffs' claims were moot as a result of the adoption of the Major Events Policy.  *See* Doc. 13 (Motion to Dismiss).  This Court agreed, but afforded Plaintiffs leave to amend with additional facts regarding both policies.  *See* Doc. 27 (Order).  Plaintiffs did so and filed an amended complaint challenging both the High-Profile Speaker Policy and Major Events Policy ("Policies") and seeking monetary and injunctive relief.  Doc. 32; *see id.* ¶ 180.  The University again moved to dismiss.  Doc. 38 (Motion to Dismiss).

The United States does not advance any position as to whether the University's interim adoption of the Major Events Policy moots Plaintiffs' claims. Nor does the United States take a position as to whether the Defendants are entitled to qualified immunity.  Rather, the United States is satisfied that, taking the facts alleged as true, Plaintiffs have stated claims that both policies violate the First Amendment by granting unfettered discretion to campus administrators.

## DISCUSSION

The free speech protections of the First Amendment are as applicable to State-run colleges as they are to any other government institution.  *Healy v. James*, 408 U.S. 169, 180 (1972).  Plaintiffs' allegations, if proven, demonstrate that the University's High-Profile Speaker Policy and Major Events Policy are unconstitutional because they grant administrators unchecked discretion to restrict protected speech.

## I.     PLAINTIFFS ADEQUATELY PLEADED THAT THE UNIVERSITY'S HIGH-PROFILE SPEAKER POLICY AND MAJOR EVENTS POLICY VIOLATE THE FIRST AMENDMENT.

The power of the government to regulate speech on the campuses of public colleges and universities is contingent on the character of the forum in question.

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.")  "[T]he Supreme Court has broadly discerned three distinct (although not airtight) categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public fora."  *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011).  The parties to this case dispute the nature of UC Berkeley's speaker facilities. Plaintiffs contend that they are designated public fora, but the University claims that they are limited public fora.  While this is a question properly left for later stages of the litigation, one thing is clear:  the University's High-Profile Speaker Policy and Major Events Policy would be unconstitutional in *either* type of forum.

A "public forum" is "public property which the state has opened for use by the public as a place for expressive activity," either by tradition or designation. *Perry Educ. Ass'n*, 460 U.S. at 45.  In a "public forum," the government may impose "[r]easonable time, place, and manner restrictions . . . but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest and restrictions based on viewpoint are prohibited."  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Perry Educ. Ass'n*, 460 U.S. at 45.  In such a forum, even content-neutral time, place, and manner restrictions must be narrowly tailored to achieve a significant government interest and "leave open ample alternative channels of communication."  *Perry Educ. Ass'n*, 460 U.S. at 45; *Ward*, 491 U.S. at 791.

By contrast, a limited public forum is government property that "is limited to use by certain groups or dedicated solely to the discussion of specific subjects."

*Pleasant Grove*, 555 U.S. at 470.  In limited public fora, "the government may impose restrictions that are 'reasonable in light of the purpose served by the forum,' so long as the government does not 'discriminate against speech on the basis of its viewpoint.'"  *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 797 (9th Cir. 2011) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  Speech restrictions are permissible "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Perry Educ. Ass'n*, 460 U.S. at 46.

This Circuit has held that "[s]peech in a designated public forum has significantly greater protection than speech in a limited public forum—restrictions on speech in a designated public forum are subject to strict scrutiny and, 'therefore, must be narrowly tailored to serve a compelling government interest.'"  *Alpha Delta Chi-Delta Chapter*, 648 F.3d at 797 (quoting *Christian Legal Soc'y of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11).  However, if a regulation of speech discriminates on the basis of viewpoint or creates a high risk of viewpoint discrimination, it is immaterial whether the forum is a designated or limited public forum; under longstanding precedent, the regulation is unconstitutional.  *See Rosenberger*, 515 U.S. at 829.

