1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| 9  YOUNG AMERICA'S FOUNDATION, et al.,<br>10                    Plaintiffs,<br>11         v.<br>12  JANET NAPOLITANO, et al.,<br>                    Defendants. | Case No.  17-cv-02255-MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 38 |

13

14          Before the Court is defendants' "Motion to Dismiss First Amended Complaint," filed

15  December 8, 2017.  Plaintiffs have filed opposition, to which defendants have replied.[1]

16  The matter came on regularly for hearing on February 16, 2018, after which, both parties

17  filed, with leave of Court, supplemental briefing.  The Court, having considered the

18  respective written submissions and the arguments of counsel at the hearing, rules as

19  follows.

20                                   **BACKGROUND[2]**

21          Plaintiffs Young America's Foundation ("YAF"), a "non-profit corporation whose

22  mission is to educate the public on the . . . hallmarks of conservative values" (see FAC

23  ¶ 14), and Berkeley College Republicans ("BCR"), a "[r]egistered [s]tudent [o]rganization"

24  (see id. ¶ 15) at the University of California, Berkeley ("the University"), scheduled for

25

26          _____

27          [1] Additionally, on January 25, 2018, the Attorney General filed on behalf of the United States a "Statement of Interest," to which defendants filed a "Response."

28          [2] The following facts are taken from the First Amended Complaint ("FAC").

United States District Court<br>Northern District of California

United States District Court
Northern District of California

February 1, 2017, an on-campus speaking engagement featuring Milo Yiannopoulos ("Yiannopoulos"), "a contentious conservative writer, speaker, and former senior editor of Breitbart News" (see id. ¶ 51) ("Yiannopoulos event").  "In the hours leading up to the [Yiannopoulos event], dozens of black-clad, masked agitators and demonstrators . . . , appearing to act in concert, set fires and threw objects at buildings in downtown Berkeley near the campus to protest [Yiannopoulos'] appearance," and entered "physical altercations . . . [with] those seeking to attend" the event.  (See id. ¶¶ 52-53.)  "[A]s a result of the violent demonstration," the University "canceled" the Yiannopoulos event and "instituted a nearly campus-wide 'lockdown.'"  (See id. ¶ 55.)

Thereafter, "[o]n or around March 1, 2017" (see id. ¶ 56) defendants, all University officials sued in their official and/or individual capacities, instituted an unwritten "High-Profile Speaker Policy" ("HPSP"), which policy was used to place various restrictions on two events hosted by plaintiffs, namely, speaking engagements featuring David Horowitz ("Horowitz"), a "prominent conservative writer" (see id. ¶ 60) ("Horowitz event"), and Ann Coulter ("Coulter"), a "conservative social and political commentator" (see id. ¶ 76) ("Coulter event").  Subsequently, on July 14, 2017, defendants instituted a written "Major Events Hosted by Non-Departmental Users" policy ("Major Events Policy" or "MEP"), a revised version of which was published on August 14, 2017, and used to place various restrictions on plaintiffs' speaking engagement featuring Benjamin Shapiro ("Shapiro"), a "renowned conservative political commentator and author" (see id. ¶ 14) ("Shaprio event").[3]

Based on the above events, plaintiffs challenge, pursuant to 42 U.S.C. § 1983, the

---

[3] At the February 16 hearing, although not in either their motion or reply, defendants, for the first time and without identifying any particular paragraph(s) in the FAC, argued that plaintiffs have pleaded the HPSP and MEP are "one and the same" (see Feb. 16, 2018 Hr'g Tr. 72:19.)  Plaintiffs, however, both in their papers and at the hearing, have consistently discussed the HPSP and MEP as two separate policies, and the Court, having reviewed the FAC, has located no clear allegation to the contrary.  Accordingly, for purposes of the instant order, the Court analyzes said policies separately.

constitutionality of the above-referenced policies and their application to plaintiffs' events. Specifically, plaintiffs assert the following four Claims for Relief: (1) "Violation of the First Amendment Right to Freedom of Expression," (2) "First Amendment Retaliation," (3) "Violation of the Fourteenth Amendment Right to Due Process," and (4) "Violation of the Fourteenth Amendment Right to Equal Protection."  By the instant motion, defendants move to dismiss the FAC in its entirety, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id.  Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

United States District Court
Northern District of California

1

2 **DISCUSSION**

To state a claim under § 1983, a plaintiff must allege facts sufficient to show the

3 defendant, acting "under color" of law, deprived such plaintiff of "rights, privileges, or

4 immunities secured by the Constitution" or laws of the United States. See 42 U.S.C.

5 § 1983. As noted, plaintiffs base their claims on defendants' alleged violation of plaintiffs'

6 First and Fourteenth Amendment rights. Defendants do not dispute that they were acting

7 under color of law, but contend plaintiffs have failed to allege any constitutional violation.

8 The Court addresses each asserted violation in turn.

9 **A.     First Amendment Freedom of Expression (First Claim for Relief)**

To determine whether defendants have violated plaintiffs' First Amendment rights,

10 the Court must first determine the nature of the forum here at issue.[4] The Ninth Circuit

11 has classified forums into four categories: (1) traditional public forums, (2) designated

12 public forums, (3) limited public forums, and (4) nonpublic forums. See OSU Student

13 Alliance v. Ray, 699 F.3d 1053, 1062 (9th Cir. 2012). Here, plaintiffs contend the

14 relevant forum is a designated public forum, while defendants contend said forum is a

15 limited public forum.