For the reasons explained below, Plaintiffs have adequately alleged that the High-Profile Speaker Policy and the Major Events Policy constitute prior restraints whose capacious conferral of discretion on University administrators invites viewpoint discrimination and are not justified by strict scrutiny.

1

2

**A.    The High-Profile Speaker Policy And The Major Events Policy Are**

**Prior Restraints On Protected Speech That Invite Viewpoint**

3    **Discrimination.**

4         When a government official has the discretionary power to determine where

5    and when individuals may speak, or what they may say, there is effectively a prior

6    restraint that "makes the peaceful enjoyment of freedoms which the Constitution

7    guarantees contingent upon the uncontrolled will of an official."  *Shuttlesworth v.*

8    *Birmingham*, 394 U.S. 147, 151 (1969).  Accordingly, policies that confer

9    discretionary power on government officials to regulate speech must contain

10   "narrowly drawn, reasonable and definite standards for the officials to follow."

11   *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951) (citation omitted); *see also*

12   *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (holding that

13   speech policies "must contain narrow, objective, and definite standards to guide the

14   licensing authority" (internal quotation marks and citation omitted)).

15        Courts have routinely struck down regulations of protected speech that

16   confer unbridled discretion upon authorities and fail to identify objective and

17   narrow standards for the regulating authority to apply.  *See City of Lakewood v.*

18   *Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988) ("[I]n the area of free

19   expression a licensing statute placing unbridled discretion in the hands of a

20   government official or agency constitutes a prior restraint and may result in

21   censorship") (citations omitted).  The absence of such standards creates a risk of

22   unconstitutional viewpoint discrimination that is subject to facial challenge.  *See*

23   *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 581 (7th Cir.

24   2002) (recognizing facial challenges under the First Amendment to policies that

25   confer too much discretion to government officials).

26        Accordingly, in determining whether Plaintiffs have stated a claim, it is

27   inconsequential whether officials have in fact exercised that discretion in a

28

viewpoint discriminatory manner.[1]  This is because "viewpoint neutrality requires
not just that a government refrain from explicit viewpoint discrimination, but also
that it provide adequate safeguards to *protect* against the improper exclusion of
viewpoints."  *Child Evangelism Fellowship of MD v. Montgomery Cty. Pub. Sch.*,
457 F.3d 376, 384 (4th Cir. 2006); *see also Kaahumanu v. Hawaii*, 682 F.3d 789,
807 (9th Cir. 2012) (holding that even though there was no actual evidence of
viewpoint discrimination in officials' exercise of discretion, the "discretionary
power is inconsistent with the First Amendment" because "the potential for the
exercise of such power exists") (citation omitted).

Plaintiffs' allegations, taken as true, sufficiently state a claim that the High-
Profile Speaker Policy and Major Events Policy contained insufficient safeguards
to protect against the improper exclusion of certain viewpoints from discourse at
the University.  Rather, both Policies suffer from the same constitutional defect:
they grant University administrators unbridled discretion to decide when, how, and
against whom to apply the Policies.

Plaintiffs allege that the unwritten High-Profile Speaker Policy "d[id] not
rely on any objective criteria (e.g. anticipated crowd size) . . . to determine whether
an invited speaker is considered 'high-profile.'"  Doc. 32 ¶ 93.  Instead, it relied on
a doubly subjective criterion:  administrators' subjective assessment of a potential
audience's subjective response to the speaker.  As the Interim Vice Chancellor
admitted, the Policy applied only to "high-profile events featuring *potentially
controversial* speakers."  *Id.* ¶ 67 (emphasis added).  Thus, according to the
University, the former President of Mexico, while high-profile, was presumably
not a potentially controversial speaker warranting a 3 p.m. curfew, a distant venue,

---

[1]  The United States takes no position on whether Plaintiffs have adequately
alleged that the University applied the challenged policies in a viewpoint
discriminatory manner in this case.

and a substantial security bill for the student organization that hosted him; David Horowitz, on the other hand, was. *Supra* pp. 4–5.