16

17 "The defining characteristic of a designated public forum is that it's open to the

18 same indiscriminate use, and almost unfettered access that exist in a traditional public

19 forum." See Seattle Mideast Awareness Campaign v. King Cty., 781 F.3d 489, 496 (9th

20 Cir. 2015) (internal quotations and citations omitted). A limited public forum, by contrast,

21 is open "to use by certain groups or dedicated solely to the discussion of certain

22 subjects." See Christian Legal Soc'y v. Martinez, 561 U.S. 661, 679 n.11 (2010). At the

23 February 16 hearing, the Court, for the reasons stated in detail on the record, found the

24 forum here at issue is a limited public forum.

25 In a limited public forum, government officials may not "discriminate against

26 _____

27     [4] For purposes of the instant order, the forum at issue comprises the campus
facilities made available to and/or requested by plaintiffs for purposes of hosting the
28 subject events.

speech on the basis of [their] viewpoint" or place restrictions on speech that are not

"reasonable in light of the purpose served by the forum."  See Rosenberger v. Rector &

Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995) (internal quotation and citation

omitted).

An ordinance or policy enforced in connection with a limited public forum may be

challenged either as unconstitutional on its face or as applied to a plaintiff's protected

conduct.  See Wright v. Incline Village Gen. Improvement Dist., 665 F.3d 1128, 1133,

1138-40 (9th Cir. 2011) (discussing facial and as-applied challenges to ordinance and

policy under which access to limited public forum restricted).  Here, plaintiffs contend, the

HPSP and MEP are unconstitutional both on their face and as applied.

### 1.  Facial Challenges

Where challenged under the First Amendment, an ordinance or policy is deemed

facially unconstitutional if "(1) it is unconstitutional in every conceivable application

because it . . . impermissibly restricts a protected activity or (2) it seeks to prohibit such a

broad range of protected conduct that it is unconstitutionally overbroad"  See Menotti v.

City of Seattle, 409 F.3d 1113, 1128 (9th Cir. 2005).[5]  In bringing a challenge based on

the former, i.e., on the basis that the ordinance "impermissibly restricts a protected

activity," see id., "a plaintiff seek[s] to vindicate his own constitutional rights," see Santa

Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1033 (9th Cir. 2006)

(internal quotation and citation omitted).  In bringing a challenge based on the latter, i.e.,

on the basis that the ordinance is "overbroad," see id., the plaintiff asserts that, although

the plaintiff's own "speech or expressive conduct may validly be prohibited or

sanctioned," the ordinance "threatens others not before the court," see id. (internal

quotation and citation omitted).

---

[5] Although, in support of their First Amendment claim, plaintiffs challenge the
HPSP and MEP as being unconstitutionally vague, such challenge "actually raises a due
process, as opposed to First Amendment, claim," see Hunt v. City of Los Angeles, 638
F.3d 703, 710 (9th Cir. 2011), and, consequently, the Court addresses this additional
ground in Section C.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Court next addresses plaintiffs' facial challenges to each of the above-

2  described policies.

3              **a.  High-Profile Speaker Policy**

4    Plaintiffs contend the HPSP impermissibly restricts protected speech by affording

5  University officials "unbridled discretion" to impose time, place, and manner restrictions

6  on the Horowitz and Coulter events.[6]

7    In support thereof, plaintiffs allege the HPSP, an "unwritten and unpublished"

8  policy (see FAC ¶ 2), required all events involving "high-profile" speakers to "conclude by

9  3:00 p.m." and be held in "securable" locations (see id. ¶ 56), and, further, enabled

10  University officials to impose "security fee[s] . . . as a matter of discretion" (see id. ¶ 69).

11  Additionally, plaintiffs allege, "neither the University nor [d]efendants . . . set forth the

12  exact nature and scope of the [HPSP], despite requests from [p]laintiffs," or "provid[ed]

13  any criteria making clear who [was] considered a 'high-profile' speaker[,] . . . to whom [the

14  HPSP] [had] been applied[,] . . . or what, if anything, render[ed] a particular venue . . .

15  'securable.'"  (See id. ¶ 56.)

16    At the hearing, defendants, citing dicta in Ward v. Rock Against Racism, 491 U.S.

17  781 (1989), argued, for the first time, that an "unbridled discretion" challenge is improper

18  where, as here, the challenged policy does not afford discretion to deny expressive

19  activity, but only to impose time, place, and manner restriction on such activity.  See id. at

20  793-94 (noting "it is open to question" whether claim based on discretion to regulate, but

21  not to deny, speech can support facial challenge; further noting "[o]ur cases permitting

22  facial challenges . . . have generally involved licensing schemes that ves[t] unbridled

23  discretion . . . to permit or deny expressive activity") (internal quotation and citation

24  _____

25         [6] To the extent plaintiffs continue to assert a facial challenge based on
   overbreadth, plaintiffs' claim is subject to dismissal for the reason that damages "are
26  unavailable for an overbreadth challenge," see Outdoor Media Grp., Inc. v. City of
   Beaumont, 506 F.3d 895, 901, 907 (9th Cir. 2007), and plaintiffs no longer have a viable
27  claim for declaratory or injunctive relief, as the HPSP has been superseded by the MEP,
   see id. (finding declaratory and injunctive relief claims rendered moot by repeal of
28  ordinance).

omitted) (second alteration in original).