The Supreme Court has held that when a regulation of speech "involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Forsyth Cty.*, 505 U.S. at 131 (internal quotation marks and citations omitted). The University's approach to the planning of the Horowitz event illustrates the danger of vesting unbounded discretion to regulate protected speech in university administrators. Under the facts as alleged, it appears that the University repeatedly moved the goal posts for BCR, making it all but impossible for the event to take place. For example, on March 23, 2017, an administrator offered Plaintiffs a range of acceptable dates and times for the event, writing, "would anytime Tues, 4/11 bet. noon to 6pm or Wed. 4/12 bet. 11am and 6pm work?" Doc. 32 ¶ 62. Plaintiffs confirmed that April 12, 2017, from 4 to 6 p.m. would be agreeable. *Id.* ¶ 64. But one week later, on March 30, 2017, the University of California Police Department and University officials reneged, informing BCR that Horowitz's presentation could not run past 3 p.m. "due to purported security reasons." *Id.* ¶ 66. They also urged Plaintiffs to "limit attendance at the Horowitz event to students only." *Id.* Three days later— and six days before the Horowitz event was to take place—the University moved the goal posts once again, informing BCR for the first time that it would have to pay a $5,788 security fee if it wished to hold the event. *Id.* ¶¶ 68–69. Thus, after weeks of vacillation, the University offered Plaintiffs a remote venue at an unfavorable time for a prohibitive "security fee," which caused BCR to cancel the event.

This is similarly true of the Coulter event. While BridgeCal's speakers were able to address both Berkeley students and the general public during evening hours, Doc. 32 ¶¶ 160–161, the High-Profile Speaker Policy all but straitjacketed BCR in its attempts to host Coulter as a speaker in the same lecture series, on the

same subject.  For example, after more than a week of negotiations with campus officials regarding the time and venue of the Coulter event, BCR accepted all of the University's restrictions, including a 3:30 p.m. end time that conflicted with class hours.  *Id.* ¶ 90.  This cut-off would not only "make it impractical for thousands of students to attend, who might otherwise wish to do so," but also make it "extremely difficult, if not impossible, for the event to be held in a sufficiently large room to seat the hundreds of expected attendees."  *Id.* ¶ 87.  Nevertheless, administrators summarily canceled the event, stating that "Coulter's speech was likely to spark outrage" and invite security threats.  *Id.* ¶ 92.

The Major Events Policy does little to cure the defects of the High-Profile Speaker Policy.  While it does contain some objective criteria defining a "major event," other criteria grant administrators the unfettered discretion to designate events "major."  Doc. 32, Ex. L, at 2.  For example, under the Major Events Policy, the University can designate an event "major" if "[a]uthorized campus officials determine that the event has a substantial likelihood of interfering with . . . campus functions or activities," "is likely to significantly affect campus safety and security," or is so complex as to require "the involvement of more than one campus administrative unit."  *Id*.  However, the Major Events Policy offers no guidance on how to interpret and apply any of these terms.  Indeed, it is difficult to imagine a student-sponsored event that could *not* be characterized to satisfy one of these criteria and thus subject it to the differential barriers of an eight-week notice requirement, "security fee," and so forth.

Furthermore, neither of the Policies hold administrators accountable for the way they exercise their wide discretion—even though numerous courts have found that requiring officials to articulate the reasons for their decisions makes it less likely that a policy will run afoul of the First Amendment.  *See Epona v. Cty. of Ventura*, 876 F.3d 1214, 1224 (9th Cir. 2017) (noting that a requirement of specific factual findings "provides an important check on official discretion by facilitating

effective review of the official's determination and ensuring that the determination is properly limited in scope" (internal quotation marks, alterations, and citations omitted)); *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 802 (9th Cir. 2008) (striking down an ordinance because the "absence of clear standards in the Parade Ordinance, the lack of any decision-making trail for us to review and the absence of any administrative appeals process underscore the obvious risk that officials could engage" in unconstitutional discrimination); *Desert Outdoor Advert., Inc. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996) (striking down an ordinance in part because "officials can deny a permit without offering any evidence to support the conclusion that a particular structure or sign is detrimental to the community").