The Ninth Circuit, however, has permitted facial challenges based solely on time, place, and manner restrictions, at least where the challenged provision has, in practice, been enforced "as though it authorize[d] denying permits."  See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle, 550 F.3d 788, 795 (9th Cir. 2008) (hereinafter, "Seattle Affiliate") (allowing facial challenge to proceed where parade ordinance provided no discretion to deny permit for street parade but was enforced as though police had authority to rescind permit and require group to use sidewalk).[7]

Here, plaintiffs allege that defendants "informed" them the Coulter event "could not proceed" if defendants could not locate a "'securable' venue" (see FAC ¶ 85), and, thereafter, "claiming that [they] could not secure a room[,] . . . cancel[ed] the event" (see id. ¶ 98).  Given such allegation, the Court finds plaintiffs are not precluded from proceeding on their facial challenge, and, accordingly, next turns to the merits of the claim.

As discussed above, plaintiffs allege in the FAC that the HPSP includes no standards, either through the policy's terms or its history of enforcement, to limit any implementing officials' discretion; as plaintiffs further point out, the HPSP provides, for example, no standard for determining what events fall under the policy, at what locations events may be held, and what, if any, security fee may be imposed.  Such allegations are sufficient to plead a facial challenge based on unbridled discretion.  See OSU Student Alliance, 699 F.3d at 1064-65 (finding "[t]he fact that the 'policy' was not written or otherwise established by practice meant there were no standards by which the officials could be limited"); see also Kaahumanu v. Hawaii, 682 F.3d 789 (9th Cir. 2012) (holding

_____

[7] After Seattle Affiliate, the Ninth Circuit allowed a facial challenge to proceed, apparently without the above-discussed issue having been raised, where an "unwritten" and "unannounced" policy limited the university campus locations at which the plaintiffs could disseminate their student paper but did not entirely preclude such dissemination. See OSU Student Alliance, 699 F.3d at 1057-58, 1064-65 (finding policy impermissibly afforded university officials "unbridled discretion").

1 prohibition against viewpoint discrimination in limited public forum "includes the

2 prohibition on a licensing authority's unbridled discretion").

3 **b.  Major Events Policy**

4 Plaintiffs contend the MEP is facially unconstitutional because, according to

5 plaintiffs, it affords University officials "unbridled discretion" to impose time, place, and

6 manner restrictions on the Shapiro event and is overbroad.[8]  Although the MEP, on its

7 face, provides only for restriction, and not denial, of speech, the Court, for purposes of

8 the below discussion, and while questioning plaintiffs' ability to proceed with their facial

9 challenge, see Ward, 491 U.S. at 793-94, will assume plaintiffs are not precluded from

10 doing so.

11 **(1)  Unbridled Discretion**

12 Plaintiffs bring their challenge on three separate grounds.  First, plaintiffs contend

13 three of the seven criteria used to designate an event as a "Major Event," thereby

14 bringing the event within the scope of the policy, are not sufficiently definite to limit the

15 University's discretion in making such designation.  Second, plaintiffs contend that once

16 an event is deemed covered thereunder, the MEP fails to sufficiently constrain the types

17 of restrictions that may be imposed, or the circumstances under which any such

18 restrictions may be imposed.  Third, plaintiffs contend the MEP permits the imposition of

19 unconstitutionally high security fees.[9]

20 At the February 16 hearing, the Court, for the reasons stated on the record, found

21 plaintiffs' second and third grounds unpersuasive, and, as to the first ground, found two of

22 _____

23 [8] As noted, plaintiffs' challenge on grounds of vagueness will be addressed in
Section C.

24

25 [9] To the extent plaintiffs also contend the MEP affords University officials
"unbridled discretion" to "refuse to approve the use of promotional materials both on and
26 off campus, including any effort to publicize an event online, through social media" (see
Opp. at 27:2-4), such contention is unsupported by the FAC and exhibits attached thereto
27 (see FAC Ex. L at 5 (requiring student organizations to submit publicity material to
University for purpose of University's "verify[ing] that event details (such as date, time,
28 and location) are accurate")).