Thus, Plaintiffs have sufficiently alleged that both the High-Profile Speaker Policy and Major Events Policy are unconstitutional because they require administrators to engage in appraisal of facts, exercise of judgment, and formations of opinion absent any clear guidelines or discernable standards, and absent any accountability mechanisms.  Furthermore, Plaintiffs' allegations, if proven, would sufficiently demonstrate the high risk of viewpoint discrimination inherent in the Policies' grant to administrators of unchecked discretion over student-sponsored speech.

## B.   The University's Interest In Campus Safety Does Not Outweigh Plaintiffs' First Amendment Rights.

Public colleges and universities have a legitimate and important interest in ensuring that expressive activities do not compromise security and discipline on campus.  *Healy*, 408 U.S. at 189 ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").

However, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508; *see also Norton v. Discipline Committee of East Tenn. State Univ.*, 399 U.S. 906, 908 (1970) (applying *Tinker* in the university context).  There is no presumption that university officials will exercise their discretion in good faith to further that interest.  In fact, the Supreme Court has held that the very doctrine that prohibits state officials from exercising unbridled discretion over expressive activities also prohibits such a presumption.  Therefore, any limits on officials' discretion must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood*, 486 U.S. at 770; *see also Kunz v. New York*, 340 U.S. 290, 293 (1951).

California law contains an explicit requirement that time, place, and manner regulations on guest speakers "shall be content neutral and specified in advance," Doc. 32 ¶ 33 (quoting Cal. Code Regs. tit. 5, § 100004).  The Major Events Policy likewise provides that it is to be applied "without regard for perspectives or positions expressed in connection with those events." *Id.*, Ex. L, at 1.  However, without any discernable limits on administrative discretion, these commitments are empty promises.  As the Second Circuit noted in striking down a university speech policy, "the bare statement [of viewpoint neutrality] without meaningful protections is inadequate to honor its commands." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 104 (2d Cir. 2007).  Mere good intention does not save an unconstitutional policy. Accordingly, the mere recitation of viewpoint neutrality "does nothing to help courts identify covert viewpoint discrimination, nor does it prevent self-censorship by timid speakers who are worried that officials will discriminate against their unorthodox views notwithstanding constitutional proscriptions." *Id.*; *cf. Southworth*, 307 F.3d at 590 (upholding a policy because the viewpoint-discrimination prohibition in the policy was bolstered by procedural safeguards and an appeal process).

In sum, Plaintiffs have adequately alleged that neither the unwritten High-Profile Speaker Policy nor the written Major Events Policy meaningfully restricts the discretion of administrators in deciding which speakers and events are subject to those policies and the onerous restrictions that attach to them.  Because Plaintiffs have alleged that there are no narrow and objective criteria restricting that discretion and that there are no meaningful procedural protections to ensure that the discretion is appropriately exercised, they have stated a First Amendment claim.

## CONCLUSION

Plaintiffs' amended complaint adequately pleads that the University's speech restrictions violate the First Amendment, and therefore, at least to that extent, the Court should deny Defendants' motion to dismiss.


Dated:  January 25, 2018

Respectfully submitted,

JEFFERSON B. SESSIONS III
Attorney General

JOHN M. GORE
Acting Assistant Attorney General

  /s/ Tara Helfman
TARA HELFMAN
Senior Counsel
Civil Rights Division

STEVEN MENASHI
Acting General Counsel, Department of Education

THOMAS E. CHANDLER
Deputy Chief, Appellate Section

VIKRAM SWARUUP
Attorney, Appellate Section