United States District Court
Northern District of California

the three challenged criteria used to define the term "Major Event" are sufficiently definite.[10]  Although the Court questioned the constitutionality of the remaining criterion, by which "Major Event" is defined as an event for which "[a]uthorized campus officials determine that the complexity of the event requires the involvement of more than one campus administrative unit" (see FAC Ex. L at 2) (hereinafter, "Complexity Provision"), plaintiffs' facial challenge, to the extent based thereon, nonetheless is unavailing for two reasons.  First, as discussed in Section E, defendants are entitled to qualified immunity as to any claim for damages resulting from defendants' implementation of said criterion. Second, plaintiffs' claims for declaratory and injunctive relief thereon are moot, as, on January 9, 2018, the University issued a final version of the MEP ("January 9 policy"),[11] in which the Complexity Provision has been revised. See Outdoor Media, 506 F.3d at 901, 907 (holding plaintiff's declaratory and injunctive relief claims rendered moot by repeal of ordinance); see also ASU Students For Life v. Crow, 357 F. App'x 156, 158 (9th Cir. 2009) (holding plaintiff's claims for declaratory and injunctive relief rendered moot by university's issuance of "revis[ed]" policy).[12]

### (2)   Overbreadth

A facial challenge may be brought, and a policy "invalidated as overbroad[,] if a substantial number of its applications are unconstitutional, judged in relation to the

---

[10]  The Court found sufficiently definite the following two criteria: (1) "Authorized campus officials determine that the event is likely to significantly affect campus safety and security (based on assessment from the University of California Police Department, hereafter UCPD) or significantly affects campus services (including kiosk guards, service roads, or parking)"; and (2) "Authorized campus officials determine that the event has a substantial likelihood of interfering with other campus functions or activities."  (See FAC Ex. L at 2).

[11]  Defendants' request for judicial notice of the "Major Events Hosted by Non-Departmental Users" policy adopted January 9, 2018 (see Heckenlively Decl., filed March 2, 2017, Ex. 1) is hereby GRANTED.  See Esquivel v. San Francisco Unified Sch. Dist., 630 F. Supp. 2d 1055, 1057 n.2 (N.D. Cal. 2008) (taking judicial notice of school board policy).

[12]  In so finding, the Court makes no determination as to the constitutionality of the Complexity Provision as revised.

United States District Court
Northern District of California

[policy]'s plainly legitimate sweep." See United States v. Stevens, 559 U.S. 460, 473 (2010) (internal quotation and citation omitted).  Here, plaintiffs' overbreadth challenge to the MEP rests on the same alleged deficiencies as their unbridled discretion challenge, and, as set forth below, fails.

In order to bring an overbreadth challenge, a plaintiff must establish: (1) there is a "realistic danger" that the ordinance will "significantly compromise recognized First Amendment protections of parties not before the [c]ourt"; and (2) "the ordinance will have a[] different impact on . . . third parties' interests in free speech than it has on" the plaintiff's.  See Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S 789, 801 (1984).

Here, in light of the University's issuance of the January 9 policy, the Court need not resolve the parties' respective arguments as to plaintiffs' standing, as plaintiffs' overbreadth claim is moot.  See Outdoor Media, 506 F.3d at 901, 907 (holding damages "are unavailable for an overbreadth challenge"; further holding repeal of ordinance rendered plaintiff's declaratory and injunctive relief claims moot); see also ASU Students For Life, 357 F. App'x at 158 (holding plaintiff's claims for declaratory and injunctive relief rendered moot by university's issuance of "revis[ed]" policy).

### c.      Conclusion: Facial Challenge

Accordingly, for the reasons set forth above, to the extent plaintiffs' First Claim for Relief is based on a facial challenge to the HPSP, such claim is not subject to dismissal.

### 2.  As-Applied Challenges

As noted, the forum here at issue is a limited public forum, and, consequently, the restrictions imposed on the Horowitz, Coulter, and Shapiro events must have been viewpoint neutral and "reasonable in light of the purpose served by the forum."  See Rosenberger, 515 U.S. at 829.  Plaintiffs contend the subject restrictions fail to meet either requirement.

### a.  Viewpoint Discrimination

To establish viewpoint discrimination, a plaintiff bringing an as-applied challenge

must show the government restricted protected speech "*because of* not merely in spite of," the speaker's point of view.  See Moss v. U.S. Secret Service, 572 F.3d 962, 970 (9th Cir. 2009) (emphasis in original); Seattle Mideast Awareness Campaign, 781 F.3d at 502 (holding plaintiff must show "the government intended to suppress expression merely because public officials oppose the speaker's view") (internal quotation and citation omitted).[13]

Here, plaintiffs contend, viewpoint discrimination may be inferred from public statements made by three University officials, and, according to plaintiffs, the fact that, on dates close to those on which the Horowitz and Coulter events were scheduled to be held, two "liberal" speakers were permitted to speak on campus "without incident or interference from [d]efendants."  (See FAC ¶¶ 160-61.)  The Court is unpersuaded.

### (1)    University Officials' Statements

Plaintiffs contend viewpoint discrimination is evidenced by statements made by the Chancellor of the University, Carol Christ ("Chancellor Christ"), a University Provost, Paul Alivisatos ("Provost Alivisatos"), and the Vice Chancellor of Finance, Rosemarie Rae ("Vice Chancellor of Finance Rae"), all said statements made in September 2017, the month Shapiro was scheduled to speak.

First, in an interview with the Los Angeles Times, Chancellor Christ, in response to a question concerning "the most controversial speaker in [her] time at Berkeley," stated that a speaker "who denied the Holocaust" came to campus "in the 90's," that the University "had him speak in a small, really out-of-the-way room as a way of protecting the campus," and that "[t]he legal advice [they've] been getting now" is that, if available,

---

[13] To the extent plaintiffs contend defendants' actions amount to a "heckler's veto," by which "listeners react to speech based on its content and the government then ratifies that reaction by restricting the speech in response to listeners' objections," see Santa Monica Nativity Scenes Comm. v. City of Santa Monica, 784 F.3d 1286, 1292 (9th Cir. 2015), such argument is unavailing, as the doctrine has "no relevance in a limited public forum" except to the extent a defendant's "claimed fear of a hostile audience reaction" can be shown to be a "mere pretext for suppressing expression because public officials oppose the speaker's point of view."  See Seattle Mideast Awareness Campaign, 781 F.3d at 502.  As discussed below, plaintiffs have failed to allege any such pretext.

1   they "can't deny [a more desirable] room to speakers on the basis of their viewpoints."

2   (See id. Ex. U at 4).

3       Chancellor Christ's remarks, however, particularly when read in the context of the

4   subject of the interview as a whole, make clear that the University's assignment of that

5   more remote and smaller venue was driven by safety concerns.  (See, e.g., id. Ex. U at 1

6   (reporter's introductory paragraph beginning, "UC Berkeley . . . has become the nation's

7   most prominent stage for violent confrontations between the left and the right";

8   continuing, "campus is spending hundreds of thousands of dollars in security costs to

9   prevent violence"); see also id. (stating Chancellor Christ "said a 'combustible mix' of

10  changing youth sensibilities, political polarization and the choice of university campuses

11  as battlegrounds has made protecting free speech more fraught than ever").)  In other

12  words, the venue was chosen in spite of, not "*because of*," the speaker's point of view.

13  See Moss, 572 F.3d at 970 (emphasis in original).  Further, even if the statement can be

14  read to describe viewpoint discrimination in the past, the statement provides no support

15  for an inference that the University engaged in viewpoint discrimination at any time

16  relevant to the instant action.  Indeed, as noted, Chancellor Christ states therein that

17  such practice is inconsistent with the University's current policy (see FAC Ex. U at 4) and,

18  at the beginning of the above-referenced interview, she states that, while she may

19  disagree with the viewpoints of speakers, such as Ben Shapiro, she "believe[s] very

20  strongly" in their "right to speak on campus" (see id. at 1).

21      Plaintiffs' reliance on statements made by Provost Alivisatos and Vice Chancellor

22  of Finance Rae is similarly unavailing.  Plaintiffs allege that, "[i]n the days leading up to

23  the Shapiro [e]vent," Provost Alivisatos "emailed the student body and employees,"

24  stating: "'We are deeply concerned about the impact some speakers may have on

25  individuals' sense of safety and belonging.  No one should be made to feel threatened or

26  harassed simply because of who they are or for what they believe.'"  (See FAC ¶ 153.)

27  Next, plaintiffs allege that, "at the outset of the Shapiro [E]vent," Vice Chancellor of

28  Finance Rae stated: "[A]t UC Berkeley, we respect the action and intention of public

United States District Court
Northern District of California

protest . . . [University police] and the campus *will be making decisions* about how disruptions at this event will be addressed."  (See id. ¶ 154 (emphasis in original).)

Plaintiffs have not alleged, however, any facts to show either such individual had any authority as to the restrictions that were placed on plaintiffs' events, and neither statement suggests either such individual, on his/her own behalf or on behalf of any of the defendants, sought to restrict Shapiro's speech in any way, let alone "because of" Shapiro's point of view.  Rather, the above-referenced statements reflect a not unfounded concern for safety, as well as a need for flexibility in responding to any potential disruption occurring at the time of the Shapiro event.  Indeed, plaintiffs themselves voiced concerns about the possibility of a "violent outbreak" at the Shaprio event.  (See id. Ex. Q (email from Berkeley College Republicans to University police, "request[ing] information on how [University police] plan[ned] to respond in the case of a violent outbreak surrounding the Ben Shapiro event").)

### (2)    Differential Treatment

Plaintiffs also contend viewpoint discrimination may be inferred from defendants' more favorable treatment of two "liberal speakers" (see FAC ¶ 4), who spoke on campus on dates close to those of the scheduled Horowitz and Coulter events.  Specifically, plaintiffs allege that defendants, citing "security concerns" (see id. ¶ 61) imposed on the Horowitz and Shapiro events, an undesirable 3:00 p.m. curfew, along with security fees and venue restrictions, whereas "the former president of Mexico," Vicente Fox Quesada ("Fox"), was permitted to "speak on campus at 4:00 p.m. to hundreds of people, without incident or interference from [d]efendants" (see id. ¶ 160), and Maria Echaveste, "former presidential advisor and White House Deputy Chief of Staff to President Bill Clinton," was "not subjected" to the HPSP and was permitted to speak at a central location on campus from 6:45 p.m. to 8:00 p.m., "without incident or interference from [d]efendants" (see id. ¶¶ 98, 161).

Any inference of viewpoint discrimination is, however, soundly negated by plaintiffs' allegation that, before violence spurred an increased concern for security,

Yiannopoulos, "a contentious conservative writer [and] speaker," obtained "all necessary approval" to speak on campus, and plaintiffs have not alleged that any restrictions were imposed in connection with that approval.  (See id. ¶ 51.)  Moreover, the FAC includes numerous allegations setting forth defendants' repeated explanation that the restrictions imposed on plaintiffs' events were prompted by safety concerns, and there are no allegations suggesting those concerns were unfounded, or that the Fox and Echaveste events raised any security concerns, let alone concerns that rose to the level of those that surrounded plaintiffs' events.  (See, e.g., FAC ¶ 67 (alleging plaintiffs received, in advance of Horowitz event, email from Stephen Sutton, University Vice Chancellor for Division of Student Affairs ("Vice Chancellor Sutton"), explaining time and venue location restrictions were implemented to "mitigate risk [and] ensure safety for all"); ¶ 103 (alleging plaintiffs received, in advance of Coulter event, email from Ellen Topp, Interim Chief of Staff for Student Affairs, explaining, "[campus] police department has made it clear that they have very specific intelligence regarding threats that could pose a grave danger to [Coulter], attendees, and those who may wish to lawfully protest the event"); ¶ 150 (alleging plaintiffs received, in advance of Shapiro event, email from Vice Chancellor Sutton, explaining closure of venue's balcony due to recent "'violent incidents in the City of Berkeley'"); see also id. Ex. A (email from Vice Chancellor Scott Biddy and Vice Chancellor Sutton) (stating University police "determined that, given currently active security threats, it is not possible to assure . . . the safety of Ms. Coulter, the event sponsors, audience, and bystanders"); Ex. T (decision from Vice Chancellor for Undergraduate Education Catherine Koshland on BCR's appeal of balcony closure for Shapiro event) (upholding decision to close balcony; explaining, in light of recent violence in Berkeley, "the balcony poses an unnecessary risk to safety and security, even with perimeter security measures in place").)

### b.  Reasonableness of Restrictions

As discussed above, any restrictions, in addition to being viewpoint neutral, must be "reasonable in light of the purpose served by the forum."  See Rosenberger, 515 U.S.

14

at 829.

Here, the University made the subject campus facilities available "to enabl[e] student organizations and other groups to host a variety of events on campus and thereby to supplement and enrich students' educational experience." (See FAC Ex. L at 1.) The Court thus analyzes the challenged restrictions in light of such purpose, which restrictions, as noted, are the security fees, curfews, venue options, and attendance limitations placed on the Horowitz, Coulter, and Shapiro events.

At the outset, the Court acknowledges that a reasonable restriction "need not be the most reasonable or the only reasonable limitation," see Seattle Mideast Awareness Campaign, 781 F.3d at 501, and that, with regard to security fees, government officials may, as defendants point out, "properly impose fees consistent with the First Amendment" (see Reply at 10:18-19 (citing Cox v. State of New Hampshire, 312 U.S. 569, 577 (1941)). Any such fees, however, must be limited to the costs incurred in administering the event. See Sullivan v. City of Augusta, 511 F.3d 16, 38 (1st Cir. 2007) (noting "[t]he Supreme Court has held that the government cannot profit from imposing licensing or permit fees on the exercise of a First Amendment right; further noting, "[o]nly fees that cover the administrative expenses of the permit or license are permissible") (citing Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1943); Cox, 312 U.S. at 577). As set forth below, the Court finds plaintiffs have sufficiently alleged a First Amendment violation based on the imposition of an unreasonable fee.[14]

First, plaintiffs allege defendants charged a $5788 "security fee" for the Horowitz event (see FAC ¶ 68), which fee was imposed under the HPSP, a policy alleged to be wholly lacking in standards by which the basis for such fee, let alone the reasonableness thereof, could be assessed. Next, plaintiffs allege, defendants, under the MEP, initially imposed a $15,738 "security fee" for the Shapiro event, which fee was "approximately

---

[14] In light of such finding, and given that the parties have not addressed the constitutionality of each alleged restriction separately, the Court does not address herein the reasonableness of the remaining restrictions.

three times the amount charged . . . for an event featuring Supreme Court Justice Sonia Sotomayor in the same facility in 2011." (See id. ¶ 142.)  Although, as plaintiffs further allege, the fee subsequently was reduced to $9162 after defendants closed access to the venue's balcony area and thereby reduced audience capacity "from over 1,900, to just over 1,042" (see FAC ¶¶ 141, 143, 150), the fee ultimately charged for the Shapiro event, even adjusting for inflation, remains substantially above a fee of approximately $5000 for the Sotomayor event, which, in addition, may have involved a larger potential audience as there is no allegation that the balcony was closed for that event.

In the absence of a pleaded explanation for any of the fees imposed, and where, as here, an explanation is not otherwise apparent,[15] such allegations suffice to support an as-applied challenge.

### c.       Conclusion: As-Applied Challenges

Accordingly, for the reasons set forth above, to the extent plaintiffs' First Claim for Relief asserts an as-applied challenge predicated on the alleged unreasonableness of the restrictions imposed, the claim is not subject to dismissal.

## B.       First Amendment Retaliation (Second Claim for Relief)

"The First Amendment forbids government officials from retaliating against individuals for speaking out."  See Blair v. Bethel Sch. Dist., 608 F.3d 540, 543 (9th Cir. 2010).  To allege a First Amendment retaliation claim, a plaintiff must show "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct."  See Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 770 (9th Cir. 2006).

Here, plaintiffs contend defendants' actions were taken in retaliation for plaintiffs'

_____

[15] Any safety concerns, for example, cannot be used to explain the difference between the fees charged for the Shaprio and Sotomayor events; pursuant to the MEP, "security fees [may] not be charged to event sponsors based on concerns that the subject matter of the event or the viewpoints, opinions, or anticipated expression of the sponsors, event performers, or others participating in the event might provoke disturbances or response costs required by such disturbances."  (See id. Ex. L at 9.)

United States District Court
Northern District of California

"holding and expressing conservative viewpoints by inviting conservative speakers to speak on the [University] campus" (see Compl. ¶ 183), in particular, plaintiffs' having "engaged in a protected activity by inviting Milo Yiannopoulos to speak on campus" (see Opp. at 21:16-17).  The Court is not persuaded.

As discussed above, plaintiffs have pleaded the undisputed factual circumstances prompting defendants' safety concerns, and have alleged no facts supporting a finding of discrimination or other animus.  (See, e.g., FAC ¶¶ 52-55, 67, 86, 92, 103, 150 & Exs. A, Q.)  Consequently, as the factual allegations provide a "more likely explanation[]" than that asserted by the plaintiff, the complaint fails to state a "plausible" claim.  See Iqbal, 556 U.S. at 681-82.

Accordingly, plaintiffs' Second Claim for Relief is subject to dismissal.

## C.   Fourteenth Amendment Due Process (Third Claim for Relief)

To support their Third Claim for Relief, which, as noted above, is based on an allegation that each of the challenged policies is "impermissibly vague" (see Opp. at 23:15), plaintiffs must show (1) "a deprivation of a constitutionally protected interest," and (2) that "the deprivation was achieved by means of [the] constitutionally vague policy or procedure."  See Williams v. Vidmar, 367 F. Supp. 2d 1265, 1274 (N.D. Cal. 2005) (citing Zinermon v. Burch, 494 U.S. 113, 125 (1990)).  A policy or procedure is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  See United States v. Williams, 553 U.S. 285, 304 (2008).

### 1.  High-Profile Speaker Policy

As noted, plaintiffs allege the HPSP is "unwritten and unpublished" (see FAC ¶ 2), and that defendants "failed to provide any criteria making clear who is considered a 'high-profile' speaker under the policy; to whom this policy has been applied since its formation; or what, if anything, renders a particular venue on the UC Berkeley campus 'securable'" (see id. ¶ 56).  As alleged, the HPSP thus is wholly lacking in standards to guide enforcement, and, consequently, fails to give "fair notice," see Williams, 553 U.S. at

1    304, of what conduct falls within the policy's scope.

2        Accordingly, to the extent plaintiffs' Third Claim for Relief is based on a challenge

3    to the HPSP, such claim is not subject to dismissal.

4        **2. Major Events Policy**

5        In bringing a Due Process challenge, "[a] plaintiff who engages in some conduct

6    that is clearly proscribed cannot complain of the vagueness of the law as applied to the

7    conduct of others."  See Holder v. Humanitarian Law Project, 561 U.S. 1, 20 (2010).  As

8    noted above, the Court has found the challenged portions of the MEP, with the possible

9    exception of the Complexity Provision, to be sufficiently definite.  To the extent plaintiffs'

10   vagueness challenge is based on the Complexity Provision, such claim is unavailing, as

11   the parties agree that the Shapiro event, the one event sponsored by plaintiffs to which

12   the MEP was applied and for which plaintiffs requested a room large enough to

13   accommodate at least 500 attendees (see FAC ¶ 133), would have been classified as a

14   "Major Event" regardless of the Complexity Provision (see id. Ex. L at 2 (defining "Major

15   Event" to include any event for which "[o]ver 200 persons are anticipated to attend")).

16       Accordingly, to the extent plaintiffs' Third Claim for Relief is based on a challenge

17   to the MEP, such claim is subject to dismissal.

18   **D.    Fourteenth Amendment Equal Protection (Fourth Claim for Relief)**

19       As discussed above, plaintiffs' First Amendment claim is not wholly subject to

20   dismissal.  Once a plaintiff has sufficiently pleaded a First Amendment violation, such

21   plaintiff, in order to state an Equal Protection claim, must show he/she was treated

22   differently than another person, that the two "are in all relevant respects alike," see

23   Nordlinger v. Hahn, 505 U.S. 1, 10 (1992), and that such differential treatment was not

24   "finely tailored to serve substantial interests," see A.C.L.U of Nevada v. City of Las

25   Vegas, 466 F.3d 784, 798 (9th Cir. 2006) (holding strict scrutiny applies to Equal

26   Protection claim where government action has infringed First Amendment rights).

27       Here, plaintiffs base their Equal Protection claim on the above-described

28   differences between the manner in which their events were handled and the manner in

United States District Court
Northern District of California

which the Fox, Echaveste, and Sotomayor events were handled.  As set forth above in Section A, plaintiffs have failed to allege they and the hosts of the Fox and Echaveste events were "in all relevant respects alike."  See Nordlinger, 505 U.S. at 10.  Plaintiffs have, however, for the reasons also set forth in Section A, alleged sufficient facts to show plaintiffs and the hosts of the Sotomayor event were, with regard to the fees imposed on the Shapiro and Sotomayor events, similarly situated, and, given the substantial difference in those fees, without any explanation discernible from the facts alleged in the complaint or otherwise apparent, the Court finds plaintiffs have pleaded sufficient facts to state an Equal Protection Claim based thereon.

Accordingly, plaintiffs' Fourth Cause of Action, to the extent based on the Fox and Echaveste events, is subject to dismissal, and, to the extend based on the Sotomayor event, is not subject to dismissal.

**E.      Qualified Immunity**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation and citation omitted).  A "clearly established" right is one "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  See id. (internal quotation and citation omitted).  Although there need not be a case "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."  See id. (internal quotation and citation omitted).

Here, to the extent plaintiffs assert a claim for damages based on the Complexity Provision, the Court finds defendants are entitled to qualified immunity.  Although, as discussed at the February 16 hearing, such provision could be deemed impermissibly vague and to afford an impermissible amount of discretion, its wording is not so deficient that "every reasonable official would have understood" it to be unconstitutional.  Indeed, plaintiffs have not cited, and the Court has not found, any authority placing the provision's

1   constitutionality "beyond debate."  See id.; Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)

2   (holding qualified immunity "gives government officials breathing room to make

3   reasonable but mistaken judgments about open questions of law"); see also Reichle v.

4   Howards, 566 U.S. 658, 664 (2012) (holding "courts may grant qualified immunity on the

5   ground that a purported right was not 'clearly established' by prior case law, without

6   resolving the often more difficult question whether the purported right exists at all").

7        As to plaintiffs' remaining claims, although the Supreme Court has "stressed the

8   importance of resolving immunity questions at the earliest possible stage in litigation,"

9   see Pearson v. Callahan, 555 U.S. 223, 232 (2009), the Court, in light of unresolved

10  factual issues pertaining to defendants' stated security concerns, finds it preferable to

11  defer resolution of the immunity question until the record is more fully developed.

12  **F.    Punitive Damages**

13       A plaintiff alleging a § 1983 violation pleads a claim for punitive damages where

14  the complaint includes facts sufficient to show the defendant's conduct was "motivated by

15  evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally

16  protected rights of others."  See Smith v. Wade, 461 U.S. 30, 56 (1983).  Here,

17  defendants contend plaintiffs have failed "to allege sufficient facts" to support an award of

18  punitive damages.  (See Reply at 18:18.)[16]  The Court agrees.

19       As discussed above, plaintiffs have failed to plead facts sufficient to show

20  defendants were motivated by viewpoint discrimination or retaliatory animus.  The FAC

21  contains no alternative factual basis for a finding of improper motive, nor does it allege

22  any facts sufficient to show defendants acted with "reckless or callous indifference" to

23  plaintiffs' rights.

24  _____

25       [16] Contrary to plaintiffs' contention, a claim for damages, "by itself" (see Opp. at 30:8), can be dismissed pursuant to Rule 12(b)(6) where such dismissal is based on a

26  failure to allege sufficient facts to support recovery.  See Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974 (9th Cir. 2010) (holding motion pursuant to Rule 12(b)(6), rather

27  than 12(f), proper vehicle for challenging claim for damages at pleading stage); Williams v. Cty. of Alameda, 26 F. Supp. 3d 925, 948-49 (N.D. Cal. Feb. 10, 2014) (dismissing

28  claim for punitive damages pursuant to Rule 12(b)(6)).

United States District Court
Northern District of California

Accordingly, plaintiffs' claim for punitive damages is subject to dismissal.

**CONCLUSION**

For the reasons set forth above, defendants' motion is hereby GRANTED in part and DENIED in part as follows:

1.  As to plaintiffs' First Claim for Relief, to the extent such claim is based on a facial challenge to the MEP, the motion is hereby GRANTED, and, to the extent such claim is based on a facial challenge to the HPSP, and asserts an as-applied challenge to the HPSP and MEP predicated on the alleged unreasonableness of the restrictions imposed, the motion is hereby DENIED.

2.  As to plaintiffs' Second Claim for Relief, the motion to dismiss is hereby GRANTED.

3.  As to plaintiffs' Third Claim for Relief, to the extent such claim is based on a challenge to the MEP, the motion is hereby GRANTED, and, to the extent such claim is based on a challenge to the HPSP, the motion is hereby DENIED.

4.  As to plaintiffs' Fourth Claim for Relief, to the extent such claim is based on the Fox and Echaveste events, the motion is hereby GRANTED, and, to the extent such claim is based on the Sotomayor event, the motion is hereby DENIED.

5.  As to plaintiffs claim for punitive damages, the motion is hereby GRANTED.

**IT IS SO ORDERED**

Dated: April 25, 2018

MAXINE M. CHESNEY
United States District Judge

United States District Court
Northern District of California